FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

2017 MAR -2 PM 3: 02

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

CASE NO.

6:17-cv-364-Orl-37TBS

CS BUSINESS SYSTEMS, INC., a foreign for-
profit corporation, JAMES L. SHELTON AND
VIRGINIA L. SHELTON, husband and wife,
BRAD HECKENBERG AND LANA C.
HECKENBERG, husband and wife, PJS RENTAL,
LLC, a foreign limited liability company, WON Y.
SHIN TRUST, WON Y. SHIN TRUSTEE,
BART SUTHERIN AND KATHRYN SUTHERIN,
husband and wife, ITZ GROUP, LLC, a foreign
limited liability company,

**COMPLAINT FOR CIVIL ACTION**

        Plaintiffs,

**TRO AND INJUNCTIVE**
**RELIEF SOUGHT**

v.

**CLASS ACTION**

DWIGHT C. SCHAR, PAUL E. SIMONSON,
DCS INVESTMENTS HOLDINGS GP, LLC,
DCS REAL ESTATE INVESTMENTS, LLC, a
Virginia and Florida Limited Liability Company, DCS
REAL ESTATE INVESTMENTS, LLC, a Florida Limited
Liability Company, DCS REAL ESTATE INVESTMENTS
I, LLC, a Florida Limited Liability Company, DCS REAL
ESTATE INVESTMENTS II, LLC, a Florida Limited
Liability Company DCS REAL ESTATE INVESTMENTS
III, LLC, a Florida Limited Liability Company DCS REAL
ESTATE INVESTMENTS IV, LLC, a Florida Limited
Liability Company DCS REAL ESTATE INVESTMENTS
IV-A, LLC, a Florida Limited Liability Company DCS
REAL ESTATE INVESTMENTS V, LLC, a Florida
Limited Liability Company BELLA COLLINA PROPERTY
OWNERS ASSOC., INC., DAVID BURMAN, AEGIS
COMMUNITY MANAGEMENT SOLUTIONS, INC., a
Florida for-profit corporation, RANDALL F. GREENE,
KEITH CLARKE, PAUL LEBREUX, RICHARD C.
ARRIGHI, JAMES D. RYAN, MICHAEL J. RYAN,
THE RYAN LAW GROUP, LLC, CULLEN D'AMBROSIO,
ROCKING RED H, LLC, RICKY L. SCHARICH, BELLA
COLLINA TOWERS, LLC
        Defendants,

_____/

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CS BUSINESS SYSTEMS, INC., a  foreign for-profit corporation, at al.,
                  Plaintiffs,

v.

DWIGHT C. SCHAR, et al.
                  Defendants,

_____/

**CASE NO._____**

**COMPLAINT FOR
CIVIL ACTION**

## PRELIMINARY STATEMENT

Plaintiffs, by and through their undersigned counsel, hereby sue the above-captioned Defendants, alleging that they conspired to illegally seize control of the Bella Collina Property Owners Association, Inc., a Florida Nonprofit Corporation (Hereinafter the "POA"). The Defendants used this control to commit illegal acts for the purpose of extorting land, homes and money from lot owners and embezzling the assets and economic opportunities of the POA.

In 2012, the Defendants conspired to create a monopoly in the sale and development of real estate in Bella Collina. An essential element of this Conspiracy was the destruction of property values, forcing owners to abandon lots and homes to business entities controlled by the Conspirators. The Defendants illegally usurped control of the POA. The POA, without member authorization, then filed 400 fraudulent lawsuits for the collection of invalid special assessments, which coerced lot owners to surrender their lots. DCS then used control of the POA to write-off the assessments, obtaining unencumbered title to POA members' lots to the detriment of the POA and the community.

The Defendants violated fiduciary duties and committed illegal actions, including the recordation of false legal documents, the mailing of false assessment statements, the violation of lot owners' legal rights and the constant harassment of lot owners.  The Conspirators succeeded in acquiring approximately 600 lots and a number of luxurious homes from the targeted owners, for little or no payment, and a monopoly of over eighty percent (80%) of all properties.  They use this monopoly to manipulate prices to the detriment of the remaining non-developer lot owners and to the benefit of the conspiracy.

The Paintiffs seek a Temporary Restraining Order to prevent the Defendants from illegally asserting control of the POA.  They then seek an injunction and the Appointment of a Receiver to return control of the POA to the non-developer lot owners through a fair election as required by Court Order, the Governing Documents and statutory law, satisfying the important public policy of creating self-governing communities.  Finally, they seek class certification, creation of a Constructive Trust, an accounting, and compensatory damages for the POA and the class members, plus treble damages, punitive damages, attorney fees and court costs to remedy the damage caused by the destructive conduct of the Conspirators.

The Plaintiffs seek this relief in accordance with the provisions of The Racqueteer Influenced Corrupt Organizations Act, the Sherman Clayton Antitrust Acts, the Fair Debt Collection Practices Act and related Florida statutory and common law causes of action.

## PARTIES

1.     The named Plaintiffs own lots in Bella Collina, a planned, gated, residential community located in Montverde, Lake County, Florida, which consists of 801 lots and is governed by the Bella Collina Property Owners Association, Inc. (hereinafter the "POA"), a Florida Not-For Profit Corporation.

2.      As members of the POA, the Plaintiffs have standing to redress any "alleged failure or refusal to comply with" the provisions of the Florida Homeowners Association Act, §720.301, Florida Statutes, et seq., pursuant to §720.305, Florida Statutes.

3.      Defendant Dwight C. Schar (hereinafter "Schar") resides at Ocean Blvd., South Palm Beach, Florida, and at all relevant times, funded and commanded the efforts of the Conspirators.

4.      DCS Real Estate Investments, LLC, aka DCS Real Estate Investments, LLC of Virginia, (hereinafter DCS) is a foreign for profit corporation with its headquarters at 6809 Metro Park Drive, Suite 500, Alexandria, Virginia 22310 and its principal address and the address of its registered agent at 51 Third St., Building 10, Shalimar, Florida 32579.

5.      DCS Investment Holdings, GP (hereinafter "DCS Holdings"), is a Florida limited liability company, managed by DCS Investment Holdings GP, LLC, with a principal address at 505 South Flagler Drive, Suite 900, West Palm Beach, Florida 33401,

6.      DCS Real Estate Investments, LLC (hereinafter "DCS Florida") is a Florida limited liability company, managed by DCS Investment Holdings GP, LLC, with a principal address at 505 South Flagler Drive, Suite 900, West Palm Beach, Florida 33401,

7.      The Bella Collina Club, LLC (hereinafter the "Golf Club") is a foreign limited liability company with its principal address at 200 Ocean Crest Drive, Suite 31, Palm Coast Florida 32137, but that owned and operated the Bella Collina golf club and related facilities until 2012.

8.      The Club at Bella Collina, LLC (hereinafter "the Golf Club") is a Florida limited liability company, managed by DCS Investment Holdings GP, LLC, with a principal address at 505 South Flagler Drive, Suite 900, West Palm Beach, Florida 33401, that owns and operates the golf club and related facilities at Bella Collina.

9.     DCS Real Estate Investments, LLC I, II, III, IV, IV-A, and V (hereinafter "DCS I-V") are six Florida limited liability companies that hold real estate obtained by the illegal actions described in this Complaint with principal address at 505 South Flagler Drive, Suite 900, West Palm Beach, Florida 33401,

10.    Bella Collina Towers, LLC (hereinafter "BC Towers") is a company owned and managed by DCS, Schar and Simonson, and was formed to construct and operate a hotel in this residential community, which construction has been facilitated by the filing of false legal documents, violates the Original CC&Rs and diminishes the property values of Bella Collina as hereinafter described.

11.    Schar, at all relevant times, owns and controls DCS Holdings, DCS, DCS Florida, the Golf Club, DCS I-V, the Club at Bella Collina, LLC, and BC Towers (hereinafter collectively referred to as "the Schar Entities").

12.    Schar and DCS wholly control the POA and use it to perpetrate the illegal activities described herein.

13.    DCS Holdings is the managing member of the entities owned and controlled by Schar.

14.    Paul E. Simonson (hereinafter "Simonson") is the registered agent and chief executive officer of the Schar Entities.

15.    Defendant David Burman (hereinafter "Burman") is a Florida licensed community association manager who resides in Auburndale, Florida, and, at all relevant times, was a board member, officer and controller of the POA, and the owner and operator of Aegis Management Solutions, Inc. (hereinafter "Aegis").

16.    Aegis is a Florida for-profit corporation, owned and operated by Burman, with headquarters at 8390 Championsgate Boulevard, Championsgate, Florida.

17.    Randall F. Greene (hereinafter "Greene") is an employee, agent or officer of DCS, who resides in Montverde, Lake County, Florida, and at all relevant times was appointed as board member of the POA by DCS.

18.    Richard C. Arrighi ("Arrighi") is a convicted felon, disbarred attorney, and agent or officer of Schar or the Schar Entities, and agent and officer an officer of Phoenix Homes, a DCS designated builder, who resides in Montverde, Lake County, Florida, and, at certain relevant times, was a DCS appointed board member of the POA.

19.    Keith Clarke (hereinafter "Clarke") is an officer of Phoenix Homes, a DCS designated builder, who resides at Montverde, Lake County, Florida, and at all relevant times was a DCS appointed board member of the POA.

20.    Paul Lebreux (hereinafter "Lebreux") is a builder who resides in Montverde, Lake County, Florida, controls 5 lots, and, at all relevant times, is a DCS appointed board member of the POA.

21.    James D. Ryan, Michael J. Ryan (hereinafter the "Ryans") and The Ryan Law Group are licensed Florida attorneys with offices at 636 U.S. Highway One, Suite 110, North Palm Beach, Florida 33408, who, at all relevant times, represented DCS, the POA, Rocking Red H, LLC and various Schar entities.

22.    Cullen D'Ambrosio (hereinafter "D'Ambrosio") is a licensed Florida Attorney who works for the Ryan Law Group and resides in Palm Beach County, Florida.

23.    Rocking Red H, LLC is a Florida Limited Liability Company with headquarters at 636 U.S. Highway One, Suite 110, North Palm Beach, Florida  33408, whose managing member is D'Ambrosio.

24.     Ricky L. Scharich (hereinafter "Scharich") is a Florida licensed specialty contractor, mortgage broker and real estate broker with headquarters at 17034 Medici Way, Montverde, Florida 34756.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. §1331, because those claims arise under the laws of the United States (18 U.S.C. §1961, *et seq.*).

26.     The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. §1367, because the federal and non-federal claims arise from a common nucleus of operative fact.

27.     Venue is proper in this Judicial District under 28 U.S.C. §1391(b) because all Defendants reside and/or do business in the State of Florida, and because all claims for relief arise from acts, events, and omission that occurred in this District and a substantial part of the property that is the subject of the action is situated in this District, e.g. all real estate which is the subject of this case is located in Lake County Florida.

## GENERAL ALLEGATIONS

28.     Bella Collina consists of 801 home sites authorized by the Original CC&Rs, any reasonable and duly enacted amendment thereto and the articles of incorporation of the POA.

29.     The POA filed articles of incorporation with the Florida Department of State Division of Corporations as a Florida nonprofit corporation on December 23, 2003.

30.     Burman, at all relevant times, was a board member and a controller of the POA and the owner and operator of Aegis.

31.     Aegis, at all relevant times, contracted with the POA to provide management services to the POA as a state licensed community association manager (CAM").

32.     The "POA" governs the Community for the lot owners, who become members when they acquire a lot.

33.     Bella Collina was developed by Ginn-LA Pine Island Ltd., LLLP (hereinafter "Ginn" or "the original developer"), a foreign limited liability company, as a residential community pursuant to §720.301, Florida Statutes, et. seq., also known as the Florida Homeowners Association Act.

34.     Ginn recorded the original Declaration of Covenants, Restrictions and Easements for Bella Collina (the "Original CC&Rs") on January 16, 2004. (The Original CC&Rs are recorded at Book Number 2490, Page 568 in the official records of Lake County, Florida and are incorporated herein by reference.)

## ILLEGAL DEVELOPER CONTROL OF THE POA

35.     The original articles of incorporation of the POA, recorded on December 23, 2003, in pertinent part, set forth that Bella Collina "is intended to comprise eight hundred ten (810) Homes and the Association Property," (Article I, Section 5); that "total developed lots shall mean eight hundred ten (810)"; that each lot owner is a member; that a majority of the board members shall include a majority of members other than the declarant on the turnover date, which must occur "Three months after the conveyance of ninety percent (90%) of the "total Developed Lots" (as defined in Article X.C hereof) by Declarant, as evidenced by the recording of instruments of conveyance of such lots amongst the Public Records of the County," (Article V, Section D, 2, i) at which time the members shall assume control of the Association.  (The Original Articles are attached as Exhibit C of the Original CC&Rs, and are incorporated herein by reference.)

36.     On April 19, 2004, the POA filed Amended and Restated Articles of Incorporation, which, in pertinent part, decreased the authorized number of lots from 810 to 801 (Article I, Section 5).  The

Amended Articles are attached as Exhibit B of the Second Amended and Restated CC&Rs which are filed at Book Number 2810, Page 722 in the Official Records of Lake, County Florida and are incorporated by reference herein.)

37.     Consistent with §720.301(8), Florida Statutes, the recorded original declarations and the articles of incorporation shall be collectively referred to as the "Governing Documents," all of which are in the possession of Defendants and are public records.

38.     The Governing Documents also recognize the existence of a club known as The Bella Collina Club, which in conjunction with a separate sports club and equine center with a bridle path encircling the community and ballfields were some of the luxurious amenities promised in the Original CC&Rs.

39.     In reliance on the Original CC&Rs, numerous individuals, including the Plaintiffs, purchased lots in the community at prices between slightly less than $300,000 and up to $2,000,000 each for an estimated gross total of approximately $500,000,000.

40.     On information and belief, Ginn provided all lot purchasers with a HUD registered report, which indicated on page 13 that construction of the country club, and other amenities, was optional at the discretion of the developer and membership was not mandatory.

41.     Ginn sold almost all lots in two single day promotional events called "launches."

42.     It marketed the lots throughout the United States and various parts of the world, and former and current lot owners are residents of many states and countries.

43.     Many of the promised substantial and material amenities, e.g. the sports club, ballfields, equine facilities, and bike and bridle trails, were never completed.

44.     After the first conveyance, but before the turnover, the articles could only be amended by a majority vote of the board at a duly called meeting, and after turnover, by a majority of voting interests at a duly called meeting.

45.     The first conveyance of a lot was to Ray Coudriet Builder on April 23, 2004.

46.     By July 31, 2004, at least 311 lots had been conveyed.

47.     By June 31, 2005, 405, or one-half of the authorized lots had been conveyed, at which time the POA was obligated to call a meeting and elect one non-developer member as a director.

48.     By August 29, 2005, 721 lots, over 90% of the authorized number of lots, had been conveyed according to the Lake County public records, which occurrence triggered the requirement that the non-developer lot owners assume control of the three member POA board.

49.     Judge Richard L. Singletary of the Circuit Court for Lake County, Florida, by Order dated June 24, 2016, ruled that the Turnover date was August 29, 2005, as more particularly described herein.

50.     Ginn filed Amended and Restated Declaration of Covenants, Restrictions and Easements for Bella Collina was recorded on May 15, 2004, after most Plaintiffs purchased their initial lots, and after execution of hundreds of lot purchase agreements with other unsuspecting purchasers. (The Amended and Restated CC&Rs, hereinafter the "Amended CC&Rs," are recorded at Book Number 2571, Page 1533 in the Official Records of Lake County, Florida and are incorporated herein by reference.)

51.     Ginn filed the Second Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Bella Collina and Supplemental Declaration (hereinafter the "Second Amended CC&Rs,") on April 18, 2005, by which time 396 lots had been conveyed.

52.     Burman and Ginn were required by law to be familiar with the CC&Rs and §720.307, Florida Statutes, which compel the turnover of control of a community when 90% of lots were sold.

53.     Burman and Ginn knew, or should have known, that Bella Collina exceeded the lot sale threshold percentage for turnover on August 29, 2005.

54.     Burman and Ginn knew, or should have known, that every board appointed by Ginn after August 29, 2005 was illegitimate and that their actions were *ultra vires*.

55.     Aegis and Burman received $85,000 to 109,000 per year in reported compensation for board membership and management fees, without competitive bidding or disclosure to members, and in wholesale defiance of the Florida Homeowners Association Act's prohibition against board members receiving compensation.

56.     Ginn, Burman and Aegis, from 2004 to until 2012, managed Bella Collina and exerted exclusive control over the POA.

57.     The Declarations remained substantially unchanged for over seven years, during which time, Ginn never attempted to enforce the illegal and unreasonable amendments for mandatory club membership, the build compulsion, or the special assessment for club dues.

58.     Also prior to 2012, national economic circumstances affected Bella Collina and the disenfranchised POA member-lot owners became ripe for exploitation.

## THE CONSPIRATORS

59.     Massachusetts convicted Arrighi of conspiracy to receive stolen or embezzled funds in the amount of $1,603,303.12 and willful failure to file tax returns, including fiduciary returns in Massachusetts, for which he was disbarred by the Massachusetts Board of Bar Overseers.

60.     On information and belief, Arrighi is experienced with the embezzlement of funds and was employed by Schar and the Defendants to execute their criminal conspiracy as hereinafter described.

61.     On information and belief, Simonson and Greene became skillful at defrauding creditors, use of legal entities to launder money, use of legal proceedings to harass victims, and various illegitimate

accounting practices while employed by Catalfumo Construction, Inc. during its massive fraud of business partners and creditors, and, at all relevant times, were the authorized agents and employees of Schar, using these practices in the management of his assets and companies including those at Bella Collina, as hereinafter described.

