CS BUSINESS SYSTEMS, INC., *et. al.*

        Plaintiffs,                Case No.: 5:17-cv-86-OC-40-PRL

v.

DWIGHT C. SCHAR, *et. al.,*

        Defendants.
_____/

## DCS DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Defendants Dwight C. Schar, Paul E. Simonson, DCS Investments Holdings GP, LLC, DCS Real Estate Investments, LLC, DCS Real Estate Investments II, LLC, DCS Real Estate Investments IV, LLC, DCS Real Estate Investments I, LLC, DCS Real Estate Investments III, LLC, DCS Real Estate Investments IV-A, LLC, DCS Real Estate Investments V, LLC, Rocking Red H, LLC, The Club at Bella Collina, LLC, Richard C. Arrighi, Ricky L. Scharich and Bella Collina Towers, LLC (collectively, the "DCS defendants"), by and through the undersigned counsel, respond in opposition to the Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 10] filed by the plaintiffs, CS Business Systems, Inc., James L. Shelton and Virginia L. Shelton, Brad Heckenberg and Lana C. Heckenberg, PJS Rental, LLC, Won Y. Shin Trust, Won Y. Shin Trustee, Bart Sutherin and Kathryn Sutherin and ITZ Group, LLC's (collectively, the "plaintiffs").

**INTRODUCTION**

This lawsuit and the plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") are legally and factually baseless, and a thinly veiled attempt to re-litigate long resolved or waived matters. The entire dispute comes down to a few property owners' displeasure with the operation and collection efforts of the Bella Collina Property Owners' Association ("POA"). As evidenced by a review of the Complaint, the plaintiffs have attempted to transform their minor personal grievances into a class action case by alleging serious, significant claims against the DCS defendants, including claims for RICO and antitrust violations. These allegations, as well as the allegations and arguments included in the Motion, are unfounded and irresponsible. For that reason, and because the Motion fails to meet the procedural and substantive requirements of Federal Rule of Civil Procedure 65 and Local Rule 4.05, the Motion must be denied.

**MEMORANDUM OF LAW**

**I.     FACTUAL BACKGROUND**

Bella Collina is a residential community in Lake County. The original developer first brought it to market in 2004 when its original Declaration of Covenants, Restrictions and Easements for Bella Collina ("Original CC&Rs") were recorded on January 16, 2004. The Original CC&Rs provided for a community on what is known as the "Pine Island" parcel, on the east side of County Road 455 in Lake County, that was intended to constitute 398 lots. The Original CC&Rs also expressly anticipated development of additional lots and development of the Bella Collina Golf and Country Club ("Club") on the west side of County Road 455. These covenants did not require lot owners to purchase or maintain a membership in the potential club.

The developer began accepting lot reservation agreements in 2003. Once the developer determined the additional property across the street was a certainty, it drafted Amended CC&Rs committing that land to the governing documents and setting out additional club membership provisions: If the Club was developed, then membership in it would be mandatory for each lot owned, and delinquent club charges were deemed to be special assessments that the Association had the right *and* obligation to collect. At that time, the developer contemplated 801 total developed lots on the property.

All potential buyers received written notification of the new club obligations included in the new Amended CC&Rs from the developer *before* they were formally adopted and recorded. All buyers acknowledged the obligations before closing.

> The notifications read:
>
> Buyer acknowledges that *Buyer is required to acquire and maintain a membership in the club and pay Club membership dues pursuant to the Amended and Restated Declaration of Covenants, Restrictions and Easements for Bella Collina*.

(emphasis added).

The first time any deed from the developer for a lot was recorded June 14, 2004. Buyers, including the plaintiffs, signed the required Club membership agreements. Buyers, including some or all of the plaintiffs, opted to upgrade from the basic sports to full golf memberships for each lot then acquired.

After fifty percent of the lots had been transferred to purchaser members, the POA attempted to conduct an election for one (1) of three (3) seats on the board. But the POA received no nominations. No quorum was ever assembled. Consequently, no meeting could be conducted. The POA then appointed the statutory fifty percent board member.