62.     On information and belief, Schar funded and controlled the actions of the Conspirators.

63.     On information and belief, Schar, Simonson, Arrighi, Ryan, The Ryan Law Group, D'Ambrosio, Burman, Aegis, Greene, Clarke, Lebreux, and Scharich (hereinafter the "Conspirators") and others conspired and expressly agreed to execute a plan to illegally control the POA and to aggressively target its members with threats, intimidation, harassment, economic pressure, insults, humiliation and lawsuits to coerce them to surrender their ownership in their lots (hereinafter the "Conspiracy").

## THE CONSPIRACY

64.     On information and belief, Schar, Simonson, Arrighi, Ryan, The Ryan Law Group, D'Ambrosio, Burman, Aegis, Greene, Clarke and Lebreux, Schirach and others intentionally and knowingly developed the Conspiracy to fraudulently exercise control of the POA to dispossess lot owners of their property, embezzle POA funds and usurp POA property and opportunities for their own profit and benefit.

65.     The conspirators created DCS, the Schar Entities, Rocking Red H, LLC and other business entities to fulfill the conspiracy.

66.     On July 2, 2012, as part of this Conspiracy, DCS acquired Ginn's interests in Bella Collina and its status as developer, recording the assignment at Book 4181, Page 1163 in the Public Records of Lake County, Florida, which is incorporated herein by reference.

67.     As part of its assignment of Ginn's rights to Bella Collina, DCS also acquired the Golf Club and approximately 50 of the remaining unsold lots.

68.     DCS is owned by Schar and managed by Simonson and Greene and was created for the purpose of fulfilling the Conspiracy.

69.     On information and belief, Simonson, Arrighi, Ryan, The Ryan Law Group, Burman, Aegis, Greene, Clarke and Lebreux are all agents, officers or contractors with DCS and Schar and knowingly executed instructions to execute the Conspiracy.

70.     DCS assumed Ginn's illegal and exclusive control of the POA for the purpose of fulfilling the Conspiracy, to the exclusion of at least 749 lot owners who were the only individuals legally authorized to control the POA.

71.     Ginn, DCS and the conspirators illegally maintained control of the POA by refusing to hold elections for lot owner board members as required by the Governing Documents and §720.307, Florida Statutes, despite the occurrence of the Turnover Date on August 29, 2005, and by defying an injunction to hold a valid Turnover Election.

72.     On or about June 25, 2012, at the direction of Schar, Simonson, and Arrighi, DCS entered into a "Attorney Services Contract" with the Ryan Law Group "To prosecute the Client's claims regarding Association Dues and Club Membership Dues owed by various lot owner, located in the subdivision owned by Client and known as Bella Collina in Lake County, Florida" in furtherance of the Conspiracy.

73.     The lot owners of the POA never authorized The Ryan Law Group or James D. Ryan or Michael J. Ryan to represent the POA.

74.     The malicious intent of the Conspirators was to coerce lot owners into a settlement which required the surrender of the subject lot to DCS, dismiss the fraudulent lawsuit, write-off the POA assessments and pay of almost all settlements proceeds to or for the benefit of the Conspirators.

75.     The Conspirators laid out the conspiracy in an "*Agreement to Fund Collection Activities*" dated September 3, 2012 (hereinafter referred to as "the Agreement"), a copy of which is attached hereto and incorporated herein as Exhibit A.

76.     The Preamble of the Agreement falsely states that the POA is entering into a contract with the Golf Club, even though none of the legal formalities relating to the formation of a POA contract, e.g. notice, board meeting, membership meeting, approval, had been observed.

77.     The "Whereas" clauses of the Agreement recite the following intentions:

1.  The parties would use control of the POA to institute a campaign to enforce the illegal and unreasonable mandatory membership mandate;

2.  The Golf Club would control and fund all legal activities and use the Ryans and the Ryan Law Group to execute the campaign;

3.  The objectives were the collection of illegal assessments and the acquisition of lots by the Golf Club.

78.     The numbered paragraphs of the Agreement set forth the Conspirators' intentions:

1.  Paragraph two asserted that the Golf Club would fund the litigation;

2.  Paragraph three created a hierarchy of disbursements from any recovery solely benefitting the Conspirators at the expense of the POA: "any recovery will be applied first to recovery of costs and attorney fees expended on the matter, then to recording fees and documentary stamps if there is a lot involved; then to ad valorem taxes unless Owner pays same; then, to The Club/POA charges and assessment."; in the unlikely event of an actual a recovery sufficient to pay some annual or special assessments for club dues, it would be divided between the parties on a formula that disproportionately benefitted the club; any excess would be paid to the Golf Club.

3. Paragraph four recognizes the Club's right and intent to acquire lots by agreeing "to fund a credit in exchange for marketable title to a lot as a way of facilitating settlement."

4. Paragraph five sets a ceiling for the valuation of defined categories of lots at between $7,500 and $50,000;

5. Paragraph 6 sets a minimum payment to the POA of $500.

6. The Agreement was executed by Greene as the POA president and by Simonson as manager of the Golf Club and two DCS entities.

79.    Although the Agreement deceptively represented that a purpose of the agreement was to collect assessments, the practices and mechanisms created by the agreement deprived the POA of annual assessments that had accrued on lots, defeateing the stated purpose.

80.    In a letter dated August 25, 2014 to certain DCS and Aegis employees, Michael Ryan detailed the strategy:

> "The POA and The Club have an agreement based on the fact that The Club is funding the costs and attorney fees incurred in the collection process with the understanding that on settlement the costs and attorney fees are paid and/or reimbursed first; except in the instance where the lot is recovered , the recording costs and documentary stamps are paid first. When we do recover a lot, the POA's designee buys the Lot for a price based on Paul's matrix. So in a typical case, the recording fees and doc stamps are paid. Then, the costs and fees are paid (typically $3,500 total) and the balance is used to pay outstanding real estate taxes. In cases where there isn't. enough money to pay all the taxes, the grantee has to fund the additional amount which is paid outside of closing. However, in some cases the outstanding balance for real estate taxes is so high that the Lot may be put in Limbo in which case the title goes into a holding company; otherwise, the title goes straight to DCS; or, alternatively, if there is a lender to deal with and the title may go to the holding company if this puts us in a better bargaining position to acquire clear title.
>
> Notwithstanding the foregoing, if there is not money left to distribute to the POA and/or The Club, The Club has guaranteed the POA a recovery of at least $500/lot. Hence, the fact that there are so many $500.00 POA checks being generated. In those cases The Club takes nothing.
>
> *In almost every instance a settlement will dictate that the balances outstanding to The Club or the POA after applying the recovery should be written off.*" (Emphasis Added)
> ..."In almost all cases, the recovery is not sufficient to pay the outstanding amounts in full."

..."In summary, The Club funds this effort and DCS wants Lots. The POA does not want to and cannot be in the development business and does not have the wherewithal or desires to funds the litigation-it just want to be paid. This arrangement allows us to enforce the Owners' obligations to pay its charges and dues and eventually have these lots back in good standing with the POA, The Club and the Tax Collector."

## ILLEGAL CONTROL OF THE POA

81.     The Conspirators knew that their operation of the POA and their assertion of the "special assessment" for club dues were fraudulent.

82.     On September 19, 2012, an attorney for Richard Scharich, a Bella Collina lot owner, served a "Demand for Initial Election Meeting" pursuant to §720.303, Florida Statutes, on the POA, Aegis and DCS, placing them on formal notice that the POA should have been turned over in August of 2005.

83.     On October 12, 2012, Scharich's attorney served an unfiled "Counterclaim for Declaratory Judgment and Injunctive Relief," placing the Conspirators on notice that their operation of the POA and attempted enforcement of the special assessment of fees for the mandatory club membership and other Amendments to the CC&Rs were illegal.

84.     The Conspirators received numerous other notices of the illegality of their practices.

85.     The Conspirators took almost all benefits from coerced settlement agreements, including the write-off of accrued assessments, which would have remained a priority lien on the property until full payment by the current or future lot owner.

86.     The Conspirators acquired 600 valuable lots free of all encumbrances, the POA received little or no benefit, and the lot owners suffered incredible losses as hereinafter described.

87.     On information and belief, DCS thus embezzled $6,000,000 to $12,000,000 in annual assessments from the POA, $12,000,000 to $24,000,000 from the Golf Club (assuming the mandatory club dues were legal), and acquired 600 lots originally sold for approximately $500,000,000 for virtually nothing.

88.     Ironically, the Conspirators forced the POA to forgive the very assessments for which lot owners were accused of delinquency.

89.     On information and belief, thhe Conspirators then instructed Greene, Burman and Aegis to record the contributions from DCS to the POA as $7,000,000 in "Developer Loans," which were used to offset DCS' POA obligations.

## THE FRAUDULENT RECORDED AND POA DOCUMENTS

90.     Despite knowledge of the illegality of its operation of the POA, the Conspirators, without property owner approval, appointed its agents, including at all relevant times Burman, Greene, Clarke and Lebreux, to act as unelected board members of the POA and on the instruction of DCS, fraudulently recorded the Third Amendment to Second Amended and Restated Declaration of Covenants, Conditions and Restrictions for Bella Collina on September 4, 2012, the Fourth Amendment to Second Amended and Restated Declaration of Covenants, Conditions and Restrictions for Bella Collina on October 25, 2013, the Fifth Amendment to Second Amended and Restated Declaration of Covenants, Conditions and Restrictions for Bella Collina on March 19, 2014, and subsequent amendments to the CC&Rs, all of which alleged declarations were illegal and used in furtherance of the hereinafter described conspiracy to deprive POA members of their lots and control of their POA. (These unauthorized amendments are recorded at Book Number 4208, Page 409, Book Number 4398 Page 1814, Book Number 4453, Page 1983 in the official records of Lake County, Florida and are incorporated herein by reference.)

91.     On or about June 27, 2012, Greene, Burman and Arrighi, executed and included among the POA's records, a document entitled "**ACTION OF THE BOARD OF DIRECTORS OF THE BELLA COLLINA PROPERTY OWNERS ASSOCIATION, INC., TAKEN BY UNANIMOUS WRITTEN CONSENT IN LIEU OF A SPECIAL MEETING,**" appointing themselves President, Vice President and Secretary, respectively, without any notice to the lot owners.

92.    From 2005 to 2009, Ginn and Burman filed false documents with the Florida Divisions of Corporation, indicating that Mike Searles, and other agents or employees of Ginn, were officers of the POA.

93.    On August 25, 2012, the Conspirators filed a document with the Florida Secretary of State falsely representing that the POA principle place of business was Burman and Aegis' address, that Aegis was the registered Agent, and that Greene, Burman and Luen Chan, a lot owner, were the officers and directors of the POA, which confirmed the illegal "Action of the Board of Directors of the Bella Collina Property Owners Association, Inc. Taken by Unanimous Written Consent in Lieu of a Special Meeting," on June 28, 2012 and contradicted the resolution illegally adopted the day before.

94.    Almost immediately, Luen Chan resigned, giving the following reason in an email message dated September 19, 2012: "...all POA decisions and actions have been made without my involvements (sic) or even knowledge. It is clear that my position in the developer-controlled POA board is in name only."

95.    However, Simonson had already executed an "Action of Declarant of the Bella Collina Property Owners Association, Inc." dated August 25, 2012, accepting Luen Chan's resignation and resolving that Paul Lebreux would serve as director in his place.

96.    On September, 23, 2009, Burman and Aegis filed a false document with the Florida Division of Corporations, indicating that Aegis was the new registered agent of the POA and Aegis' address was the new "principal address."

97.    From 2012 to the present, the Conspirators filed false documents with the Florida Department of State Corporations Bureau, the Lake County Departments of Zoning and Code Enforcement, and the Lake County Clerk of Courts representing that they were the authorized representatives of the POA and that they were authorized by the POA and its members to file the said

documents, all for the benefit of the Defendants and to the detriment of the POA and its members as hereinafter described.

98.     On August 20, 2012, Burman, filed a false record with the Florida Division of Corporations, indicating that he, Greene, and Luen Chan were the directors and officers of the corporation.

99.     Every year since 2012, Burman, acting as an agent and at the direction of the Conspirators, filed false records with the Florida Division of Corporations, indicating that unelected agents or employees of the Conspiracy were the directors and officers of the POA.

100.    Burman knew these filings were false and made the false representations in these filings so that the agents and officers of the Conspiracy appeared authorized to conduct the business of the POA, which false representations were essential to the success of the conspiracy.

101.    Without Burman's false filings, the Conspirators could not have controlled the accounts or legal actions of the POA.

102.    On September 4, 2012, within three months of DCS' acquisition of the assignment of developer's rights, Simonson, as an agent of the conspirators, and with the intent to fulfill the Conspiracy, filed the "Third Amendment to Second Amended and Restated Declaration of Covenants, Conditions and Restrictions for Bella Collina" (hereinafter the "Third Amended CC&Rs") at Book Number 4208, Page 409 in the Public Records of Lake County, Florida.

103.    The Third Amended CC&Rs fraudulently assertrd that, "pursuant to Article XII, Section 9(A) of the CC&Rs, Declarant may unilaterally amend the terms of the CC&Rs."

104.    To the contrary, Article XII, Section 9 of the prior CC&Rs addresses "Waiver of Subrogation" in an Article that exclusively deals with "Insurance and Condemnation."

105.    Article XIII, Section 8 of the prior CC&Rs, which does address "Amendment and Modification," requires that "After the Turnover Date, this Declaration may be amended by: (i) the consent

of the Owners owning two-thirds (2/3) of all Lots; together with (ii) the approval or ratification of a majority of the Board."

106.    Simonson falsely represented that this amendment was joined in by the POA.

107.    The fraudulent Third Amended CC&Rs illegally eliminated "asphalt bike paths, horse trails,"…"Equestrian Property," added seventy nine (79) lots, eliminated the prohibition of amendments effecting the equestrian property, required notification to the Club Property Owner of any proposed lot sale so that DCS could interfere with such sale or demand payment of the illegal special assessment for club dues, reduced the soon to expire build compulsion from twenty-four (24) to eighteen (18) months, increased the expiration of the declarant's repurchase rights from ten (10) years to twenty (20) years, allowed construction and operation of a hotel and transferred the "Association's rights to enforce the lien and foreclosure provisions of Article VI" to the Club Property Owner, all to fulfill the illegal conspiracy.

108.    Paul Simonson, acting on the instruction of the Conspirators, signed this amendment on August 28, 2012 as "manager" of DCS Capital Investments, LLC, DCS Investment Holdings, GP, LLC, The Golf Club and Bella Collina, LLC with the full knowledge that he lacked authority to file the third Amended CC&Rs illegal, and that they were in furtherance of the conspiracy.

109.    The Third Amended CC&Rs added illegal and unreasonable new language to Article I, Section 16 of the Second Amended Declarations providing that "[a]ny facilities may be added or removed from the Club Property from time to time in the sole discretion of the Club Property Owner."

110.    The Third Amended CC&Rs added illegal and unreasonable new language to Article II, Section 3, Subsection D of the Second Amended Declarations providing that "the Association reserves the right to transfer the Association's rights to enforce the lien and foreclosure provisions of Article VI to the Club Property Owner from time to time, in the Association's sole discretion."

111.  The Third Amended CC&Rs added illegal and unreasonable amendments at Article X, Section 19, Subsection D, Paragraph 5 providing that DCS's repurchase rights are extended from 10 years to 20 years and added language to Article X, Section 21 which allows DCS to "develop or create portions of the Committed Property as a hotel or resort."

112.  The Ryans and the Ryan Law Firm, in furtherance of the Conspiracy, filed fraudulent lawsuits to selectively enforce the build compulsion contained in the Amended CC&Rs and the Second Amended CC&Rs, which had expired in 2014, but had been illegally extended for another ten (10) years in the fraudulent Third Amendment to Second Amended and Restated Declaration of Covenants, Conditions and Restrictions for Bella Collina at Article X, paragraph 23, subparagraph 5, which states that the repurchase right shall expire "...ten (10) twenty (20) years after the date of these CC&Rs are recorded in the Public Records."

113.  The illegal enforcement of an expired build compulsion was a scheme that the Conspirators employed to selectively extort lots from from Bella Collina lot owners.

114.  The Third Amended CC&Rs added illegal and unreasonable amendments at Article X, Section 21, which allows DCS to "develop or create portions of the Committed Property as a hotel or resort."

115.  The Third Amended CC&Rs, and all CC&Rs and legal documents filed in the Public records, were a violation of §712.08, Florida Statutes, which prohibits the assertion of "false or fictitious claims to land."

116.  On January 28, 2016, Burman filed a false document (assigned document number N03000011005 and CC3513563321) with the Florida Secretary of State, Department, which indicated that Joseph P. Cross (hereinafter "Cross"), a lot owner at Bella Collina, was President of the POA, Clark

was the Secretary, Lebreux was the Vice President, Burman was a Director and Aegis was the Registered Agent, which document bore the electronic signature of Cross.

117.    On information and belief, Burman, or one of the other Conspirators, forged Cross' signature, and Cross never consented to be President of the POA.

118.    Also on January 28, 2016, the Ryans and The Ryan Law Group filed a false Document (Instrument Number 2016009918) titled "**DECLARATION OF JOINDER AND RATIFICATION BY A SUPER MAJORITY OF THE BELLA COLLINA LOT OWNERS OF ALL PRIOR ACTS OF THE DECLARANT WITH REGARDS TO AMENDING OR SUPPLEMENTING THE COVENANTS, CONDITIONS AND RESTRICTIONS FOR BELLA COLLINA CC&RS**" with the Lake County Clerk of the Circuit Court at Book 4734, Page 892, which was signed by Greene as President of the POA and Simonson as Manager of DCS and "on behalf of the Owners of the Lots Listed on Exhibit A."