By August 29, 2005, 721 deeds transferring lots to purchaser members and to participants in the "Featured Builders Program" had been recorded. Despite the Official Records establishing the transfer of ninety percent of the total developed lots from the developer to others, the developer concluded that the deeds from it to other developer members (featured builders, promoters, and developer-related) did not count towards the ninety percent turnover threshold. Accordingly, the obligation to turn over control of the community to the purchaser members had not yet been triggered.

At this point, Bella Collina was considered one of the greatest success stories in the history of residential real estate development. Unfortunately, as construction of the horizontal infrastructure, the golf course, and the clubhouse were underway, the market began its precipitous decline. In 2007, the home sites were ready for new home construction but the Great Recession hit. Flipping lots for profits was no longer viable. The vast majority of Bella Collina's owners walked out on their obligations to build homes, to make mortgage payments, to pay taxes, and to pay community assessments to the POA and Club. About forty new houses were started, but work on eight of those stopped before completion. New home construction within the community came to a halt some time in 2008.

Also in 2008, with the site work and club completed, the developer explored initiating a voluntary turnover of the POA. The developer was able to get a few owners to participate on a turnover committee to solicit nominations and accumulate a quorum so that the turnover could occur. That effort failed.

Approximately ninety percent of the POA and Club member accounts fell delinquent and lot prices dropped quickly. Funding from the Developer remained as the POA's and the Club's primary source of revenue. Eventually lots were resold for as little as $3,000, and frequently for

less than $10,000. Hundreds of mortgage foreclosure lawsuits were initiated and tax deeds began to issue.

Defendant DCS Real Estate Investments, LLC ("DCS"), became the successor Declarant in June 2012. It immediately began efforts to restore the integrity and value of the community by, among other efforts, addressing all of the account delinquencies, and purchasing as many of the distressed properties as possible and taking them off of the market. DCS made resources available to the POA beyond what was necessary for maintenance of the facilities, as well as to start collection of delinquent accounts and beautification of the property. The POA, in turn, immediately began its efforts to enforce the obligations imposed on the lot owners by the governing documents including, but not limited to, the obligation to pay POA and Club assessments and to acquire a membership for each lot owned.

DCS first approached banks that had become owners as a result of defaulted loans. SunTrust, for example, had seventy-eight lots but no memberships. More importantly, Suntrust did not want to own any memberships or continue lot ownership. As a result, DCS acquired Suntrust's lots and the POA received its first large collection payment of $584,157.77 (and the Club waived any recovery to maximize the POA's collection).

The POA then initiated court proceedings against the owners with the most lots. The POA eventually filed approximately 300 cases to collect delinquent assessments owed on approximately 600 lots. The vast majority of these cases involved sophisticated owners who were well represented by counsel, and most of the cases included claims based on delinquent Club charges.

Every owner was offered options to either bring their accounts current and continue ownership, or sell at the current market price and use the proceeds towards the obligations

encumbering the lot including, but not limited to, assessments. Often, the sales proceeds were insufficient to satisfy superior liens and taxes, but in *every* instance the POA received something from the seller or DCS. The Club's share of any recovery was frequently disproportionately discounted to increase the POA's share.

The delinquency rate for assessments and amenity fees decreased dramatically. The POA and the Club have recovered millions in past due assessments, and the Lake County tax collector has been paid many millions more towards delinquent real estate taxes. Hundreds of delinquent mortgages have also been resolved. About thirty-five of those roughly 300 cases remain pending and two-thirds of those are in the throes of settlement. As a result of the litigation and direct purchases from banks, tax deed holders, and original purchasers outside the context of litigation, DCS has acquired several hundred lots. Those lots are all contributing their full share towards POA obligations. On January 28, 2016, the owners of 606 (75.66%) of the 801 total developed lots in Bella Collina, including DCS, recorded a document in the Official Records titled Declaration of Joinder and Ratification by a Super Majority of the Bella Collina Lot Owners of all Prior Acts of the Declarant with Regard to the Amending or Supplementing the CC&Rs ("Declaration of Ratification"). DCS owned 487 of the 606 lots that joined in the Declaration of Ratification and the remaining 119 lots were owned by others.