119.    The January 28, 2016 Declaration was a desperate act by the Conspirators in furtherance of the conspiracy objective of maintaining illegal control of the POA.

120.    The January 28, 2016 Declaration falsely ratified "all prior acts of the Declarant with regard to the amending or supplementing the CC&Rs for BELLA COLLINA," including increasing the the number of lots in the community to avoid the ninety percent (90%) turnover threshold, that the Declarant received the authority of 118 other Bella Collina lot owners and that "All acts done by DCS as Declarant are hereby ratified unanimously by the Board of the POA and by more than Two-Third (2/3) of the owners of lots in Bella Collina, including Declarant."

121.    On April 6, 2016, Burman filed a false document (assigned document number N03000011005 and CC5018089117) with the Florida Secretary of State, Department, which indicated that Dutch P. Holt (hereinafter "Holt"), a lot owner at Bella Collina, Clark, and Lebreux were Directors

of the POA, Greene was President of the POA, Burman was the Secretary, Burman was the Vice President, and Aegis was the Registered Agent, which document bore the electronic signature of Greene.

122.    On June 7, 2016, Burman filed a false document (assigned document number N03000011005 and CC5018089117) with the Florida Secretary of State, Department, which indicated that Dutch P. Holt (hereinafter "Holt"), a lot owner at Bella Collina, Clark, and Lebreux were Directors of the POA, Greene was President of the POA, Burman was the Secretary, Burman was the Vice President, and Aegis was the Registered Agent, which document bore the electronic signature of Greene.

## IRREPARABLE HARM CAUSED BY THE CONSPIRACY

123.    DCS directed the POA, in fulfillment of the conspiracy, to request zoning and use changes for Bella Collina, which include, but are not limited to, relocating the site of many amenities from their originally planned, desirable location to a new, less desirable location, or eliminating them altogether, decreasing lot sizes, turning property dedicated for the sports club, the equine center, and ballfields to additional lots, and building a hotel/condominium complex, all for the benefit of DCS and to the detriment of the POA members.

124.    DCS, acting through the illegally controlled POA, devised a Conspiracy to inflate assessments owed by property owners to the point that the property owners were forced to convey their property to DCS rather than lose more money on their distressed lots, the values of which were suppressed by the conspirators.

125.    On information and belief, Ginn and the Conspirators asserted inflated assessments in violation of the Governing Documents and the Homeowners Association Act.

126.    The inflated assessments include exorbitant CDD fees, annual assessments, illegal special assessments, interest, attorney fees, late fees, country club initiation fees and dues.

127.    The Conspiracy includes the constant harassment of lot owners by depriving them of access to the community, following them with security guards, verbal confrontations, threats of suspensions and fines without legally mandated procedures.

128.    The Conspiracy includes the filing and threats of filing liens against property, interference with attempted property sales, exorbitant maintenance and CDD fees, selective enforcement of an expired build compulsion, and repetitive lawsuits, often over trivial matters, without satisfaction of statutory pre-requisites.

129.    The Conspiracy involves the use of lawsuits, as previously described, to force sales of lots and homes for nothing or a the five to ten percent of the value that would exist in the absence of the conspiracy, creating comparables that destroy the appraised value for other properties in the community, rendering them virtually unmarketable.

130.    The Conspiracy involves the control of the Pine Island CDD, which provides the central water supply to Bella Collina.

131.    The suppression of lot values and development of Bella Collina causes extraordinarily high water bills and financial hardship on the CDD.

132.    The conspiracy involves the conspirators' use of confidential POA and CDD information supplied by members with the expectation of privacy, to harm members, including, the requirement that all members submit a detailed application to the POA, with an application fee of $500, for all proposed real estate sales, which the conspirators then use to interfere with the sale to satisfy the goal of the conspiracy to suppress lot values, acquire more lots and usurp the opportunities of the members.

133.    The Conspiracy involves the surrender of beneficial opportunities of the POA to DCS and its attorneys and officers.

134.    On information and belief, more than 400 lawsuits have been filed by the POA, acting as the alter ego of DCS, in this jurisdiction to date, all of which cases have been filed without standing and represent a fraud on the judicial system.

135.    Ryan and the Ryan Law Group, on the instruction of DCS, Simonson, Schar and the other Conspirators, file these lawsuits, knowing that such actions are fraudulent, may disqualify the POA as a non-profit, will harm the lot owners, and will serve the Conspirators' efforts to sabotage lot values and drive out non-developer lot owners.

136.    This Conspiracy has been successful as most property owners, despondent about the failure of their lot values to rise commensurate with the dramatic increase of almost all property values in Central Florida and the rapid build out of almost all other communities, have been forced to convey their properties to DCS rather than continuing expensive and vexatious litigation and paying absurd amounts for assessment, membership deposits and club dues and enduring the constant harassment and intimidation.

137.    As part of this Conspiracy, Ryan, on behalf of the DCS controlled POA, offers to discharge a lot owners' annual assessments and alleged special assessment debt to the POA, and other assessments, attorney fees and costs allegedly owed to the POA, and settle expensive and vexatious litigation in exchange for their surrender of their property to the Conspirators.

138.    These lawsuit settlements deprive the POA of any benefit of the asserted assessments or lot transfers, and permit the Conspirators to usurp all possible opportunities of the POA.

139.    Schar, Simonson, the Ryans, the Ryan Law Group and others in the Conspiracy transferred most of the approximate 600 lots received as the objective of the Conspiracy to DCS, DCS I-V, Rocking Red H, LLC, VV and BP, which entities currently possess such property.

140.    On information and belief, the POA suffered damages of at least $9,000,000 in annual assessments, interest, late fees and costs from the Conspirators' use of the POA to "write-off" the assessments for these 600 lots, and the Conspirators were enriched by the receipt of unencumbered lots.

141.    On information and belief, the Ryans use the Ryan Law Group's escrow account to distribute funds to the Conspirators that belong to the POA.

142.    The Conspiracy uses POA money to benefit DCS at the expense of the property owners, compensating directly Conspirators such as the Ryans, Greene, Burman and Aegis, and subsidizing applications to the Lake County Commissioners to turn common property into additional property to be developed by DCS.

143.    On information and belief, this Conspiracy includes the embezzlement or underfunding of reserve funds for the benefit of the Conspirators.

144.    On information and belief, the Conspiracy includes embezzlement of $2,445,295.78 of escrowed membership deposits that were transferred to the Golf Club pursuant to an "Assignment and Assumption Agreement" on June 27, 2012 from the law firm of that closed on lots for Ginn.

145.    The Conspirators embezzled millions in income from annual assessments paid by the lot owners and similarly-situated, non-developer lot owners for the sole benefit of the Conspiracy.

146.    The illegal characterization of DCS as developer prior to turnover has been used to justify DCS' failure to pay assessments to the POA on the more than 600 lots that it owns or illegal write-offs of POA assessments owed on lots surrendered to , which means that the POA has been deprived of approximately $1.8 million in dues annually for each year after the original developer's assignment.

147.    The financial statements of the POA now indicate debt owed to the developer of $7,000,000., despite the forced write-off of assessments owed on lots transferred to the Conspirators.

148.    The Conspirators use improper accounting methods and fraudulent account statements and tax returns to justify nonpayment of obligations to the POA and to increase annual assessment payments by the lot owners to fulfill the goals of the Conspiracy.

149.    On information and belief, the Conspirators control the CDDs of the community, which charge exorbitant amounts to lot owners for basic services, and harass lot owners in the lawful use of irrigation wells permitted by the Original CC&Rs, with lawsuits and threatening letters to further the Conspiracy.

150.    On information and belief, DCS owes the POA approximately $12 to 15 million dollars in dues, the payment of which has been avoided by the Conspirators' control of the POA.

151.    The POA acts as the mere alter ego of DCS and the Conspirators and only in their best interests, not the best interest of the lot owners as required by law.

152.    The conspirators prevented the POA from appointing an architectural review board or from designating qualified builders, informing all parties interested in building homes that they must use Phoenix , a construction company owned and operated by Arrighi, who then charges exorbitant prices and requires excessive specifications, making home building economically unfeasible.

153.    As indicated in the Bella Collina Property Valuations, attached hereto and incorporated herein as Exhibit B, the listed lot owners suffered approximately $13,617,728. in direct economic damages from the violations of law and breaches of duty inherent in the Defendants' Conspiracy.

154.    Other property owners suffered commensurate losses, so the gross amount of the total lost by lot purchasers is approximately $450,000,000, despite a brisk market for vacant lots and new home construction in all other gated communities, including adjacent new home communities in Montverde.

155.    The Conspiracy is the exclusive, direct and proximate cause of the Plaintiffs' damages.

156.   The Honorable G. Richard Singletary, Circuit Court Judge, by Order dated June 24, 2016

("June 24, 2016 Order"), granted petitions for injunctive relief, finding, in pertinent part, as follows:

"36) Therefore, August 29, 2005 is the Turnover Date as defined by BCPOA's governing documents and Florida Statutes, Section 720.307.

"37) Once turnover is required, the Developer, in accordance with Florida Statute, Section 320.307, has ninety days from the Turnover Date within which to complete a series of statutory obligations, including the election of a majority of non-developer lot owners to the Board of Directors of the BCPOA and the resignation of the Developer appointed Board Members.

"38) In this case, ninety days (90) after the Turnover Date would have been on November 28, 2005..."

"40)...The Articles of Incorporation of the BCPOA and Florida Statute, Section 720.307 compel the turnover of the BCPOA to an owner elected board within (90) days after ninety percent of the lots were sold, which triggering event occurred on or about August 29, 2005."

"41) "These triggering events should have resulted in an initial election meeting and vote of parcel owners for a board of directors. No such meeting and vote ever occurred....

"42) **Respondents continue to suffer immediate and irreparable injury, loss and damages as a result of the Developer's failure to comply with the Florida Statute and the BCPOA's governing documents.**" (Emphasis added.)

"43) The Petitioners and the other lot owners have no adequate remedy of law.

"44) The harm, if any, which would result to the Developer and the BCPOA, if this injunction is granted, would be relatively insignificant compared to the immediate and irreparable injury loss of damages the Petitioners, and those similarly situated, would suffer in the event that this injunction is not granted.

"45) **A permanent injunction is necessary to enjoin the BCPOA from denying Bella Collina lot owners and BCPOA members control of its community.**" (Emphasis added.) June 24, 2016 Order, p.8, Appendix 11.

"A)   Petitioners request for receivership is DENIED without prejudice.

"B)   Petitioners request for injunctive relief for the Turnover of the Property Owner's Association is **GRANTED**." (Emphasis added.)
"Respondents shall proceed with Turnover in compliance with all relevant Florida Statues and the governing documents of the BCPOA. The triggering date for the turnover shall be the date of this Order. All other requests for injunctive relief are denied..."

157.     Judge Singletary, consistent with the incontrovertible evidence, held that the Turnover Date for Bella Collina was August 29, 2005, that the Appellants were suffering irreparable harm by the Conspirators' control of the POA, and that the Turnover election of lot owner directors, in accordance with the Governing Documents and applicable law, must occur within 90 days.

## CONSPIRATOR INTERFERENCE WITH THE TURNOVER

158.     With less than two months left for the election, the Plaintiffs discovered that the conspirators, in a desperate attempt to maintain a strangle hold on the POA, agreed that the alleged special assessment delinquency would be used as grounds to disqualify the Plaintiffs, and all similarly situated lot owners, from voting in the Turnover election or from becoming candidates for the board; the developer controlled POA would allow builders, contractors and developer agents to cast votes, and there would be five director seats instead of the three required by the Articles of Incorporation.

159.     The Plaintiffs filed motions to preclude these illegal actions, which the POA board, consisting of Greene, Burman, Clarke and Lebreux, on the instruction of the Conspirators, opposed.

160.     This opposition was in bad faith, detrimental to the POA and in furtherance of the Conspiracy's goal of unfettered control of the POA.

161.     The motion asserted that the mandatory membership and special assessment Amendments are unreasonable and violate the Governing Documents and §§720.3075, 720.303(2), 720.315, 720.306, Florida Statutes.

162.     On August 1, 2016, the POA filed a response in opposition to the emergency motion, which confirms the intent to use the illegal club mandate to disqualify non-developer lot owners.

163.     Schar, Simonson, Ryan, Burman, Clarke, Greene and Lebreux knew that these motions sought relief required by law and that were in the best interests of the POA.

164.    However, Schar, Simonson, Ryan, Burman, Aegis, Clarke, Greene and Lebreux supported the developer at the expense of the POA and qualified builders and contractors under the developer's control to vote in violation of §720.307, Florida Statutes and the Governing documents.

165.    They conspired to appoint a POA controlled board, just as Ginn-LA and DCS had done illegally for the prior eleven years.

166.    Burman, Aegis, Clarke, Green and Lebreux cooperated with the POA's obviously conflicted attorney, Ryan, who represents DCS, the Golf Club, the CDD and the Developer appointed Board, to corrupt the election process, defeating the purposes of the Court Order and the best interests of the POA.

167.    The DCS controlled board disqualified all lot owners allegedly delinquent in payment of club dues from voting in the election or running as a candidate for the Board.

168.    The DCS controlled board accepted the vote of builders, contractors and DCS agents in defiance of §720.307, Florida Statutes and the June 24, 2016 Court Order.

169.    The DCS controlled board, to the continuing harm of the POA and to solely benefit the Conspirators, filed a motion to delay the Turnover election at least another eight months, with Burman testifying in support of DCS and to the detriment of the POA that an election could not possibly be held in the remaining 21 days.

170.    Judge Singletary denied the POA's motion on September 2, 2016.

171.    On or about September 6, 2016, in a desperate and hasty attempt to appear to comply with this Court's Order, the POA's attorney filed a First Notice of Turnover Election, and subsequently mailed these notices to lot owners, informing them that candidates for an undisclosed number of board seats must submit applications by the arbitrary date of September 13, 2016 for an election that would occur on September 22, 2016.

172.    In bad faith and with the intent to subvert the Court Order as predicted in the Emergency Motions, the POA attached to the Notices sent to James and Virginia Shelton, Plaintiffs, Kathryn and Bart Sutherin, the Carlson Trust, Brad Heckenberg and virtually every lot owner not under the control of the Conspirators a "Notice of Voting Rights Suspension," prohibiting them from voting or becoming candidates for election because they owed assessments (in each of these cases the lot owner had paid all annual assessments but refused to pay the illegal special assessment related to club membership).

173.    James D. Ryan, in open court on September 1, 2016, asserted that there were 166 eligible voters and those with unpaid assessments would be disqualified from voting.

174.    Under pressure from lot owners, David Burman and Aegis finally posted the alleged list of eligible voters on the POA website.

175.    The list only included 152 lot owners, including several lot owners who received notices they were not eligible to vote or stand for election to the board.

176.    The eligible list included the Carlson Trust, CS Business Services (5 lots), Alfred Little (3 lots), James and Virginia Shelton, and Bart and Kathryn Sutherin, who were told by Ken Burman, director and principle of the CAM, Aegis, that their inclusion was a mistake.(See affidavits).

177.    The list of eligible voters included preferred builders Ryan Arrighi, brother of Phoenix Builders Richard Arrighi, Paul Lebreux and PSR Developers (6 lots), Legacy Construction, Inc. (5 lots), Richard and Vanessa Scharich (Richard Scharich is the managing member of Vogel Homes a preferred builder and has contractor licenses) and Sharich Invenstments (19 lots), managing member of Vogel Homes, Vogel Building Group (3 lots), Simonson Holdings (1 Lot) (See Affidavits, Exhibit B OF State Court Second Emergency Motion), all of which were under the control of the Conspirators.

178.    However the list of Delinquent lot owners included Paul Lebreux ($36.12), Keith Clarke ($1,567.55), Paul Simonson ($1,567.55), Richard Arrighi ($10,956.48), Phoenix Capital (Arrighi and

Clarke's Company) $32,944.59.

179.    On or about September 13, the POA's attorney, to further the Conspiracy to maintain control of the POA by DCS, Schar and Simonson, filed a "Notice of Compliance," averring that only two lot owners applied during the corrupt election process, Paul Lebreux and Keith Clarke, and that an election would not be held.

180.    Lebreux and Clarke qualified, even though they were delinquent in the payment of POA dues, a disqualifying factor for lot owners not controlled by the Conspirators.

181.    The Conspirators knew that Florida Statutes §720.307 prohibits voting by the developer, builders and contractors who buy lots for development or resale, but maliciously violated the law to further the Conspiracy.

182.    Rocking Red H LLC, whose managing member is an attorney at the Ryan Law Group, Cullen D'Ambrosio, owes $367,461 in delinquent taxes on its 13 lots, yet an attorney for this firm continues to represent the POA.

183.    The POA showed contempt for the June 24, 2016 Order, and is unable and unwilling to perform the critical and legally mandated election requirements such as a complete the required turnover audit.

184.    The Conspiracy subverts the important public policy of creating self-governing private communities.

185.    The Conspirator controlled board continues to disqualify all lot owners with alleged delinquent special assessments for club dues related to the mandatory membership amendments from voting and candidacy for a board seat.

186.    Only the two board members previously appointed by the Conspirators without authorization are allowed to run for the two board seats.

187.    The Conspirator controlled POA asserts that, under these circumstances, the Conspirator controlled candidates are deemed elected.

188.    The Conspirators cancelled the court ordered, statutorily required vote, holding only an informational meeting on September 22, 2016.