Bella Collina is now a viable, vibrant community. New homes rise with regularity. The POA and Club are solvent. Without the DCS defendants' involvement, it is safe to conclude that Bella Collina would have collapsed. Inconceivably, the plaintiffs have expressed their gratitude by filing this frivolous lawsuit.

II. **PLAINTIFFS ARE NOT ENTITLED TO THE EXTRAORDINARY RELIEF OF A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION.**

## A. The Motion Suffers From Significant Procedural Deficiencies.

As a threshold matter, the Motion fails to comply with Federal Rule of Civil Procedure 65 and Local Rule 4.05. Specifically, and in violation of Rule 65(b)(1)(A) and Local Rule 4.05(b)(2), the plaintiffs have failed to set forth specific facts in an affidavit or a verified complaint showing that immediate and irreparable injury will result to the plaintiffs before the DCS defendants may be heard in opposition to the relief requested. Instead, the plaintiffs submitted some sort of unsworn "Verification of Complaint for Civil Action" signed by one of the plaintiffs, James L. Shelton. [Doc. 11]. In the document, Mr. Shelton states "that the facts set forth in the within pleading are true and correct to the best of my information and belief." But, Mr. Shelton, only one of eleven plaintiffs, cannot possibly possess personal knowledge of all of the factual bases for the other plaintiffs' claims. And he admits as much, stating in the "Verification" that his support is based upon "information and belief." Such qualifying language is fatal. *See Touchston v. McDermott*, 120 F.Supp. 2d 1055, 1059 (M.D. Fla. 2000) (quoting 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §2949 (2d ed. 1995) for the proposition that "[w]hen the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for preliminary injunction"); *see also Leedom Management Group, Inc. v. Perlmutter*, No. 8:11-cv-2108, 2012 WL 909322, at *8 (M.D. Fla. 2012) (denying motion for preliminary injunction where supporting affidavit is made on information and belief). In short, Mr. Shelton's "Verification" is legally insufficient and cannot provide the factual basis upon which the relief sought in the Motion may rest.

Likewise, in violation of Rule 65(b)(1)(B), the plaintiffs' counsel has failed to certify in writing any efforts made to give notice to the DCS defendants of the relief requested and the

reasons why notice should not be required. The plaintiffs' counsel has ignored this requirement, notwithstanding that he twice spoke with counsel for the DCS defendants after the lawsuit was filed, but before the Motion was filed. After those calls, the DCS defendants filed Notices of Appearances and two motions directed to the Complaint. Because counsel for the plaintiffs was armed not only with the fact that the DCS defendants had retained counsel, but also with all of their contact information, the failure to provide the required certification is inexcusable.

Similarly, in violation of Local Rule 4.05(b)(2), the Motion fails to set forth facts demonstrating that notice and a hearing on the application for preliminary injunction is "impractical if not impossible" because of the emergent nature of the relief requested. Here, the allegations in the Complaint and the Motion indicate that the actions about which the plaintiffs complain have gone on for more than four years, if not more than twelve. Clearly, no emergency exists and the Motion should be denied.

In addition to its other inadequacies, the Motion fails to analyze the elements required to establish a clear right to a temporary restraining order or preliminary injunction. The plaintiffs' Motion, like their Complaint, contains conclusory assertions, untethered to any specific claim for relief or specific common allegation. The plaintiffs cite four *Florida state law* cases instead of the applicable federal decisions. None of those cases address or support the merits of the underlying claims. The Motion generally refers to Claims one through six and fourteen of the plaintiffs' Complaint, all of which have an adequate remedy at law as set forth in the plaintiffs' own prayer for relief. (Compl. ¶534-537). "Only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Canal Authority v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1973).