189.    The Conspirators, with the unqualified cooperation of Burman, Clarke and Lebreux, thus maintained control of the POA, flagrantly defying the June 24, 2016 Order and making a mockery of the letter and spirit of the law.

190.    This situation prompts a series of other motions, including a "Second Emergency Motion for Declaratory Relief and Injunction," a "Motion to Disqualify Attorney" and two extensive supplemental filings of Legal Authority in support of the Emergency Motions, which the Conspirators instruct Ryan to oppose.

191.    Thus Burman, Greene, Clarke and Lebreux, acting as the POA Board but at the direction of the Conspirators, prohibit the lot owners from voting in defiance of §720.307, Florida Statutes, other statutory law, the Governing Documents and the June 24, 2016 Order, all in furtherance of the above-described illegal Conspiracy.

192.    The failure of Burman, Greene, Clarke and Lebreux to conduct an election at the September 22, 2016 meeting, at which the *de facto* appointments of two builders previously appointed by DCS are ratified, condemns the POA to the unfettered control of the Conspirators, who permit the meeting even though it lacks a required quorum by attendance of thirty percent of the lot owners entitled to vote, as required by Law and the Governing documents.

193.    Burman, Greene, Clarke and Lebreux violate the governing documents by ignoring the quorum requirement by the acquisition of proxies, which are prohibited by the governing documents at meetings to elect directors.

194. Burman, Green, Clarke and Lebreux subject the POA to an election dispute by the lot owners before the Florida DBPR.

195. Burman, Greene, Clarke and Lebreux perform the all above-described actions in furtherance of the Conspiracy and at the direction of Schar, Simonson and Ryan.

## CLASS ACTION ALLEGATIONS

196. Plaintiffs bring this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and Local Rule 4.04, on behalf of themselves and a classes consisting of all persons who are:

1. current non-developer owners of a lot within Bella Collina.

2. former non-developer owners of lots in Bella Collina from June 2012 to the present.

197. The definition of the Class as set forth above is subject to amendment upon completion of discovery, and may ultimately include other classes.

198. The members of the Class are sufficiently numerous, consisting of approximately one hundred one (101) curent owners of 164 lots within Bella Collina, as indicated on the list which is attached hereto and incorporated herein as Exhibit C, and approximately 586 former owners so as to make joinder impracticable.

199. Plaintiffs' claims involve questions of law and fact common to the Classes, because Plaintiffs and other members of the Class were made subject to affirmative obligations set forth in the Amended Covenants with neither their agreement or consent and were all members of the POA which was illegally controlled by the Conspirators.

200. Plaintiffs and the Class are entitled to declaratory and injunctive relief necessary to provide control of the POA to the non-developer lot owners and nullification of the Amended Covenants and are further entitled to an award of their reasonable attorney fees and costs.

201.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

202.     Plaintiffs' claims are typical of the claims of the members of the Classes.

203.     Plaintiffs will fairly and adequately protect the interests of the Classes.

204.     Plaintiffs have retained counsel with a depth of knowledge and understanding of the facts and law related to the present case, with competence and experience in class litigation.

205.     Plaintiffs will vigorously pursue the claims of the Classes.

206.     The Class as defined herein is maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure in that prosecution of separate claims by individual members of the Class would create a risk of either:

a.  inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards for the Defendants, i.e., the parties opposing the Class; or

b.  adjudications with respect to individual members of the Class as a practical matter which would be dispositive of the interests of other members of the class who are not parties to the adjudications, or would substantially impair or impeded the ability of other members of the class – who are not parties to the adjudications – to protect their interests.

207.     The Class as defined herein is certifiable pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Defendants have taken actions generally applicable to the Class in that they have acted in a nearly uniform matter with respect to all members of the Class, thereby making final injunctive relief or declaratory relief concerning the Class as a whole appropriate.

208.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

209.    The Class members, to the extent they are aware of their rights against Defendants as alleged herein, would be unable to secure counsel to litigate their claims on an individual basis and thus a class action is the only feasible means of obtaining a remedy for the Class members.

210.    Individual actions would also present a risk of inconsistent decisions, even though the conduct of Defendants (in their execution of the Joinder and Consent) has been uniform with respect to each Class member.

211.    Plaintiffs envision no difficulty in the management of this action as a class action.  The identification of all class members and their contact information is readily determinable from statutorily required POA records.

## REPRESENTATIVE CONSPIRACY ACTIONS

## JAMES L. SHELTON AND VIRGINIA L. SHELTON

212.    On April 22, 2004, the Sheltons, in reliance on the original CC&Rs, entered into a Lot Purchase Agreement with Ginn-LA for lot number 253 for $299,000, but an early purchase discount of $20,000, decreased the final cost to $279,000.

213.    On June 7, 2004, the Sheltons closed on the said purchase and acquired title to their Bella Collina Lot. All lots are worth a fraction of their original cost or are unmarketable.

214.    The Sheltons' property is currently assessed at about $30,000 by the Lake County tax assessor, a loss of about 90%, which loss is caused by the conduct of the Conspirators.

215.    Each month the Sheltons receive an invoice for club dues with a false amount owing.

216.    The Conspirators damaged the Sheltons as set forth on Schedule B, attached hereto and incorporated herein by reference.

217.    The Sheltons have paid quarterly POA fees of between $695 and $789 and pay a CDD fee of $2319, and so have paid approximately $60,000 in just these fees during the last 12 years for an undeveloped lot, surrounded by other undeveloped or abandoned lots.

218.    Since 2012, the Sheltons received monthly false statements from the Conspirator controlled POA demanding payment of the illegal special assessment for the payment of allegedly delinquent club dues.

219.    On July 2, 2013, the Conspirator controlled POA, without authorization, filed suit in Circuit Court in and for Lake County at Case Number 2013-CA-002108 to collect $37,952.39 in allegedly delinquent fees and dues ($20,312.42 for monthly dues, $1,5558.21 for "incidentals," $25,000 for a golf deposit, $17,539.97 for interest and late fees decreased by $26,458.23 in payment credits) owed to a private country club by illegally deeming them to be "special assessments."

220.    The Conspirators used the legal proceedings to repetitively harass and intimidate the Sheltons, subjecting them to the payment of significant legal costs.

221.    The Conspirators instructed the guard gate to deny the Sheltons access to the community to which lot owners were entitled in violation of Florida Homeowners Association Act.

222.    The Conspirators malicious illegal conduct as detailed herein destroyed the value of Sheltons lot, making it virtually unmarketable.

223.    Ryan, as agent for the Conspirators, directly threatened the Sheltons with financial ruin from continued litigation and judgments related to the special assessment for dues related to the club mandate.

224.    Greene, as agent for the Conspirators, by notice to all lot owners in his status as President of the POA, threatened the Sheltons with the expired build compulsion.

225.    The Conspirators maliciously deprived the Sheltons of the right to vote for POA board members or to become a candidate for the POA board, depriving the Sheltons in their lawful participation in the governance of their community.

226.    Shelton, Choo, and Heckenberg obtained an emergency court order to view records that the POA was legally obligated to have available for inspection at all times under the Florida Homeowner's Act.

227.    On April 1, 2016 at around 9:00 AM in Aegis' Office at Champions Gate, which the POA declares as its principal business location and stores its documents, Shelton began a day long court ordered review of POA records in the presence of Greene and Ryan who sat across the table only 4 feet away.

228.    During the review, Greene and Ryan continued to make references concerning a pending case, arrogantly asserting that the Sheltons, Choos, and Heckenbergs did not have a chance to obtain a turnover of the community.

229.    Ryan began viewing several documents that related to the lawsuit, but not to the specific POA documents under review to intimidate Shelton.

230.    Ryan would pull out documents to show to Greene saying "this is the signature of James Shelton. It looks like the same signature that is on his driver's license."

231.    Ryan turned to Greene saying, "Do you agree that both signatures are the same. We really have him now; what do they think they are doing".

232.    Ryan intended to intimidate and distract Shelton during efforts to examine the many boxes of POA documents.

233.    Later, in an orchestrated effort to subject Shelton to coercion by Green, Ryan exited the room, whereupon Greene immediately leaned across the table, and in a very loud, demanding voice,

said, "I have a lot more things I should be doing than sitting in this meeting". "What the _ _ _ _ (expletive deleted) do you guys think you will accomplish by reviewing these records, "and suggested Shelton was wasting his time.

234.    Greene followed with "Your attorney doesn't know what he is doing; he is just throwing _ _ _ _ (expletive deleted) up against the wall to see what might stick."

235.    Greene then asserted that he had "won every single case  and will win the case against the Sheltons," that DCS would get their lots and will get attorney fees, which are mounting up every day; he continued with "I advise you to get out now to minimize your expenses, Your lawyer never won a case and is worse than the other lawyers we have faced," repeating "You are going to lose. "

236.    Later in the afternoon, Greene left the conference room and Burman entered the room.

237.    With Burman and Ryan present, Shelton inquired about the letter and the detailed investigative report that Luen Chan and Ken Lam, lot owners discussed more fully above, served on the POA, which disclosed widespread financial abuse by DCS, accusing it of defrauding the POA out of millions of dollars.

238.    Burman, sitting near the head of the conference  table replied: "I am sitting in the same chair and same position at the table that Ken Lam was sitting  just before he stood up to get some water, and had the heart attack and died."

239.    Ryan asserted that the letter and report from Chan was slanderous to the people on the POA Board, specifically to Mr. Burman, continuing that the letter was so bad that "it rose to the level of Moral Turpitude."

240.    When Shelton asked for a copy of the letter, Ryan said that letter "will never be made public, and that Luen Chan had better not ever allow the letter to become public either."

241.   Ryan concluded that the POA Board would sue Chan if he ever allowed the report to become public.

## CS BUSINESS SYSTEMS

242.   CSBS closed on lot 186 on June 7, 2004, lot 377 on January 12, 2004, lots 132 and 133 on March 11, 2005, and lot 128 on October 13, 2009.

243.   The lot purchase agreement was negotiated before the conveyance of each lot.

244.   CSBS received a HUD registered report dated April 2, 2004, which indicated on page 13 that construction of the country club, and other amenities, was optional at the discretion of the developer and membership was not mandatory.

245.   CSBS purchased lots 186, 132 and 133 directly from the developer during one of two launches, both of which occurred before the filing date of the Second Amended CC&Rs.

246.   CSBS purchased lots 377 and 128  from private owners who received title directly from the developer on June 7, 2004 for lot 377 and March 7, 2005 Lot 128.

247.   CSBS purchased lot 133 for $1,350,000, lot 186 for $394,900, lot 132 for $1,350,000, lot377 for $604,900 and lot 128 for $40,000, for a total of $3,739,800.

248.   These lots are now assessed by the Lake County Property Appraiser at $115,000, 50,000, $115,000, $115,000 and $82,500, respectively, for a total of $477,500, a loss of $3,262,300 or over 87.23%.

249.   Each month CSBS receives 5 invoices for club dues with a false amounts owing.

250.   The Conspirators damaged CSBS as set forth on Schedule B, attached hereto and incorporated herein by reference.

251.   The intentional and illegal acts of the Conspiracy are the direct and proximate cause of CSBS' losses.

252.    CSBS paid quarterly POA fees of between $695 and $789 and paid a CDD fee of $2319, so have paid approximately $225,000 in just these fees during the last 10 years and approximately another $100,000 in taxes, all for vacant lots surrounded by other undeveloped or abandoned lots.

253.    On December 6, 2012, less than six months after the developer assignment, Ryan, on behalf of the POA, the Conspirators' alter ego, filed a complaint against CSBS for $246,913.79, without lot owner approval as required by law, for allegedly delinquent club dues, late fees, 18% statutory interest and attorney fees as of August 31, 2015.

254.    The alleged damages for CSBS' special assessment increase at least $113.22 each day.

255.    The Conspirators mail five false invoices for club dues each month.

256.    The Conspirators used the legal proceedings to repetitively harass and intimidate the Sheltons, subjecting them to the payment of significant legal costs.

257.    The Conspirators instructed the guard gate to deny the Sheltons access to the community to which lot owners were entitled in violation of Florida Homeowners Association Act.

258.    The Conspirators malicious illegal conduct as detailed herein destroyed the value of Sheltons' lot, making it virtually unmarketable.

259.    Ryan, as agent for the Conspirators, directly threatened CSBS with financial ruin from continued litigation and judgments related to the special assessment for dues related to the club mandate.

260.    Greene, as agent for the Conspirators, by notice to all lot owners in his status as President of the POA, threatened the Sheltons with the expired build compulsion.

261.    The Conspirators maliciously deprived the Sheltons of the right to vote for POA board members or to become a candidate for the POA board, depriving the Sheltons in their lawful participation in the governance of their community.

262.    The Conspirators offered to end the harassment represented by the lawsuit if CSBS would surrender its choice lots to DCS.

263.    The Conspirators fraudulently asserted that CSBS must sell a choice lot pursuant to a build compulsion covenant in favor of the Declarant that expired in 2014, but that the Conspirators attempted to resurrect by recording a fraudulent amendment to the CC&Rs.

## KATHRYN AND BART SUTHERIN

264.    On June 4, 2004, the Sutherins purchased lot 277 of Bella Collina and constructed a home for $2,100,000 in which they resided with their family until 2015, at which time they felt compelled to leave the community and rent their home due the harassment of the Conspirators.

265.    They also bought an undeveloped lot which they surrendered to the mortgagee, SunTrust Bank.

266.    The Conspirators, through the POA and the Golf Club, mail false invoices for club dues each month.

267.    Every month from July, 2012 to until the present, the conspirators mailed false statements for alleged assessments for POA assessments and club dues on both properties.

268.    During 2013, Greene threatened to prevent school bus access to the community as retaliation against the Sutherins.

269.    During August or September 2014, without any POA board meeting, Aegis, Burman and Greene, in furtherance of the Conspirators' objective to harass homeowners, prohibited the Lake County School District from picking up the Sutherin children, among the very few children in the sparsely built our community of school age, at a safe and convenient location within Bella Colina and required the District's buses to transport the children at a dangerous, inconvenient location outside of the community.

270.    The DCS controlled POA sued the Sutherins in the Circuit Court of Lake County, Florida

for the illegal special assessment on their home at case number 2012-CA-004493, for the illegal special assessment on their surrendered lot at case number 2014-CA-000528 (even though SunTrust subsequently satisfied all liens and encumbrances during a transfer of 78 foreclosed lots it surrendered to DCS to satisfy illegal assessment demands of the POA), for an injunction against helicopter flight (withdrawn) at case number 2015-CA-001532, for speculative water usage payments falsely claimed by the DCS controlled Pine Island CDD and use of a landscape irrigation well authorized by the CC&Rs but outlawed by subsequent illegal and fraudulent CC&Rs at case number 2016-CA-001274.

271.    When Sutherins paid the partial judgment to the POA, Ryan rejected the payment and instructed her to make the check payable to an account controlled by the Ryan Law Group, depriving the POA of any benefit.

272.    The Conspirators prohibit the Sutherins from access to the Golf Club even though they are current in all dues.

273.    The conspirators threatened interference with the rental or sale of the Sutherins' home.

274.    On May 3, 2016, at 9:13, Greene texted Katherine Sutherin, after illegally obtaining her cell phone number from POA records, and issued the following thinly veiled threats: "Catherine, it was really good seeing you so much this past weekend when you would stop in front of my house and lay on the horn. It's good to see that you miss "us"...."By the way, congrats on your new tenant," "can't wait to see you guys soon," and at 10:15 "Ha! You're funny. Once again you always have incorrect information (so typical of you) We will be in touch very soon on what you owe us. See you soon in Court."

275.    During the May 3, 2016 exchange of texts, Greene responded to Kathryn Sutherin's accusation that he was obsessed with harassing and intimidating them and sent a Bella Collina embossed mug to their new home for that purpose with the following:

"Once again you give yourself too much credit in assuming I am obsessed with you people. You don't pay your bills to anyone including several lawyers I know. We sent you a mug just to let

you know that we have not forgotten that you still owe us money and we know where to send the copy of the judgment when we get it. You are the child blowing your horn and so is your husband w the chopper buzzing houses in BC. Next time I get an N number when comes out here, my lawyer will file another complaint.."

"I really don't like white trash."

276. The POA denied and will continue to deny the Sutherins access to their community by turning off their transponder, which allows residents of Bella Collina to access the community using the automated gate.

277. Further, the Club at Bella Collina, LLC, denies the Sutherins access to club facilities even though they are current with all dues and monthly minimums, as retaliation for the Sutherins' resistance to the Conspirators' control of the community.

278. On July 31, 2016, Katherin Sutherin discovered that the transponder for her vehicle had been disabled by the POA, and she had to gain access to her community by seeking the permission of a security guard to enter through the guest gate.

279. On August 1, 2016, Bart Sutherin discovered from the security guard posted at the entrance gate that his transponder had been disabled by Greene, an employee of DCS and its appointed member of the POA board.

280. Security further informed Mr. Sutherin that they were required to follow him and report his location to Greene.

281. While Mr. Sutherin was on his property, Green pulled up in a car to a nearby vacant lot to observe him.

282. Greene used his position in the HOA to gain access to the Sutherins' cell telephone number to send harrassing texts, and mailed a mug to the Sutherins' new home after they changed their residence as a thinly veiled threat.

283. POA assessments on lot 277 are fully paid.

284. The POA never conducted a board meeting to consider suspension of the Sutherins' access rights or informed them in writing of such a suspension as required by law.