In failing to analyze the required elements to establish a clear right to a restraining order or preliminary injunction, the plaintiffs fail to appreciate the unnecessary burden they place on the Court. Indeed, Local Rule 4.05(b) highlights a significant consideration that the plaintiffs ignored – the Court is busy. The rule sets forth specific requirements so that the Court can resolve the emergency motion for extraordinary relief on the papers. For example, the rule requires movants to articulate specific facts such that the Court can "make a reasoned determination as to the amount of security which must be posted pursuant to Rule 65(c), Fed. R. Civ. P." Here, the plaintiffs completely fail to set forth any facts on which the Court can make a determination about the amount of a bond that *is required* by Rule 65. Instead, without any explanation or basis for the request, the plaintiffs summarily ask the Court to dispense with a bond. Such request violates Local Rule 4.05(b)(3)(ii). The Court should deny the Motion.

Finally, the plaintiffs' proposed order is woefully inadequate, and fails to comply with Local Rule 4.05(b)(3)(iii). The proposed order does not comply with *any* of the requirements of Fed. R. Civ. P. 65(b) and (d). In submitting this proposed order, the plaintiffs totally ignored the strict guidelines that require a Court to issue a reasoned, detailed injunction or restraining order. Choosing not to accept the burden placed on them by Rule 65, the plaintiffs seek to shift the burden to the Court to draft a compliant order.

In sum, based on the Motion's numerous procedural deficiencies, the Court should conserve its resources and deny the Motion outright. However, and out of an abundance caution, the DCS defendants will briefly address the substantive inadequacies of the Motion below. Because the plaintiffs failed to explain which facts and which claims for relief support a restraining order, the DCS defendants' response is necessarily general.

**B.     The Plaintiffs are Not Able to Meet the High Standard for Obtaining a Temporary Restraining Order or Preliminary Injunctive Relief.**

9

For a court to enter a TRO or a preliminary injunction, the movant must show "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels and Resorts, B. V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003); *see also Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225 (11th Cir. 2005)*. Courts do not routinely grant temporary restraining orders and preliminary injunctions. Both are extraordinary remedies that are "not to be granted unless the movant clearly establishes the 'burden of persuasion' as to each of the four prerequisites." *Schmitt v. Reimer*, CV 110-102, 2010 WL 3585187, at *1 (S.D. Ga. Sept. 14, 2010.) "All four factors must be satisfied" before the relief sought may issue. *Faculty Senate of Florida Internat'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1203 (S.D. Fla. 2007) (internal quotations omitted). Further, when a court considers whether an injunction should issue, "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Canal Authority v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1973). Injunctive relief "authorized by Rule 65, Fed. R. Civ. P., is not granted as a matter of right, but is an extraordinary remedy and must be sparingly granted." *Bashman v. Freda*, 805 F. Supp. 930, 932 (M.D. Fla. 1992). "Ultimately, issuing a preliminary injunction should be 'the exception rather than the rule.'" *Creative Touch Interiors, Inc. v. Nicholson*, No. 6:14-cv-2043, 2015 WL 12672126, at *1 (M.D. Fla. January 9, 2015) (quoting *Siegel v. LePore*, 234 F. 3d 1163, 1176 (11th Cir. 2000)).

Unless a movant meets all of the necessary requirements, he is not entitled to injunctive relief. *Land-Cellular Corp. v. Zokaites*, 463 F. Supp. 2d 1348, 1357 (S.D. Fla. 2006), *see also*

*Anago Franchising, Inc. v. CHMI, Inc*., 2009 WL 5176548, 10 (S.D. Fla. 2009) (stating that a plaintiff "must clearly meet its burden of persuasion as to each of the four elements necessary for issuance of a preliminary injunction, and its failure to satisfy one is fatal to its request for this extraordinary remedy."). Courts should only issue injunctive relief where "the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries irremediable.'" *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919). The plaintiffs must establish compelling proof in order to warrant imposition of such "an extraordinary and drastic remedy..[.]" See *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (internal citations and quotations omitted). Where, as here, the moving party fails to demonstrate a substantial likelihood of success on *any of the merits*, that failure "standing alone, make[s] preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176.