285. Despite receiving full payment for any and all outstanding amounts, the POA continues to refuse to allow the Plaintiffs access to their community in violation of *Florida Statutes* §§ 720.305, which states in pertinent part:

(a) An association may suspend, for a reasonable period of time, the right of a member, or a member's tenant, guest, or invitee, to use common areas and facilities for the failure of the owner of the parcel or its occupant, licensee, or invitee to comply with any provision of the declaration, the association bylaws, or reasonable rules of the association. **This paragraph does not apply to that portion of common areas used to provide access or utility services to the parcel. A suspension may not prohibit an owner or tenant of a parcel from having vehicular and pedestrian ingress to and egress from the parcel, including, but not limited to, the right to park.**

(b) **A fine or suspension may not be imposed by the board of administration without at least 14 days' notice to the person sought to be fined or suspended and an opportunity for a hearing before a committee of at least three members appointed by the board who are not officers, directors, or employees of the association, or the spouse, parent, child, brother, or sister of an officer, director, or employee. If the committee, by majority vote, does not approve a proposed fine or suspension, it may not be imposed.** The role of the committee is limited to determining whether to confirm or reject the fine or suspension levied by the board. If the board of administration imposes a fine or suspension, the association must provide written notice of such fine or suspension by mail or hand delivery to the parcel owner and, if applicable, to any tenant, licensee, or invitee of the parcel owner.

**(3)    If a member is more than 90 days delinquent in paying any fee, fine, or other monetary obligation due to the association, the association may suspend the rights of the member, or the member's tenant, guest, or invitee, to use common areas and facilities until the fee, fine, or other monetary obligation is paid in full. This subsection does not apply to that portion of common areas used to provide access or utility services to the parcel. A suspension may not prohibit an owner or tenant of a parcel from having vehicular and pedestrian ingress to and egress from the parcel, including, but not limited to, the right to park.** The notice and hearing requirements under subsection (2) do not apply to a suspension imposed under this subsection.

(4) An association may suspend the voting rights of a parcel or member for the nonpayment of any fee, fine, or other monetary obligation due to the association that is more than 90 days delinquent. A voting interest or consent right allocated to a parcel or member which has been suspended by the association shall be subtracted from the total number of voting interests in the association, which shall be reduced by the number of suspended voting interests when calculating the total percentage or number of all voting

interests available to take or approve any action, and the suspended voting interests shall not be considered for any purpose, including, but not limited to, the percentage or number of voting interests necessary to constitute a quorum, the percentage or number of voting interests required to conduct an election, or the percentage or number of voting interests required to approve an action under this chapter or pursuant to the governing documents. The notice and hearing requirements under subsection (2) do not apply to a suspension imposed under this subsection. The suspension ends upon full payment of all obligations currently due or overdue to the association.

**(5)   All suspensions imposed pursuant to subsection (3) or subsection (4) must be approved at a properly noticed board meeting. Upon approval, the association must notify the parcel owner and, if applicable, the parcel's occupant, licensee, or invitee by mail or hand delivery.**

(Emphasis added.)

286.   As indicated in Exhibit B, the Sutherins suffered damages in the nature of decreased property value and expenses of at least $1,529,110, all of which is directly and proximately caused by the conspirators' conduct as described in this complaint.

## BRAD AND LANA C. HECKENBERG

287.   Brad and Lana Heckenberg owned four lots.

288.   Lots 408 and 409, located at 16536 Bolsena Drive, Montverde, Florida  34756, were consolidated and improved with a residence.

289.   In 2012, the Conspirators sued for false assessments, which suit they dismissed in consideration for the surrender of two lots, at a below fair market price, and the execution of a settlement agreement with a liquidated damages penalty clause of $100,000 for breach of confidentiality or disparagement.

290.   The Conspirators mail a false invoice for club dues each month.

291.   The Heckenbergs sought to build an addition to their home, but were required to use Phoenix Homes, owned by conspirators Clarke and Arrighi, which made the project cost prohibitive.

292.   The Heckenbergs have been subjected to constant harassment, including denial of resident access to the community involvement in the POA, insults and threats of fines for fabricated violations related to signs, refuse, irrigation well usage, and denial of Country Club use, even though the coerced membership is fully paid.

293.   The illegal control of the POA, suppression of lot prices and inflated POA and CDD assessments and charges caused a diminution of the value of their property of, as indicated on schedule A.

## ITZ GROUP, LLC

294.   Petitioner ITZ Group, LLC owns lot 48 located at 16015 Pendio Dr., Montverde, Fl. 34756.

295.   It entered into a Lot Purchase Agreement on April 24, 2004 and closed on June 7, 2004 with Ginn.

296.   The Conspirators mail a false invoice for club dues each month.

297.   As indicated on Schedule B, attached hereto and incorporated herein, the conduct of the Conspirators directly caused the loss of $448,308.

## THE SHIN TRUST AND PJS

298.   PJS Rental LLC, managed by Dr. Kyu Ho Shin, M.D. for his children, purchased lot 268 for $40,000, from Won S. Yi, who had purchased the lot for $40,000 from Dr. Kyu Ho Shin, M.D. and Won T. Shin his wife who had purchased the lot from Ginn for $709,900, receiving a deed dated June 13, 2005.

299.   PJS Rental, LLC received Ginn a HUD registered report dated April 2, 2004, which indicated on page 13 that construction of the country club, and other amenities, was optional at the discretion of the developer and membership was not mandatory.

300.    By deed dated October 6, 2008, the Won Y. Shin Trust dated December 12, 2004 purchased lot 379 for $265,000 from Joseph Sonny who purchased the lot from Ginn on July 9, 2004 for $589,900.

301.    The Ryans and the Ryan Law Firm, in furtherance of the Conspiracy, filed a lawsuit to enforce a build compulsion contained in the Amended CC&Rs and the Second Amended CC&Rs, which had expired in 2014, but had been illegally extended for another ten (10) years in the fraudulent Third Amendment to Second Amended and Restated Declaration of Covenants, Conditions and Restrictions for Bella Collina at paragraph 23, subparagraph 5 states that the repurchase right shall expire "...ten (10) twenty (20) years after the date of these CC&Rs are recorded in the Public Records."

302.    The illegal enforcement of an expired build compulsion was a scheme that the Conspirators employed to selectively extort lots from from Bella Collina lot owners.

## P.S.I. CAPITAL, INC.

303.    P.S.I. Capital, Inc. (hereinafter P.S.I.) acquired thirty-three Bella Collina lots from a foreclosing bank.

304.    The Conspirator controlled POA immediately served false bills for approximately $3,600,000 in unpaid assessments, including for delinquent club dues, followed by suit in the Lake County, Florida Circuit Court.

305.    The Conspirators offered to end the harassment represented by the lawsuit if CSBS would surrender its choice lots to DCS.

306.    The conspirators dismissed the suit in consideration for the transfer of thirty lots to DCS, the payment of $125,000 to Ryan's Trust Account, and the execution of an agreement with a strict confidentiality clause.

307.    The settlement deprived the POA of any benefit from the lawsuit and permitted the conspirators to embezzle funds owed to the POA.

308.    On information and belief, the POA suffered damages of at least $500,000 in annual assessments, interest, late fees and costs from the Conspirators' use of the POA to "write-off" these assessments, and the Conspirators were enriched by the receipt of unencumbered lots.

309.    On December 20, 2013, Ryan filed suit against the owner of P.S.I., Paul R. Ashe (hereinafter Ashe) for use of an irrigation well, which was permitted by the Governing documents but prohibited by the illegal amendments filed by the Conspirators acting in the guise of the POA.

310.    The Conspirators instructed the guard gate to deny the Ashe access to the community to which lot owners were entitled in violation of Florida Homeowners Association Act and deprived him of access to the Golf Club even though he was a fully paid member.

311.    Ryan, as agent for the Conspirators, directly threatened Ashe with financial ruin from continued litigation and judgments related to the special assessment for dues related to the club mandate.

312.    Greene, as agent for the Conspirators, by notice to all lot owners in his status as President of the POA, threatened the Ashe with the expired build compulsion.

313.    The Conspirators maliciously deprived Ashe of the right to vote for POA board members or to become a candidate for the POA board, depriving Ashe of his lawful participation in the governance of their community.

314.    The previously quoted letter of Michael J. Ryan dated August 25, 2014 instructed the Aegis and Golf Club book keepers as follows:

### "IMPORTANT-RE P.S.I

After reviewing the ledger of P.S.I., I realize that when DCS funded the purchase of the Lots, I disbursed the full amount due the POA ($75,527.23) and only $46,611.64 which was only part of the $146,611.64 due the Club.  When we receive the last $100,000 from P.S.I., it should have all gone to the Club-but, I split it between the Club (66%) and the POA (34%)-MY BAD.  I can void the Check #1584 and reissue to The Club (See Ledger)."

315.   Thus, the POA sued for about $3,000,000 in delinquent assessments and received about $40,000 and the Conspirators received 30 lots originally worth about $18,000, cleared of all encumbrances, for nothing.

## THE SUN TRUST LOTS

316.   Prior to 2012, Sun Trust Bank, N.A. ("Sun Trust") obtained title, primarily through foreclosure, to seventy-eight lots from lot owners to whom it lent tens of millions of dollars for the purchase of Bella Collina lots.

317.   Sun Trust entered into an agreement dated April 18, 2012 for the sale of these lots (including lot 21 formerly owned by the Sutherins) to Franchas Holdings, LLC (hereinafter "Franchas").

318.   Immediately on receiving the assignment of developer from Ginn in June of 2012, DCS assumed control of the POA by having Burman file false corporate records.

319.   The conspirator controlled POA filed false claims for assessments against the Sun Trust properties, and interfered with the Franchas agreement with the malicious intent to preclude its fulfillment and force a sale of the Sun Trust properties to DCS in fulfillment of the Conspiracy.

320.   The Conspirator controlled POA filed seventy-eight (78) separate lawsuits for the collection of the illegal special assessments and regular annual assessments against Sun Trust.

321.   The Conspirator controlled POA coerced Sun Trust to sell the seventy-eight (78) properties to DCS for a bulk price of $1,064,500 (61 were transferred by deed to DCS on December 18, 2012), the payment for which was decreased by the false claim for assessments, interest and attorney fees as set forth in the lawsuits.

322.   In December of 2012, the Conspirator controlled POA dismissed all lawsuits against Sun Trust with prejudice.

323.    On information and belief, the POA did not receive benefit for the alleged assessments, the false charge for which permitted DCS to obtain a dramatically discounted price.

324.    On information and belief, the POA suffered damages of at least $1,000,000 in annual assessments, interest, late fees and costs from the Conspirators' use of the POA to "write-off" of assessments on these lots, and the Conspirators were enriched by the receipt of unencumbered lots.

325.    In 2015, DCS coerced Sun Trust to convey another 7 lots, depriving the POA of assessments encumbering those lots.

### KENNETH OWEN LAM AND LUEN C. CHAN

326.    Kenneth Owen Lam and Luen Chan worked together to review in detail the financial records of the Bella Collina POA books.

327.    Both men lived in beautiful large homes in Bella Collina, whose values were dramatically decreased by the Conspirators as described in Exhibit B.

328.    They obtained finanacial information from POA Board Member, Burman who, as previously described, was also the owner of Aegis Community Management.

329.    Aegis maintained all files for the POA Board including the financials.

330.    Lam and Chan studied year-end audits and monthly statements of the POA, and developed serious with highly irregular book keeping methods.

331.    They met with the bookkeeper and auditor along with Burman.

332.    The Conspirators especially Simonson, acting for and on behalf of the conspirators, sued Lam, for using a legal irrigation water well on the property.

333.    The water well was legally installed on Lam's property prior to his ownership.

334.    Mr. Lam spent $20,000 defending himself from the allegation even though Lam voluntarily discontinued use of the well.

335.    The meritless lawsuit was dismissed after many months of legal proceedings.

336.    On November 10, 2015, in the Aegis offices located in Champions Gate, FL, Mr. Lam and Mr. Chan were having a routine meeting with Mr. Burman, the POA auditor, Kurt Showalter, and the bookkeeper who was on conference call to discuss errors and irregularities related to the POA financial statement.

337.    Without warning or invitation, Simonson and Arrighi, acting on behalf of the Conspirators aggressively and with the intent to intimidate Lam and Chan and coerce them into abandoning their investigation and to surrender their properties, ambushed Lam and Chan.

338.    Simonson knew that Lam was elderly, frail, and sensitive in nature.

339.    Simonson loudly and aggressively shouted "I smell another lawsuit coming" and issued numerous insults and threats for an extended period of time.

340.    The ambush surprised and frightened Chan and Lam.

341.    Mr. Lam stood in a vain attempt to defend himself and the purpose of his actions.

342.    Simonson achieved his intended objective by causing Lam great discomfort, stress and embarrassment.

343.    Lam, shaken and traumatized, politely and timidly, as was his nature, excused himself to get a drink of water.

344.    At the water fountain, he collapsed on the floor, and died in the ambulance on the way to the hospital.

345.    Chan, characterizes the incident as an "ambush," since neither Mr. Simonson nor Mr. Arrighi had been involved in any of the previous meetings, and no concerns were ever expressed to Mr. Chan or Mr. Lam regarding their involvement with the their review of the books of accounting.

346.    Chan believes the aggressive intimidation by both Simonson Mr. Arrighi caused Lam's death.

347.    On information and belief, Simonson's and Arrighi's attack on Lam and Chan was for the purpose of covering up the Conspirators' fraudulent use of the POA to embezzle funds and to use the POA to extort lots and money from lot owners.

348.    The Conspirators sued Chan, forcing him to sign an agreement containing a severe penalty for breach of confidentiality, and threatened him with further suit if the report detailing the financial misconduct was released.

## STEPHEN AND ELIZABETH FRIEZE

349.    On January 28, 2005, the Friezes, then citizens and residents of England, purchased lot number 391 from R. L. Vogel Homes, Inc., a designated builder of Bella Collina and constructed a luxury home for approximately $5,100,000., using their life savings from the sale of their family business and a loan in the amount of $3,600,000 from Fifth Third Bank.

350.    The Friezes also invested approximately $1,000,000 in furnishings for their home.

351.    On June 29, 2012, Burman, fraudulently asserting that he was agent for the POA but acting as agent for the conspirators, filed a lien on behalf of the POA against the Friezes' home for $11,849.02 in unpaid assessments at Book Number 4181, Page 487of the Official Records of Lake County, Florida.

352.    On February 25, 2013, the Conspirators, acting as the POA, filed suit against the Friezes in the Circuit Court of the Fifth Judicial Circuit for Lake County Florida at case number 2013-CA-000680, alleging that the Friezes owed $14,163.68 in annual assessments and $78,407.64 in special assessments for payment of the illegal mandatory club membership.

353.    The conspirators used the POA and the lawsuit to acquire personal information about the Friezes which was used to further the purposes of the conspiracy and provided to Arrighi.

354.    On August 24, 2014, the Friezes attended a status conference at the Lake County Court House concerning the Bella Collina suit.

355.    James Ryan, acting for the conspirators, appeared for the POA, and while waiting in the corridor prior to the conference, excoriated and threatened the Friezes, in a very loud voice that many would consider shouting.

356.    From 80 feet away, they heard Mr. Ryan tell embarrassed strangers that he sued hundreds of Bella Collina Property owners who were rich enough to acquire property in the Development, and every one of these law suits has resulted in these rich Bella Collina Property owners losing their property and their wealth, including "I cannot wait to get their money," and "Now all these rich people have nothing, I've taken it all away," with the malicious intent to intimidate the Friezes and perhaps other Bella Collina lot owners.

357.    Waiving his arms wildly, Mr. Ryan announced that "there is a couple here today that are going to fight it, and then boasted: "I'm going to take all their money too, just as I have with all the others I have sued. I can't. wait."

358.    Ryan then walked over to the Friezes and arrogantly introduced himself returning to his previous position in the corridor to make the same points regarding the taking of money and property from various Bella Collina property owners.

359.    Ryan's rant continued on for at least 20 minutes, embarrassing others present who hung their heads and tried to distance themselves from this spectacle

360.    A short while after the status conference, Arrighi, using information in the possession of the POA, contacted the Friezes and appeared at their home, falsely representing himself as an attorney for DCS and the POA, and stating: "I can make everything go away."

361.    Arrighi contacted Fifth Third Bank to get details about the status of the Friezes loan and began negotiating for a discount of the balance owed in the event of a short sale.

362.    Arrighi represented that he controlled Burman, could make the POA settle its lawsuit and could solve any problems at the Reunion development, where the Friezes also owned property and where Burman was also the community association manger.

363.    On information and belief, Arrighi submitted false preliminary HUDs and other documentation to secure the agreement of the bank, which decreased the bank's payment by large assessments, fees, and commissions, which were never paid to the POA or others.

364.    On June 2, 2015, the Friezes sold their home for $1,640, 000 conditioned on the payment of the payment Club Dues allegedly owed to The Cub of Bella Collina for $51,351.65 and POA assessments of $21,446.35 as indicated on the HUD statement prepared by the closing agent.

365.    Burman executed a "Release of Lien" on August 6, 2015 in which he identified himself as the "Agent" of the POA and the consideration for the consideration for the release of the unpaid assessments as $0 at Book Number 4671, Page Number 690 of the Official Records of Lake County, Florida, indicating that the POA had not received any of the payment listed on the June 2, 2015 HUD.

366.    The pressure from the Conspirators caused the Friezes to reject a $2,700,000 offer for the house which was accompanied by a $250,000 offer to purchase the furniture.

367.    The conspirators ordered the guards at the entry gate of the POA to deny the Friezes access to their home.

368.   Arrighi appeared unannounced at the Frieze residence with other members of the conspiracy to celebrate their victory over the Friezes.

369.   Schar resides in this home when he visits Bella Collina and DCS uses it in violation of the CC&Rs as part of the Club's wedding packages and for other commercial purposes.