**C.     The Plaintiffs Are Not Likely To Succeed On the Merits.**

To prevail on this Motion, "[p]laintiff must establish a substantial likelihood of prevailing on the merits of its claim at trial." *Louis Vuitton Malletier, S.A. v. Louisvuittonbagsonsale.com*, 15-61814-CIV, 2015 WL 12550754, at *3 (S.D. Fla. Sept. 16, 2015). General accusations come nowhere near satisfying the plaintiffs' burden. *Hawk v. Bank of Am., N.A.*, 1:14-CV-03517-ELR, 2015 WL 11718111, at *2 (N.D. Ga. Feb. 25, 2015).

The plaintiffs failed to establish *any* of the necessary elements for *any* of the seven claims for relief on which they rely in support of their Motion. In the rare instance where they attempt to establish an element, the arguments devolve into inflammatory conclusions and empty recitals, devoid of factual support. A review of the allegations further reveals that they are illogical, internally inconsistent, and otherwise factually and legally insufficient, negating the plaintiffs'

entitlement to any relief under the Federal RICO Act, Florida's RICO Act, the Fair Debt Collection Practices Act, the Sherman Antitrust Act, the Clayton Act, the Florida Antitrust Act, and the Consumer Collection Practices Act. And these allegations certainly do not evidence a substantial likelihood of success on the merits.

Take the RICO claims for an example.[1] The Complaint and the Motion stand silent on, among other things, the misconduct of each alleged wrongdoer, the pattern of racketeering activity, the dates of the predicate acts, or the participants in the predicate acts. The plaintiffs fail to provide allegations that support any enumerated predicate act. They fail to specify with particularity the offenses of wire fraud or mail fraud. The Complaint and Motion lack any information about how the predicate acts form a pattern of racketeering. Finally, the plaintiffs fail to describe a common plan. In short, the plaintiffs have not shown and cannot show a substantial likelihood of success on the merits of the RICO claims.

**D. The Plaintiffs Have Failed to Demonstrate Any Irreparable Injury.**

The asserted irreparable injury must be neither remote nor speculative, but actual and imminent to support a preliminary injunction. *Global Tel\*Link Corp. v. Scott*, 652 F. Supp. 2d 1240 (M.D. Fla. 2009). When a party moves for injunctive relief, a presumption exists that the party possesses evidentiary support for its motion. *See AVO Multi-Amp Services Corp. v. Technical Diagnostic Services, Inc*., 1998 WL 25568 (N.D. Tex. 1998). Indeed, courts have routinely denied motions where the moving party has failed to attach evidence that would support its claim for irreparable harm. *See Waller v. City of St. Petersburgh*, 2005 WL 2416024 \*2 (M.D. Fla. September 30, 2005) (noting that plaintiff's conclusory allegations of irreparable harm without any detailed evidence of the nature or the extent of the prospective harm is grounds

---

[1] The DCS defendants do not address the other claims in the complaint, in part because of need to rapidly respond to the Motion, but also because the Motion itself fails to address the claims.

12

for denial of preliminary injunction). Here, the plaintiffs do nothing more than offer conclusory allegations of irreparable harm without offering any corresponding evidence of the nature or the extent of the prospective harm. The plaintiffs' failure to present any detailed evidence of irreparable harm alone provides grounds to deny them preliminary injunctive relief.

E.      **The Plaintiffs Have Not Demonstrated That the Balance of Hardships Favors Them.**

The Court must consider whether the injury to the plaintiffs outweighs the harm a temporary restraining order may cause to the DCS defendants. *Lifted Research Group, Inc. v. Bbhats.net*, 13-62086-CIV, 2013 WL 12087218, at *6 (S.D. Fla. Nov. 15, 2013). The plaintiffs have not alleged any specific harm they would face if a temporary restraining order is not issued. Instead, the Motion is peppered with conclusory allegations of state law violations and conspiracy theories. The plaintiffs readily acknowledge that their airing of grievances has occurred over the course of many years, and that many of the issues raised in this lawsuit are currently being litigated, or have been litigated and decided, in state court.