## ARRIGHI AND 15008 PENDIO

370.   On June 28, Margaret A. Rogers and Russell Rogers (hereinafter "the Rogers") purchased a lot at 15008 Pendio Drive in Bella Collina effectuated by a deed recorded in the official records of Lake County, Florida at Book Number 2872, Page 1741.

371.   In 2008, the Rogers built an 8755 square foot mansion complete with an elaborate pool and spa on the "Street of Dreams" in Bella Collina, using funds from a large mortgage provided from a financial institution.

372.   In 2009, the Lake County Tax Collector Assessed the value of the home at $2,758,208.

373.   On February 12, 2013, Ryan, on behalf of the Conspirator controlled POA, sued the Rogers in Lake County Circuit Court at Case Number 2013-CA-000516 for $42,396.97 in annual assessments set forth in Exhibit A of the complaint and for $65,364.44 in special assessments for the Golf Club membership mandate set forth in Exhibit B of the Complaint, and used various other methods of coercion to force the Rogers to surrender their home.

374.   The Rogers relented and Arrighi fraudulently damaged the home in an attempt to make a fraudulent insurance claim and to get it condemned as a means to coerce the mortgagee into discounting its loan.

375.   On June 24, 2013, the Rogers conveyed the home by deed recorded at Book 4375, Page 1480 in the official records of Lake County, Florida for $125,000.

376.   After the conveyance to Arrighi, Ryan ceased significant activity in the Rogers lawsuit and dismissed the suit with prejudice on May 16, 2014.

377.   The POA never received any of the proceeds of the Arrighi sale to pay for the delinquent assessments.

378.   On November 19, 2013 aegis sent Arrighi a "DELINQUENCY NOTICE" in the amount of $47,568.45.

379.   On September 3, 2014, Greene, without any authorization, instructed co-conspirator Burman to "write off the balance" by email.

380.   Thus the POA suffered damages of $47,568.45 in assessments due on this lot and Arrighi was enriched by the receipt of an unencumbered lot.

381.   In response, on September 4, 2014, Burman instructed Aegis employee Karla Key by email to "write of the balance on Arrighi's home up to the date he took title and send new coupons.

382.   Arrighi owes the Commonwealth of Massachusetts more than $400,000 in restitution for his previously describe theft, but claims that he is destitute.

383.   The distress sale of this home creates a comparable that dramatically decreases the values of other homes in Bella Collina, serving the conspirators' goal of suppressing home and lot values.

### JORDAN AND MYRA RUPERT

384.   In September, 2011 William Boylan (hereinafter "Boylan) of Alfreso Acquisitions, LLC (hereinafter "Alfresco") acting as an agent for Jordan Rupert and Myra Rupert (hereinafter the "Ruperts") purchased a home on lot 383 for the Ruperts, exclusively using the Rupert's funds.

385.   Boylan fraudulently deeded the home to Alfresco and personally occupied it.

386.   On August 21, 2012, the Ruperts filed suit in the Fifth Judicial Circuit Court for Lake County Florida at Case Number 2012-CA-002916 against Boylan to reacquire possession of their home.

387.    On November 5, 2013, the Florida Circuit Court ruled that the Ruperts "established their equitable interest" in the home and appointed a receiver as part of the process of returning the home to the Ruperts.

388.    The conspirators, especially DCS, Greene and Ryan, were aware of this fraud and of the Circuits Court's Order and intended it as part of their conspiracy to acquire homes for little or no investment through force, intimidation and fraudulent legal proceedings.

389.    In 2013, DCS on behalf of the POA filed suit against Alfresco for allegedly delinquent club and POA dues owed for multiple properties that Alfresco had purchased (including the Ruperts' house).

390.    Greene in a deposition dated June 12, 2013 (with Jim Ryan present) acknowledged that the Ruperts were illegally deprived of their house as part of a "ponzi scheme."

391.    On April 28, 2014, although DCS and Greene were fully aware of the Rupert lawsuit, the Circuit Court Order, and the Boylan fraud, Ryan, acting as closing agent for the conspirators and with the intent to frustrate the Ruperts' reacquisition of their home, illegally filed a false deed from Alfresco to DCS "as partial satisfaction of judgement," without the knowledge or consent of the court appointed receiver, the only entity with legal authority to transfer title.

392.    On May 30, 2014, Ryan acting as closing agent, transferred the property from DCS to Randall F. Greene and Christina M. Greene, who took immediate possession of the Rupert's home, by filing another false deed, again with the intent to harm the Ruperts, benefit the Conspirators, and frustrate the Court Order.

393.    Ryan, with knowledge of the illegality of the transaction, inserted "without benefit of title search" in both deeds, and to the benefit of Greene and the detriment of the POA but without authorization, satisfied all liens.

394. Ryan filed false deeds and lien satisfactions, with the intent to further the Conspiracy.

395. The Ruperts, after obtaining a final summary judgement against Alfresco to get possession of the house, were required to amend their suit to take possession from Randall F. Greene starting the process all over again.

396. Finally, on May 1 2016 (four years and 2 fraudulent transfers later) the Ruperts obtained possession of their house only to then be sued by DCS for outstanding HOA and the illegal club dues, since Greene had not been paying those while he had title to the house.

397. The DCS controlled POA reported the Ruperts as owing $11,144.48 even though they only had legal possession of the house for 3 months.

398. Although the fraudulently stated the intent of the transfer was to satisfy a judgement to the benefit of HOA and the Club, only Greene and Ryan benefitted, Greene by occupying a house for free for 2 years and Ryan by receiving legal fees paid by the HOA to defend Greene for the fraudulent transfer.

## NICK FALDO PROPERTY

399. Nicholas A. Faldo (hereinafter "Faldo") is a lot owner and manager of Nick Faldo Real Estate Holdings, LLC with headquarters a 1000 Legion Place, Suite 1200, Orlando, Florida 32801 who resides in Orlando, Florida.

400. Faldo and the Conspirators engaged in a sham real estate transaction, described more particularly herein, for the purpose of manipulating lot prices and creating false comparables to deceive lot buyers and financial institutions.

401. On April 12, 2005, Nicholas C. Faldo and Valerie Faldo , LLC ("Faldo") acquired Lot 124 of Bella Collina for $1,250,900 by deed recorded in the official records of Lake County Florida at Book 2875, Page 585.

402.     On September 23, 2004, J Richard Watson Construction Company, Inc. ("Watson") acquired lot 380 of Bella Collina for $574,900 by deed recorded in the official records of Lake County, Florida at Book 2671, Page 223.

403.     On May 1, 2014, after employing the coercive means of the Conspirators as described herein, DCS acquired lot 380 from Watson for a stated value of $50,000 by deed recorded in the official records of Lake County at Book 4494, Page 310.

404.     On October 10, 2016, DCS conveyed lot 380 to Faldo for a stated value of $599,000 by deed recorded in the official records of Lake County, Florida at Book 4853, Page 1976.

405.     Lot 380 has a current appraised value of $115,000 for real estate tax purposes.

406.     Also on October 5, 2016, Faldo conveyed lot 124 to DCS for the identical amount of $599,000 by deed recorded in the official records of Lake County, Florida at Book 4853, Page 614.

407.     Lot 124 has an assessed value of $126,500 for real estate tax purposes.

408.     These DCS-Faldo deed conveyances were sham transactions to create false comparables to deceive banks and future purchasers about the true fair market value of the subject lots and the other lots that DCS owned to further the previously stated purposes of the Conspiracy.

### FIRST CLAIM FOR RELIEF
### 18 U.S.C. §1962(C)
### AGAINST ALL DEFENDANTS

409.     Plaintiffs incorporate paragraphs 1 through 408 as though set forth fully herein.

410.     Defendants constitute an associated-in-fact Enterprise, through which they illegally controlled the POA, knowing that the POA should have been turned over to the non-developer lot owners 90 days after August 29, 2005.

411.     Defendants used this control to embezzle funds from the POA, to harass POA members, to physically and verbally intimidate POA members, to mail false invoices for the invalid and illegal

"special assessment" for the payment of private country club dues, with illegal charges for improper late fees, legal fees, attorney fees and interest, to fraudulently assert rights to an expired build compulsion, to file false liens, to deprive POA members of control of their association or community, to file unauthorized development plans which harmed the community but benefitted the developer, to illegally hinder the access of POA members to their community, to interfere with the property rights of POA members by illegally suing for alleged CDD charges, prohibiting valid use of wells for irrigation, taking possession and occupancy of a POA member's homes and filing a false deed to maintain that possession, and other abusive and illegal acts.

412.    The defendants deceitfully used the POA to file about 400 lawsuits against lot owners of 600 or more lots to enforce a provision of the illegally amended CC&Rs which mandated the payment of a special assessment for the payment of private country club, which they knew to be invalid.

413.    DCS now has legal title to approximately 650 lots and more owned by insiders under the control of DCS.

414.    Of the original 750 lots sold to POA members for more than half a billion dollars, only about 100 remain in the hands of non-developer lot owners.

415.    The ostensible purpose of the lawsuits was to acquire funds for the POA.

416.    However, the Defendants' malicious intent was coerce non-developer lot owners into surrendering their lots to DCS by deflating the value of lots with oppressive fees and objectionable policies, effectively poisoning the market for resale.

417.    When the defendants found buyers for their lots, the POA would issue false and exorbitant demands for HOA fees, assessments and application fees and refuse to provide fair and accurate estoppel certificates.

418. DCS used the POA to interfere with signed purchase contracts to force a distress sale or transfer of the lot to DCS instead.

419. DCS knowingly prevented comparable sales which were necessary for buyers to obtain financing, further driving down values to obtain lots for little or no costs.

420. In each case Ryan, improperly acting as attorney for both DCS and the POA, filed suit for exorbitant amounts related to initiation fees, club dues, interest, late fees, and attorney fees, without approval of a validly elected board or lot owners as required by statute, on the pretext of enforcing POA rights to assessments.

421. The real intent of Ryan and the Defendants was to deprive the POA of any benefit and to obtain a negotiated settlement which required the defendant lot owner to surrender the subject lot and certain payments to DCS directly and for the POA to dismiss its lawsuit.

422. DCS and its attorney thus usurped any opportunity for benefit by the POA.

423. On information and belief, DCS and its attorney created LLCs such as Rocking Red H, LLC to divert lots and funds from the POA and its members to Schar, the Ryan Law Group, Simonson, Greene, and other favored insiders and prevent benefit to the POA.

424. Schar, Simonson, Ryan and DCS directed Burman, Greene, Clarke, Lebreux, the Ryan Law Group and Aegis to use illegal and improper accounting methods to deprive the POA of income owed by DCS on its increasing hoard of lots and to increase debt allegedly owed by the POA to DCS.

425. Schar, Simonson, Ryan and DCS directed Burman, Greene, Clarke, Lebreux, the Ryan Law Group and Aegis to perform the illegal and destructive acts detailed in this claim.

426. Schar, Simonson, Ryan and DCS directed Burman, Greene, Clarke, Lebreux, the Ryan Law Group and Aegis to file false corporate documents with the Florida Department of State Corporations Bureau, e.g they represented that agents and officers under the control of the Conspiracy were the

authorized officers of the POA and that POA lot members, e.g. Joseph Cross, were officers when they were not to hide the control by Greene of the POA board.

427.   Schar, Simonson, Ryan and DCS directed Burman, Greene, Clarke, Lebreux, the Ryan Law Group and Aegis directed CPA Showalter to falsely represent that an audit of the POA finances had been performed in accordance with law and generally accepted accounting standards and filed tax statements with the IRS without authority and which contained false or inaccurate information,

428.   DCS used confrontation and harrassment by almost any means possible to scare lot owners into surrendering their lots.

429.   DCS took control of the water CDD to charge exorbitant rates, denied owners access through the resident lane of the community entrance, filed repetitive nuisance suits over use of irrigation wells permitted by the original CC&Rs, and sued in 2015 to enforce a build compulsion that expired in 2014 by the terms of the original CC&Rs, filed numerous illegal amendments to the CC&Rs to benefit the developer at the expense of the lot owners.

430.   As explained herein, the Defendants are "persons" who participated in the conduct of the affairs of the Enterprise, directly or indirectly, through a pattern of racketeering activity which predicate acts include financial institution fraud (18 U.S.C. 1425), interference with commerce, robbery or extortion (18 U.S.C. 1951), racketeering (18 U.S.C. 1952), monetary transaction involving criminally obtained property (18 U.S.C. 1957), fraud using the Postal Service (18 U.S.C. §1341), fraud using wire, radio or television communicatiom (18 U.S.C. §1343), scheme or artifice to defraud or deprive another from the intangible right to honest services (18 U.S.C.§ 1346), interstate transportation of money taken by fraud (18 U.S.C. §2314).

431.   The following state violations constituted predicate acts: §812.014, Florida Statutes (Theft), §817.02, Florida Statutes (Obtaining Property by False Pretenses), §817,025, Florida Statutes

(Home or Private business invasion by false personation), §777.04, Florida Statutes (Criminal Conspiracy), §817.03 (Making false statement to obtain property or credit), §817.061, Florida Statutes (Making solicitation of payments prohibited), §817.15, Florida Statutes (False entries in books of business entity), §817.155, Florida Statutes (Matters within jurisdiction of Department of State; False, fictitious or fraudulent acs, statements or representations...), §817.2341, Florida Statutes (False or Misleading statements or supporting documents), §817.29, Florida Statutes (Cheating), §817.535, Florida Statutes (Unlawful filing of records against real or personal property), §713.084, Florida Statutes (False lien), §817.569, Flordida Statutes (Criminal use of a public record...), §836.05 Florida Statutes (Threats; extortion), §837.06, Florida Statutes (False Official Statements), §837.02, Florida Statutes (Perjury in official proceedings), §§895.01-895.06 (Florida RICO Act).

432.   As detailed herein, the Enterprise was used to make possible Defendants' pattern of racketeering activities, and the pattern of racketeering activities had:

      a.  The same or similar purpose of making money;
      b.  The same or similar result of collecting a debt or obtaining property by fraud;
      c.  The same or similar participants in the Defendants;
      d.  The same or similar victims; and,
      e.  The same or similar methods of commission.

433.   The racketeering enterprise of the Defendants and each of them caused the Plaintisffs to suffer the following damages in the form of interference with the marketability and peaceful enjoyment of private property, diminution of property value, attorney fees, court costs, assessments paid, prejudgment interest, taxes and other damages a described herein and proven at trial.

## SECOND CLAIM FOR RELIEF
## FLORIDA RICO ACT

434.   Plaintiffs incorporate paragraphs 1 through 408 as though set forth fully herein.

435.   he following state violations constituted predicate acts: §812.014, Florida Statutes (Theft), §817.02, Florida Statutes (Obtaining Property by False Pretenses), §817,025, Florida Statutes (Home or

Private business invasion by false personation), §777.04, Florida Statutes (Criminal Conspiracy), §817.03

(Making false statement to obtain property or credit), §817.061, Florida Statutes (Making solicitation of

payments prohibited), §817.15, Florida Statutes (False entries in books of business entity), §817.155,

Florida Statutes (Matters within jurisdiction of Department of State; False, fictitious or fraudulent acs,

statements or representations...), §817.2341, Florida Statutes (False or Misleading statements or

supporting documents), §817.29, Florida Statutes (Cheating), §817.535, Florida Statutes (Unlawful filing

of records against real or personal property), §713.084, Florida Statutes (False lien)

### THIRDCLAIM FOR RELIEF
### 15 U.S.C. §1962, Et Seq.
### FAIR DEBT COLLECTION PRACTICES ACT
### AGAINST RYANS, RYAN LAW GROUP, AEGIS, THE GOLF CLUB AND THE POA

436.    Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth at length

herein.

437.    Plaintiffs are consumers as defined by Florida Statutes §15 u.s.c. §1692 A(3).

438.    Defendants DCS, the Ryans, The Ryan Law Group, Aegis, The Golf Club and the POA, at

all relevant times, are debt collectors as defined by 15 U.S.C. §1692a(b).

439.    Defendants DCS, the Ryans, The Ryan Law Group, Aegis, the Golf Club and the POA and

their officers and directors violated the Consumer Collection Practices Act by knowingly sending false

billing statements related to illegal special assessments, billing lot owners for sports club initiation fees

and dues knowing that such bills were illegal and unenforceable, and engaging in abusive, deceptive and

unfair practices to collect an alleged debt in violation of 15 U.S.C. § 1692 a, et seq.

440.    Defendants identified in this Claim billed for "technology" and "lotscape" assessments that

had not been approved or provided.

441.    These violations of law caused Plaintiffs to suffer the inability to sell its property at fair

market value, the unnecessary payment of a special assessment for a non-existent sports club, a deposit

for possible membership, and diminution in the value of its lots in an amount as high as $as indicated in Schedule B, which is attached hereto and incorporated herein by reference.

### FOURTH CLAIM FOR RELIEF
### 15 U.S.C. §1, §2 and 15 U.S.C. §12, et seq.
### AGAINST ALL DEFENDANTS

442.    Plaintiffs incorporate paragraphs 1 through 408 as though set forth fully herein.

443.    Bella Collina is a discrete market for the sale and development of 801 lots.

444.    DCS and the DCS related entities possess monopoly power in the market for the sale of lots in Bella Collina, owning or controlling 80% of all lots and homes.

445.    The value of any lot was dependent on the operation of the POA and the actions of the developer.

446.    The defendants conspired to illegally control the POA and enforce restrictive covenants which they knew to be invalid, illegal and unreasonable for the illegal purpose of destroying the value and economic viability of the lots and coercing lot owners to surrender them to DCS and the DCS entities.