On the other hand, the DCS defendants and Bella Collina would suffer significant harm if a temporary restraining order is issued. Forcing the DCS defendants to stop acting on behalf of the community would cause major harm to the POA and its members. The POA is an integral part of the Bella Collina community. It is tasked with levying and collecting dues, enforcing restrictions and covenants, and overseeing the growth of the community.

The plaintiffs also fail to address the costs and harm that would accrue if the Court forced the DCS defendants (only a couple of which are involved), to cease construction on the condominium project (which, incidentally, is not covered by the CC&Rs) based on the plaintiffs' Motion. The balance of the hardships weighs clearly in favor of the DCS defendants and the denial of the plaintiffs' Motion.

13

F.  **The Plaintiffs Have Not Demonstrated That the Public Interest Would be Served By a Preliminary Injunction.**

The Court must consider the public interest. The plaintiffs bear the burden of demonstrating that the issuance of a temporary restraining order or preliminary injunction would serve the common weal. The plaintiffs merely allege that the public interest would be served by "creating and protecting self-governing homeowner associations." The plaintiffs fail to present any evidence or argument, aside from conclusory allegations, that the POA is not self-governing. Contrary to plaintiffs' contentions, the public interest is better served by denying the Motion which will insure that the POA, which is being properly and legally run, can continue carrying out its duties.

## CONCLUSION

This dispute, while cloaked by the plaintiffs in allegations of "racketeering" and "antitrust" violations, is nothing more than a property owner association dispute and retaliation for successful collection efforts. The plaintiffs have litigated and lost, litigated and settled, or are currently litigating these same issues in state court. The filing of the Complaint and pursuit of the baseless claims therein is unjustified and unsupportable. The Motion itself is both procedurally and substantively defective. Accordingly, the DCS defendants request that the Court deny the plaintiffs' Motion, award them the attorney fees incurred in defending this Motion as set forth below, and grant such additional relief as the circumstances warrant.

## REQUEST FOR AWARD OF ATTORNEY FEES

Although early, the plaintiffs' Motion compels the DCS defendants to request an award of attorney fees. The statutes under which the plaintiffs sued provide for an award of attorney fees to defendants. The Florida Rico Act allows a court to award fees to a defendant upon a finding that the plaintiff raised a claim which was without substantial factual or legal support.

*See* §895.05(7), Fla. Stat. The Fair Debt Collection Practices Act allows an award of attorneys' fees to a defendant where an action was brought "in bad faith and for the purpose of harassment." *See* 15 U.S.C. §1692k. The Florida Antitrust Act and the Florida Consumer Collection Practices Act allows an award of attorneys' fees to a defendant where the suit fails to "raise a justiciable issue of law or fact." *See* §542.22(1), Fla. Stat. and §559.77(2), Fla. Stat. Based on these authorities, the DCS defendants request that the Court award them the fees they have incurred in responding to the Motion.

Dated this 8th day of March, 2017.

                                   */s/ Michael D. Crosbie*_____
                                   **Michael D. Crosbie, Esq. (Trial Counsel)**
                                   Florida Bar No. 72575
                                   mcrosbie@shutts.com
                                   **Jennifer P. Sommerville, Esq.**
                                   Florida Bar No. 126616
                                   jsommerville@shutts.com
                                   **Nicole Ballante, Esq.**
                                   Florida Bar No. 125356
                                   nballante@shutts.com
                                   **SHUTTS & BOWEN LLP**
                                   300 South Orange Avenue, Suite 1000
                                   Orlando, Florida 32801
                                   Telephone: 407-423-3200
                                   Facsimile: 407-425-8316

**CERTIFICATE OF SERVICE**

     I certify that on March 8, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

                                   */s/ Michael D. Crosbie*_____
                                   Attorney