447.    The illegal mandatory golf club membership, illegal special assessment, illegal control of the POA, requirement that lot owners must pay for club memberships and assessments on lots, write-off of assessments on lots owned by the Conspirators, the merger of control of the boards of the POA, the Golf Club, DCS, the DCS entities and the CDD, and exorbitant and unreasonable country club fees and dues constituted anti –competitive practices in the form of price discrimination, exclusive dealings, price control, anti-competitive merger, inter-locking directorates and tying.

448.    This conspiracy to perform the acts described in the preceding paragraph, to monopolize this market and to restrain the development and resale of the lot owners' property violates the Sherman Antitrust Act, 15 U.S.C. and the Clayton Act §15 U.S.C. §12, et seq.

449.    These violations caused the Plaintiffs, and all similarly situated current and former, lot owners to suffer damages in the nature of diminished lot values and excessive carrying costs related to ownership and lack of marketability of their lots.

### FIFTH CLAIM FOR RELIEF
### §542.15, FLORIDA STATUTES, et seq.
### AGAINST ALL DEFENDANTS

450.    Plaintiffs incorporate paragraphs 1 through 408 as though set forth fully herein.

451.    This conspiracy to perform the acts described in herein, to monopolize this market and to restrain the development and resale of the lot owners' property violates the Florida Antitrust Act of 1980.

452.    These violations caused the Plaintiffs, and all similarly situated current and former, lot owners to suffer damages in the nature of diminished lot values and excessive carrying costs related to ownership and lack of marketability of their lots.

### SIXTH CLAIM FOR RELIEF
### CONSUMER COLLECTION PRACTICES ACT, FLA. STAT. §§559.55-559.785
### AGAINST RYAN, RYAN LAW GROUP, AEGIS, AND THE POA

453.    Plaintiffs incorporate by reference paragraphs 1 through as though 408 set forth at length herein.

454.    Plaintiffs are consumers as defined by Florida Statutes §559.55(2).

455.    Defendant Bella Collina Club, LLC, at all relevant times, is a debt collector.

456.    The Bella Collina Club, LLC and its officers and directors violated the Consumer Collection Practices Act by knowingly sending false billing statements related to illegal special assessments, billing lot owners for sports club initiation fees and dues knowing that such bills were illegal and unenforceable, and engaging in abusive, deceptive and unfair practices to collect an alleged debt.

457. These violations of law caused Plaintiffs to suffer the inability to sell their property at fair market value, the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of their lots.

## SEVENTH CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY
## AGAINST RYAN, RYAN LAW GROUP, AEGIS, BURMAN, GREEN, CLARKE, LEBREUX AND THE POA

458. Plaintiffs incorporate by reference paragraphs 1 through 408 of this Complaint as though set forth at length herein.

459. The members of the POA's board of directors, its lawyers, its licensed community association manager and management company were, at all relevant times, acting as agents of the POA within the scope of their agency.

460. The POA and its officers, directors, lawyers, licensed community association manager and management company have a fiduciary duty to lot owners and POA members as set forth in Florida Statutes, 720.303(1), the Non-Profit Corporations Act, the ethics and disciplinary codes of the Florida Bar Association, and the rules and regulations of the Florida DBPR governing community association managers, which duty includes the obligation to act in the members' best interest, tell members the truth about all material matters, disclose any material fact, and obey all lawful obligations.

461. HOA board members their lawyers, licensed community association manager and management company have a statutory duty to know and abide by properly adopted governing documents and the Homeowners Association Act.

462. The POA and its officers and directors breached the duties described above by not determining if amendments were properly adopted or valid according to the governing documents or law, attempting to collect illegal special assessments, failing to turn over the community to lot owners 90 days

after August 29, 2005 or pursuant to the June 24, 2016 Order, suing lot owners for alleged special assessments owed to a private, for-profit country club, demanding that prospective lot owners pay for sports club initiation fees and dues, restricting lot owner's choice of builder and taking other actions described with particularity herein, all of which increased costs and lessened lot values, in all of which actions the POA board was complicit first with Ginn and later with DCS.

463.    The POA's breaches of duty caused the Plaintiffs to suffer the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of lots.

464.    Burman, Greene, Clarke and Lebreux knew or should have known:

    a.  The original CC&Rs "shall run with the Committed Property" and shall "be binding on all parties" having any right to such property.

    b.  The original CC&Rs defined membership and the turnover date as identified in the POA's articles.

    c.  The original CC&Rs explicitly state that the country club and the equestrian facility are not "Association Property" and "are not governed by the Association or this Declaration." Article II, §§ 4 and 5.

    d.  The original CC&Rs do not require membership by lot owners in the country club, but Article II §4 mentions that membership in the proposed Bella Collina Country Club will be made available to lot owners.

    e.  The original CC&Rs do not mention a "sports club" or require the payment of any initiation fee or special assessment for a sports club or country club dues.

    f.  Article VII §3 of the original CC&Rs limits Special Assessments to costs for the improvement of "Association Property," which precludes the country club or

equestrian facility since they are, by declarant's own definition, **not** Association Property, Article II, §§4 and 5 (emphasis added).

g. Article VII §3, apparently subject to the requirement that special assessments relate to association property, requires a two-thirds (2/3) majority of a quorum of lot owners for a special assessment after turnover, but, in defiance of specific statutory law as discussed in this petition, permits the unilateral decision of a declarant dominated board before turnover.

h. In reliance on this document and in reliance on the representations of Ginn that an equestrian facility with trails circling the community and a sports club with a state of the art building and ball fields to be built on dedicated land would also be made available, property owners purchased lots in the community at incredibly high prices, between slightly less than $300,000 and up to $2,000,000 for an estimated gross total of over 500 million dollars.

i. Both the lot purchase agreements and the original CC&Rs expressly state that only the original CC&Rs run with the land.

j. On May 15, 2004, without property owner approval, Ginn recorded an Amended and Restated Declaration of Covenants, Restrictions and Easements for Bella Collina, which document was not provided to Plaintiffs.

k. The Amended and Restated Declarations contained changes that were not approved by existing lot owners, were in violation of statute, were unreasonable, were inequitable and were unenforceable.

l. The Second Amended and Restated Declarations, ("Second Amended CC&Rs") contained changes that were not approved by existing lot owners, were in violation of

statute, were unreasonable, were inequitable and were unenforceable (recorded at the Lake County Clerk of Courts at Book Number 02810, Page 0722, and which is incorporated herein by reference).

m. At all prior times, the original developer represented that the lot owners could opt out of club membership.

n. Specifically, the illegality, invalidity and inequity of Subsection D concerning club charges that required the payment of a membership purchase price called a membership deposit and membership dues, fees and other amounts (the "club charges"), solely determined by the club under the membership plan, but when delinquent:

   a. "...shall be deemed to constitute **Special Assessments** (emphasis added) of the Association, for which the Association shall have a lien against each lot for all unpaid Special Assessments in accordance with the lien and foreclosure provisions set forth in Article VI. If the Club provides notice to the Association that an owner owes Delinquent Club Charges, the Association shall have the right and obligation to collect Delinquent Club Charges from Owners and to enforce its lien for Special Assessments, through and including foreclosure of the lien. In the event that the Association does not enforce its rights hereunder with respect to a Special Assessment resulting from delinquent Club Charges, the Association hereby consents and authorizes the Club to enforce the lien and foreclosure provisions of Article VI. All Delinquent Club Charges collected by the Association from Owners are the property of the Club and shall be immediately paid to the Club."

o. That Subsection D illegally and inequitably changed the definition of special assessment in the original CC&Rs from an improvement to community property to a debt owed to a third party for forced inclusion in a private club located outside of community property (see subsection E, the Club is "not part of the Club Property" but is "mandatory"); it illegally changed the economic circumstances of the lots, their marketability, and their affordability by a dramatic, unknowable and uncontrollable amount (in this case a $40,000 initiation fee and a monthly charge of $579.58, $205.08

and, most recently, $428); it turned the non-profit association into a debt collector (see §f(5) for a for profit foreign corporation, even giving it the ability to defeat homestead protection or the ability to foreclose; it, at §F(3), required the Association to indemnify the Club for liability, making the Association the club's insurer;  and it declared a special assessment prior to turnover without the consent of a majority of a quorum of lot owners at a properly noticed meeting as required by law.

p.  Illegal enforcement of Subsection D prevented lot owners from selling lots fair market value, destroying the development of the community.

q.  Subsection D, as enforced by the Association, was the weapon used by DCS to coerce beleaguered lot owners into surrendering lots that cost hundreds of thousands, and sometimes millions, of dollars.

r.  DCS uses the POA to illegally sue for the special assessment described in Subsection D, with 18% interest (the maximum interest allowed for delinquent homeowner association dues) and exorbitant attorney fees (justified by application of the attorney fees provisions of the Homeowner's Association Act and the Governing Documents) and offers to release the alleged debt if the lot owners relinquishes ownership to this private company.

s.  All Governing Documents declare that the Club is a wholly separate entity from the POA, which separate entity adamantly refuses to disclose its income and expenses to lot owners, or to justify the obviously arbitrary amounts that the Club charges for initiation fees or monthly dues in defiance of law.

t.  Article II, Section 3, Paragraph D of the illegal and unreasonable Second Amended Declarations also provides, in pertinent part, that "Club charges owed by Owners to the

Club which become delinquent... are deemed to constitute Special Assessments of the Association, for which the Association shall have a lien against each Lot for unpaid Special assessments" destroyed member lot value and the development of the community.

u.  Article VII, Section 3 of the Second Amended Declarations which provides, in pertinent part, that "[p]rior to the Turnover Date, a Declarant controlled Board may make a Special Assessment without [a majority vote] of the Owners was illegal, unreasonable and unenforceable.

v.  Fl. Stat. 720.315 clearly provides, in pertinent part, that "[b]efore turnover, the board of directors controlled by the developer may not levy a special assessment unless a majority of the parcel owners other than the developer has approved the special assessment by a majority vote at a duly called special meeting of the membership at which a quorum is present."

w.  The illegal and inequitable nature of the payment of a $500 application fee, all membership fees and current and past dues of lot owners at the time of any resale of any lot, which demand destroyed the resale value of all lots and clouded the title of all lots to the detriment of lotowners and the benefit of DCS.

x.  Neither DCS or the POA, sought or obtained majority approval of the Bella Collina owners for any Club special assessments.

y.  Club special assessments, or liens arising out of them, are unenforceable as they were not approved by Bella Collina owners.

z. The Club has failed or refused to account for expenses and income, or to demonstrate that dues are related to a members proportionate ownership in the POA or whether DCS has paid dues for its many lots.

aa. Kurt Showalter filed to audit the POA as required by law and the POA failed to obtain a comprehensive audit prior to the alleged turnover as required by law.

bb. the changes to the Original CC&Rs and zoning changes to permit smaller lot sizes, lots in place of promised amenities such as ball fields, sports centers and equine centers and the construction of a motel are unenforceable as they were not consented to by Bella Collina owners, and are illegal and unreasonable.

cc. Fl. Stat. 720.3075(1) provides, in pertinent part, that:

   i. It is declared that the public policy of this state prohibits the inclusion or enforcement of certain types of clauses in homeowners' association documents ... which either have the effect or provide that:

   ii. A developer has the unilateral ability and right to make changes to the homeowners' association documents after the transition of homeowners; association control in a community from the developer to the nondeveloper members ... has occurred.

   iii. A homeowners' association is prohibited or restricted from filing a lawsuit against the developer, or the homeowners' association is otherwise effectively prohibited or restricted from bringing a lawsuit against the developer.

   iv. After the transition of homeowners' association control in a community from the developer to the nondeveloper members ... has occurred, a developer is entitled to cast votes in an amount that exceeds one vote per residential lot.

**EIGHTH CLAIM FOR RELIEF**
**COUNT XI-FRAUD-MATERIAL MISREPRESENTATION**
**AGAINST POA, THE RYANS, THE RYAN LAW GROUP, BURMAN, DCS, THE GOLF**
**CLUB**

465.    Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth at length

herein.

466.    The POA and its officers and directors have a fiduciary duty to lot owners and POA

members as set forth in Florida Statutes, 720.303(1), which duty includes the obligation to act in the lot

owners' and members' best interest, to tell them the truth about all material matters, to disclose any

material fact, and to obey all lawful obligations.

467.    Ginn owed Plaintiffs a duty to make true representations of material fact and to disclose

material facts only known by its agents, employees and officers.

468.    DCS contractually assumed liability for Ginn's liabilities and assumed a duty of

truthfulness and disclosure when it purchased Ginn's rights to Bella Collina.

469.    The POA, DCS and Ginn and its officers and directors breached those duties by sending

knowingly false billing statements related to illegal special assessments, knowing when promised in

various forms as herein described that they would not turn over the community to lot owners 90 days after

August 29, 2005, billing lot owners for sports club initiation fees and dues knowing that such bills were

illegal and unenforceable, filing knowingly false and unenforceable amendments to articles of

incorporation and to CC&Rs, by falsely stating that they did not have the duty to turn over the community,

or that they had the authority to unilaterally amend governing documents or to control the POA without

notice to lot owners or elections, restricting lot owner's choice of builder and taking other actions

described with particularity herein which increased costs and lessened lot values knowing that such actions

conflicted with material representations made in promotional materials, the CC&Rs and failing to disclose

additional material facts as described with particularity herein such as actual costs to run the golf club or community.

470.    The POA's breaches of duty caused Plaintiffs to suffer the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of their lots.

**NINTH CLAIM FOR RELIEF**
**COUNT XII-CONSPIRACY**
**AGAINST ALL DEFENDANTS**

471.    Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth at length herein.

472.    The POA and its officers and directors have a fiduciary duty to lot owners and POA members as set forth in Florida Statutes, 720.303(1), which duty includes the obligation to act in the lot owners' and members' best interest, to tell them the truth about all material matters, to disclose any material fact, and to obey all lawful obligations.

473.    Ginn owed Plaintiffs a duty to make true representations of material fact and to disclose material facts only known by its agents, employees and officers.

474.    DCS contractually assumed liability for Ginn's liabilities and assumed a duty of truthfulness and disclosure when it purchased Ginn's rights to Bella Collina and took control of the POA.

475.    The POA, DCS, Ginn and the POA's officers and directors breached those duties by agreeing to knowingly send false billing statements related to illegal special assessments, knowingly agreeing when promised in various forms as herein described that they would not turn over the community to lot owners 90 days after August 29, 2005, knowingly agreeing to bill lot owners for sports club initiation fees and dues knowing that such bills were illegal and unenforceable, agreeing to file knowingly false and unenforceable amendments to articles of incorporation and to CC&Rs, agreeing to falsely state that they

did not have the duty to turn over the community, or knowingly agreeing to state that they had the authority

to unilaterally amend governing documents or agreeing to control the POA without notice to lot owners

or elections, agreeing to restrict lot owner's choice of builder and agreeing to take other actions described

with particularity herein which increased costs and lessened lot values knowing that such actions

conflicted with material representations made in promotional materials, the CC&Rs and failing to disclose

additional material facts as described with particularity herein such as actual costs to run the golf club or

community.

476.    The POA, DCS and the Golf Club Entities' breaches of duty and illegal agreement to do

so caused Plaintiffs to suffer the unnecessary payment of a special assessment for a non-existent sports

club, a deposit for possible membership, and diminution in the value of their real estate as described

herein.

**TENTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT-COVENANT-DUTY OF GOOD FAITH AND FAIR**
**DEALING**
**AGAINST POA, RYAN, RYAN LAW GROUP, BURMAN AND AEGIS**

477.    Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth at length

herein

478.    The POA and its officers. lawyers, licensed community association manager and

management company and directors have contractual duties and duties related to covenants contained in

the governing documents and the covenant of good faith and fair dealing implicit in every contractual

relationship to lot owners and POA members as manifested in Florida Statutes, 720.303(1), which duties

include the obligation to act in the lot owners' and members' best interest, to tell them the truth about all

material matters, to disclose any material fact, and to obey all lawful obligations.

479.    Ginn owed Plaintiffs a duty to make true representations of material fact and to disclose

material facts only known by its agents, employees and officers.

480.   DCS contractually assumed liability for Ginn's liabilities and assumed a duty of truthfulness and disclosure when it purchased Ginn's rights to Bella Collina.

481.   The POA, DCS and Ginn and its officers and directors breached those duties by agreeing to knowingly send false billing statements related to illegal special assessments, knowingly agreeing when promised in various forms as herein described that they would not turn over the community to lot owners 90 days after August 29, 2005, knowingly agreeing to bill lot owners for sports club initiation fees and dues knowing that such bills were illegal and unenforceable, agreeing to file knowingly false and unenforceable amendments to articles of incorporation and to CC&Rs, agreeing to falsely state that they did not have the duty to turn over the community, or knowing agreeing to state that they had the authority to unilaterally amend governing documents or agreeing to control the POA without notice to lot owners or elections, agreeing to restrict lot owner's choice of builder and agreeing to take other actions described with particularity herein which increased costs and lessened lot values knowing that such actions conflicted with material representations made in promotional materials, the CC&Rs and failing to disclose additional material facts as described with particularity herein such as actual costs to run the golf club or community.

482.   The POA, DCS and the Golf Club Entities' breaches of duty and illegal agreement to do so caused Plaintiffs to suffer the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of their lots.

### ELEVENTH CLAIM FOR RELIEF
### COUNT XV-INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
### AGAINST AEGIS, DCS

483.   Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth at length herein.

484.    The POA and its officers and directors have a contractual duties and duties related to covenants contained in the governing documents and the covenant of good faith and fair dealing implicit in every contractual relationship to lot owners and POA members as manifested in Florida Statutes, 720.303(1), which duties include the obligation to act in the lot owners' and members' best interest, to tell them the truth about all material matters, to disclose any material fact, and to obey all lawful obligations.

485.    Ginn owed Plaintiffs a duty to make true representations of material fact and to disclose material facts only known by its agents, employees and officers.

486.    DCS contractually assumed liability for Ginn's liabilities and assumed a duty of truthfulness and disclosure when it purchased Ginn's rights to Bella Collina.

487.    The DCS and Ginn and its officers and directors intentionally and knowingly and maliciously interfered with Plaintiffs' contractual relations with the POA contained in the CC&Rs and the articles of incorporation by agreeing to knowingly send false billing statements related to illegal special assessments, knowingly agreeing when promised in various forms as herein described that they would not turn over the community to lot owners 90 days after August 29, 2005, knowingly agreeing to bill lot owners for sports club initiation fees and dues knowing that such bills were illegal and unenforceable, agreeing to file knowingly false and unenforceable amendments to articles of incorporation and to CC&Rs, agreeing to falsely state that they did not have the duty to turn over the community, or knowing agreeing to state that they had the authority to unilaterally amend governing documents or agreeing to control the POA without notice to lot owners or elections, agreeing to restrict lot owner's choice of builder and agreeing to take other actions described with particularity herein which increased costs and lessened lot values knowing that such actions conflicted with material representations made in promotional materials, the CC&Rs and failing to disclose additional material facts as described with particularity herein such as actual costs to run the golf club or community.

488.    The POA, DCS and the Golf Club Entities' breaches of duty and illegal agreement to do so caused Plaintiffs to suffer the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of its lot in an amount as high as $4,600,000.

## TWELFTH CLAIM FOR RELIEF
## ABUSE OF PROCESS
## AGAINST RYAN, AEGIS, DCS, POA

489.    Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth at length herein.

490.    The POA and its officers and directors have contractual duties and duties related to covenants contained in the governing documents and the covenant of good faith and fair dealing implicit in every contractual relationship to lot owners and POA members as manifested in Florida Statutes, 720.303(1), which duties include the obligation to act in the lot owners' and members' best interest, to tell them the truth about all material matters, to disclose any material fact, and to obey all lawful obligations.

491.    Ginn owed Plaintiffs a duty to make truthful representations of material fact and to disclose material facts only known by its agents, employees and officers.

492.    DCS contractually assumed liability for Ginn's liabilities and assumed a duty of truthfulness and disclosure when it purchased Ginn's rights to Bella Collina.

493.    The POA, DCS and Ginn and its officers and directors instituted the present action to coerce Plaintiffs into accepting the improper and illegal and practice of knowingly send false billing statements related to illegal special assessments, knowingly agreeing when promised in various forms as herein described that they would not turn over the community to lot owners 90 days after August 29, 2005, knowingly agreeing to bill lot owners for sports club initiation fees and dues knowing that such bills were illegal and unenforceable, agreeing to file knowingly false and unenforceable amendments to articles of

incorporation and to CC&Rs, agreeing to falsely state that they did not have the duty to turn over the community, or knowing agreeing to state that they had the authority to unilaterally amend governing documents or agreeing to control the POA without notice to lot owners or elections, agreeing to restrict lot owner's choice of builder and agreeing to take other actions described with particularity herein which increased costs and lessened lot values knowing that such actions conflicted with material representations made in promotional materials, the CC&Rs and failing to disclose additional material facts as described with particularity herein such as actual costs to run the golf club or community, all for the improper motive of increasing costs on lots and decreasing its prices and marketability, the opposite of what they should have been trying to do.

494.    The POA, DCS and the Golf Club Entities' breaches of duty and illegal agreement to do so caused Plaintiffs to suffer the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of its lot in an amount as high as $3,600,000.

## THIRTEENTH CLAIM FOR RELIEF
## FDUPTA
## AGAINST DCS

495.    Plaintiffs incorporate by reference paragraphs 1 through 403 as though set forth at length herein.

496.    The Conspirators have  contractual duties and duties related to covenants contained in the governing documents and the covenant of good faith and fair dealing implicit in every contractual relationship to lot owners and POA members as manifested in Florida Statutes, 720.303(1), which duties include the obligation to act in the lot owners' and members' best interest, to tell them the truth about all material matters, to disclose any material fact, and to obey all lawful obligations.

497.    The Conspirators owed Plaintiffs a duty to make true representations of material fact and to disclose material facts only known by its agents, employees and officers.

498.    DCS contractually assumed liability for Ginn's liabilities and assumed a duty of truthfulness and disclosure when it purchased Ginn's rights to Bella Collina.

499.    The Conspirators breached their duties by knowingly sending false billing statements related to illegal special assessments, knowingly agreeing when promised in various forms as herein described that they would not turn over the community to lot owners 90 days after August 29, 2005, knowingly agreeing to bill lot owners for sports club initiation fees and dues knowing that such bills were illegal and unenforceable, agreeing to file knowingly false and unenforceable amendments to articles of incorporation and to CC&Rs, agreeing to falsely state that they did not have the duty to turn over the community, or knowingly agreeing to state that they had the authority to unilaterally amend governing documents or agreeing to control the POA without notice to lot owners or elections, agreeing to restrict lot owner's choice of builder and agreeing to take other actions described with particularity herein which increased costs and lessened lot values knowing that such actions conflicted with material representations made in promotional materials, the CC&Rs and failing to disclose additional material facts as described with particularity herein such as actual costs to run the golf club or community, all of which constitute unfair methods of competition and unfair and deceptive practices under Florida Statutes, § 501.204.

500.    The Conspirators' breaches of duty and illegal agreement to do so caused Plaintiffs to suffer the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of their lots as indicated in schedule B.

**FOURTEENTH CLAIM FOR RELIEF**
**CONSUMER COLLECTION PRACTICES ACT, FLA. STAT. §§559.55-559.785**
**AGAINST THE GOLF CLUB, THE RYANS, THE RYAN LAW FIRM, AEGIS AND**
**BURMAN**

501.    Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth at length herein.

502.    Plaintiffs are consumers as defined by Florida Statutes §559.55(2).

503.    Defendants DCS, the Golf Club, the Ryans, Aegis and Burman, at all relevant times, are debt collectors.

504.    Defendants DCS, the Golf Club, the Ryans, Aegis, Burman and their officers and directors violated the Consumer Collection Practices Act by knowingly sending false billing statements related to illegal special assessments, billing lot owners for sports club initiation fees and dues knowing that such bills were illegal and unenforceable, and engaging in abusive, deceptive and unfair practices to collect an alleged debt.

505.    These violations of law caused Plaintiffs to suffer the inability to sell its property at fair market value, the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of their lots.

## FIFTEENTH CLAIM FOR RELIEF
### ACT, FLA. STAT. §468.4334
### AGAINST AEGIS AND BURMAN

506.    Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth at length herein.

507.    §468.4334, Florida Statutes states:

"Professional practice standards; liability.—

(1)   A community association manager or a community association management firm is deemed to act as agent on behalf of a community association as principal within the scope of authority authorized by a written contract or under this chapter. A community association manager and a community association management firm shall discharge duties performed on behalf of the association as authorized by this chapter loyally, skillfully, and diligently; dealing honestly and fairly; in good faith; with care and full disclosure to the community association; accounting for all funds; and not charging unreasonable or excessive fees.

508.    Burman and Aegis were grossly negligent.

509.    Burman and Aegis acted negligently, recklessly, in bad faith, and with malicious purpose, and in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

510.    These violations of law caused Plaintiffs to suffer the inability to sell its property at fair market value, the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of their lots.

## SIXTEENTH CLAIM FOR RELIEF
## CONSTRUCTIVE TRUST
## AGAINST ALL DEFENDANTS

511.    Plaintiffs incorporate paragraphs 1 through 408 as though set forth fully herein.

512.    Defendants' fraud, false representations about the DCS' authority to control the POA and the validity of the amended CC&Rs, the false billing practices, violations of antitrust statutes, breaches of fiduciary duties and other breaches of duties and confidence caused the Defendants to be unjustly enriched at the expense of all former lot owners since 2012.

513.    Lot owners since 2012 and all current lot owners, especially those improperly sued by the POA, paid excess or unwarranted special assessments, club dues, attorney fees, annual assessments which should be disgorged by DCS and the DCS related entities, Ryan and the Ryan Law Group, and Aegis and David Burman.

514.    The unjust enrichment included the acquisition of approximately 600 lots from the vulnerable and deceived former lot owners.

515.    Equity requires that these lots be placed in constructive trust and returned to the former lot owners from whom they were taken.

## SEVENTEENTH CLAIM- REQUEST FOR TEMPORARY RESTRIANING ORDER
## AND TEMPORARY INJUNCTION

516.    Plaintiffs incorporate by reference paragraphs 1 through 408 as though set forth fully herein.

517.    The Plaintiffs are suffering irreparable harm as described in Judge Singletary's Order dated June 24, 2016.

518.    The POA violated numerous laws as more particularly described herein, and failed to turn itself and the assets of the POA which it possesses over to a lawfully elected board of homeowners as required by the Governing Documents, The Homeowners Association Act and Court Order.

519.    Further, the POA is a mere instrumentality of DCS and acts against the best interests of the lot owners in violation of the original CC&Rs, its articles of incorporation and the law as set forth herein with particularity.

520.    DCS intends to build a hotel, Bella Collina Towers on or adjacent to Bella Collina in violation of the Governing Documents and only authorized by the unauthorized and illegal amendments filed by the DCS controlled POA as described herein.

521.    Unless this Honorable Court immediately enjoins the Defendant, the Plaintiff will suffer immediate and irreparable injury, loss and damage.

522.    Plaintiff has no adequate remedy at law.

523.    The harm, if any, that would result to Defendant if this injunction is granted would be relatively insignificant compared to the immediate and irreparable injury, loss and damage that Plaintiff would suffer in the event that this injunction is not granted.

524.    On final trial on the merits, the Court should enter a permanent injunction consistent with the temporary injunction.

    **WHEREFORE,** CSBS respectfully requests that:

    i. A Temporary Restraining Order issue enjoining Greene, Lebreux, Clarke, from acting in any

capacity as board members of the POA, the Ryans or the Ryan law firm from acting in any capacity as the POA's lawyer or in taking any legal action against any Bella Collina lot owner for any reason or on behalf of any party, DCS and Bella Collina Towers LLC from taking any action to construct a hotel on or near the Community, DCS and the DCS entities from transferring title to or engaging in any transaction related to any property acquired from any Bella Collina lot owner.

ii. A Temporary Injunction issue, after notice and hearing, enjoining the POA from seeking to enforce the special assessment for club dues, any amendments to the CC&Rs or POA articles of incorporation or continuing operations until an election can be held at which a quorum of non-developer lot owners elect a board, which, in turn, can elect officers to run the POA, prohibiting DCS, its officers, agents, servants, employees, successors and assigns, DCS and its attorneys from directly or indirectly interfering with lot owners administering the POA as required by law, prohibiting the construction of Bella Collina Towers, and returning all land originally dedicated to the community for a sports center, an equine center and recreation facilities to the community, and forbidding the POA from decreasing the minimum lot sizes on the estate-island side of the community from one acre to a quarter acre and prohibiting the sale by the defendants of any lots acquired through the mrthods of coercion described herein to until a hearing can be held on the creation of a constructive trust for the victims of this coercion.

iii. After trial on the merits, the Court permanently enjoin the POA, Plaintiff, Cross Claim Defendant DCS, its officers, agents, servants, employees, successors and assigns, and its attorneys from directly or indirectly interfering with lot owners administering the POA as required by law or from seeking to enforce the special assessment for club dues, any amendments to the CC&Rs or POA articles of incorporation and discontinue all interference with the administration of the POA by a duly elected board.

iv. The requirement the Defendant-Counter Claim-Plaintiff post a bond be waived.

v. The court grant such other and further relief, in law or in equity, to which Plaintiff may be justly

entitled, including the award of counsel fees to the Defendant-Counter Claim Plaintiffs.

## EIGHTEENTH CLAIM FOR RELIEF

## APPOINTMENT OF RECEIVER

525. The Plaintiffs incorporate paragraphs 1 through 408 as though set forth at length herein.

526. The POA failed to call annual meetings of members, amended the CC&Rs unreasonably and

without lot owner approval at properly noticed meetings of members, collected special

assessments prior to turnover without the approval of a majority of members at a properly

noticed meeting with a quorum, committed numerous other violations of law and CC&Rs as

described in detail herein, all in violation of the Florida Statutes, specifically cited herein, the

Governing Documents and the June 24 Court Order.

527. A circuit court may appoint a receiver pursuant to Florida Statutes, §720.3053 if there is a failure

to fill vacancies on board of directors sufficient to constitute a quorum.

528. There has been a failure to elect a lawful board, as described in detail herein, since ninety (90)

days after August 29, 2005, the date on which turnover was compelled by law.

529. Further, DCS has appointed individuals to act as members and officers of the POA's board who

have filed illegal amendments of the CC&Rs and of the articles of incorporation, accepted illegal

compensation, performed ultra vires actions, and taken action inimical to the best interests of the

POA and its members.

530. Florida Common Law provides Courts with the inherent authority to appoint receivers and to

dissolve of the corporation in the context of the above-stated facts.

531. Dissolution and/or appointment of a receiver are critical to prevent the continuation of Ginn's

and DCS' fraud, misrepresentation and self-dealing, the performance of actions which exceed

lawful authority, the waste of the association's assets, the continued failure to turn over the community to its members, and violation of law.

532. CSBS is aware that a notice of the request for receivership as required by law was served by James and Virginia Shelton more than thirty days from the filing of a motion for receivership.

533. CSBS believes that the emergency appointment of a receiver is critical, since the POA received permission from Lake County Officials on July 2, 2014 to confirm plans to subdivide common community property and to build a commercial motel, and the POA will continue its practice of charging excessive amounts for POA dues and for Special Assessments, and of suing lot owners illegally for the payment of such assessments and continue actions that destroy owners' lot values and increase the risk of foreclosure by mortgagees.

**WHEREFORE,** Plaintiff respectfully requests a temporary injunction issue compelling DCS from appointing board members to the POA, terminating current alleged officers of the corporation, and that an Order issue appointing a receiver to dissolve the POA or to administer it until such time as the Class A members of the Association can elect a board assembled from a quorum of non-developer and non-builder lot owners. The receiver meanwhile shall undertake the day to day operations of Bella Collina, seek a stay of all pending litigation in which Bella Collina is a party, take control of all Association assets, perform an accounting for all money received or spent since August 29, 2005, and undertake all such other actions as may be deemed necessary and appropriate under law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the entry of a judgment granting the following relief:

534.    For the First (RICO), Third (Sherman and Clayton Antitrust Acts), and Fourth (Florida Antitrust Act of 1980) Claims for Relief:

        a.    All damages proved at trial;

        b.    Compensatory damages for the named Plaintiffs in the amount of at least $13,617.72 and for all annual assessments illegally written off by Defendants and reserve or escrow funds depleted by Defendants.

        c.    For restitution or disgorgement of the amount of funds or property obtained through the Defendants' participation and interest in a RICO Enterprise or Antitrust activities;

        d.    Treble damages;

        e.    Attorney fees and costs of suit;

        f.    Prejudgment interest;

        g.    For any other relief that Plaintiffs are entitled to by statute or that the Court finds just and equitable;

        h.    Injunction against participation by Defendants in governance or management of the POA or enforcement of illegal CC&Rs, especial the special assessment for delinquent club dues or club membership mandate.

535.    For the Second (FDCPA), and Fifth (Florida Consumer Collections Practices Act) Claims for Relief:

        a.    All damages proved at trial;

        b.    All statutory penalties and damages;

        c.    Attorney fees and costs of suit;

        d.    For any other relief that the Court finds just and equitable;

536.    For the Sixth through the Thirteenth common law causes of action:

a.      All compensatory damages;

b.      Compensatory damages for the named Plaintiffs in the amount of at least $13,617.72 and for all annual assessments illegally written off by Defendants and reserve or escrow funds depleted by Defendants.

c.      Attorney fees, court costs, prejudgment interest and punitive damages if permitted by Florida case law or statute.

d.      Punitive damages pursuant to §817.525 (8)(a)(2) and §768.72, Florida Statutes.

537.    For the Fourteenth Claim for Relief:

a.      Creation of a trust of all property received obtained by DCS from prior lot owners since 2012 and disgorgement of all Golf Club charges, attorney fees, and costs of suit suffered by any prior lot owner to the trust, the trustee of which shall submit a plan to the Court for return or repayment of the prior owner's property.

b.      Attorney fees, trustee fees, court costs, prejudgment interest permitted by Florida case law or statute.

## DEMAND FOR TRIAL BY JURY

Defendant-Counter Plaintiffs, demands a trial by jury.

Dated this day 2nd day of February, 2017.

Respectfully submitted,

   /s/ E. Timothy McCullough
E. TIMOTHY McCULLOUGH, Esq.
Trial Counsel for Plaintiffs
Florida Bar Number: 0033624
7463 Conroy Windermere Rd., Suite A
Orlando, FL 32835
Telephone: (407)601-6941
Fax: (407) 601-5982
mmlawecf@gmail.com
timlaw81@aol.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed with the Clerk of Court through the

Florida E-Portal system and was served via email all counsel of record on the 2nd day of February,

2017.

Respectfully submitted,

/s/ E. TIMOTHY McCULLOUGH
E. TIMOTHY McCULLOUGH, Esq.
Trial Counsel for Plaintiffs
Florida Bar Number: 0033624
7463 Conroy Windermere Rd.
Suite A
Orlando, FL 32835
Telephone: (407)601-6941
Fax: (407) 601-5982
mmlawecf@gmail.com
servicefl@mlg-defaultlaw.com