UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CS BUSINESS SYSTEMS, INC., a foreign
forprofit corporation, JAMES L. SHELTON
AND VIRGINIA L. SHELTON, husband and
wife, BRAD HECKENBERG AND LANA C.
HECKENBERG, husband and wife, PJS RENTAL,
LLC, a foreign limited liability company, WON Y.
SHIN TRUST, WON Y. SHIN TRUSTEE,
BART SUTHERIN AND KATHRYN SUTHERIN,
husband and wife, ITZ GROUP, LLC, a foreign limited
liability company,

       Plaintiffs,

NO. 5:17-CV-86-OC-40-PRL

PLAINTIFFS' OPPOSITION AND
INCORPORATED MEMORANDUM
OF LAW TO DEFENDANTS'
MOTION TO DISMISS

DWIGHT C. SCHAR, PAUL E. SIMONSON,
DCS INVESTMENTS HOLDINGS GP, LLC,
DCS REAL ESTATE INVESTMENTS, LLC, a
Virginia and Florida Limited Liability Company, DCS
REAL ESTATE INVESTMENTS, LLC, a Florida Limited
Liability Company, DCS REAL ESTATE INVESTMENTS
1, LLC, a Florida Limited Liability Company, DCS REAL
ESTATE INVESTMENTS 11, LLC, a Florida Limited
Liability Company DCS REAL ESTATE INVESTMENTS
111, LLC, a Florida Limited Liability Company DCS REAL
ESTATE INVESTMENTS IV, LLC, a Florida Limited
Liability Company DCS REAL ESTATE INVESTMENTS
IV-A, LLC, a Florida Limited Liability Company DCS
REAL ESTATE INVESTMENTS V, LLC, a Florida
Limited Liability Company BELLA COLLINA PROPERTY
OWNERS ASSOC., INC., DAVID BURMAN, AEGIS
COMMUNITY MANAGEMENT SOLUTIONS, INC., a
Florida for-profit corporation, RANDALL F. GREENE,
KEITH CLARKE, PAUL LEBREUX, RICHARD C.
ARRIGHI, JAMES D. RYAN, MICHAEL J. RYAN,
THE RYAN LAW GROUP, LLC, CULLEN D'AMBROSIO,
ROCKING RED H, LLC, RICKY L. SCHARICH, BELLA
COLLINA TOWERS, LLC

       Defendants,

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CS BUSINESS SYSTEMS, INC., a foreign for-
profit corporation, at al.,
               Plaintiffs,

DWIGHT C. SCHAR, et al.
               Defendants,

NO. 5:17-CV-86-OC-40-PRL

## **PLAINTIFFS' OPPOSITION AND INCORPORATED MEMORANDUM**

## **OF LAW TO DCS DEFENDANTS' MOTION TO DISMISS**

Plaintiffs, by and through the undersigned attorney, file this Opposition to the DCS Defendants' Motion to Dismiss (Document 43) and to any other Defendants' joinder in this motion, stating as follows in support thereof:

I.     **Introduction**

By Order Dated March 28, 2017, this Court denied Defendants' motions for a more particular statement, citing *Decker v. City*, No. 5:15-CV-24-OC-30PRL, 2015 WL 12844302, at *3 (M.D. Fla.. May 19, 2015), for the proposition that "when a complaint "gives the Defendants fair notice of the nature and basis of the claims as well as a general indication of the type of litigation involved," the motion for a more definite statement will be denied." (March 28, 2017 Order, p. 2) The Plaintiffs denied that their Complaint was imprecise or unclear, preventing a response by the DCS defendants.

To the contrary, the Complaint elaborately notifies the DCS Defendants of the specific time, place and nature of the extensive factual allegations, and the relationship of these facts to the numerous claims. The Plaintiffs attach a "Table of Contents" as exhibit A, which demonstrates how the organization of the Complaint satisfies procedural requirements.

The Preliminary Statement provides the operational conclusions. Paragraphs one (1) through twenty-seven (27) justify this Court's authority over the parties and subject matter of this dispute. Paragraphs twenty-eight (28) to two hundred eleven (211) categorize the actions and documents involved in this case with great specificity as to time, date, place, content and parties involved.

Paragraphs twenty-eight (28) through thirty-eight (38) provide the recording date, surrounding circumstances and content of the POA's governing documents and specific applicable statutes. Paragraphs thirty-nine (39) through fifty-eight (58) provide a detailed history of the community prior to 2012. E.g. "46. By July 31, 2004, at least 311 lots had been conveyed."... "47. By August 29, 2005, 721 lots, over 90% of the authorized lots had been conveyed according to Lake County public records, which occurrence triggered the requirement that the non-developer lot owners assume control of the three member POA board."

Paragraphs fifty-nine (59) through eighty (80) identify the conspirators and delineate the essential dates, times, actions and documents of their conspiracy. Nothing is vague or speculative. "80. In a letter dated August 25, 2014 to certain DCS and Aegis employees, Michael Ryan detailed the strategy" precedes the quotation of five paragraphs from the letter.

Paragraphs eighty-one (81) through ninety describe the fraudulent control of the POA by the conspirators with great specificity. Paragraphs ninety (90) through one hundred twenty-two (122) detail the recording dates, locations, contents, authors and signatories of the numerous false

documents that the conspirators used to extort land and money from Bella Collina lot owners and to embezzle money from the POA.

Paragraphs one hundred twenty-three (123) through on hundred fifty-five (155) directly link the specific actions of the conspirators to direct damages, including economic damages a specific monetary value. "144. On information and belief, the Conspiracy includes embezzlement of $2,445,295.78 of escrowed membership deposits that were transferred to the Golf Club pursuant to an "Assignment and Assumption Agreement" on June 27, 2012 from the law firm that closed on the lots." The actions described are specific as to time, date, place and actor.

These actions included an ongoing attempt to defy a court order by Lake County Judge Singletary to turn over the community to the remaining lot owners. Paragraphs one hundred fifty-six (156) through one hundred ninety-five (195) provide the dates, times and actors involved including specific citation of applicable statutes and quotation from the Court Order.

The next thirteen sections, encompassing paragraphs two hundred twelve (212) through four hundred eight (408), individual case histories of the people and companies whose legal rights and property were damaged by the Conspirators' conduct. These sections contain dozens of examples of this conspiracy in action, always specific as to time, place, nature and actors. This section of the Pleading was inspired by numerous other RICO complaints, which apparently satisfied the specificity requirements of pleadings alleging fraudulent conduct.

The final one hundred twenty-six (126) paragraphs comprise eighteen (18) claims, a prayer for relief and a demand for jury trial. The claims each incorporate the first four hundred eight (408) factual allegations, to which, presumably, the DCS Defendants would be required to respond. They would have already admitted, denied or deferred from lack of knowledge each of the specific factual averments. Far from being confusing, the Defendants' answer would serve to

establish the uncontested facts and highlight those in contention. The Claims then relate the operative facts that support the elements of the legal theories. Each Claim identifies the Defendants to whom it applies.

Far from lacking particularity, the Plaintiffs' Complaint is excessively particular. It benefits from the numerous recorded documents and previously discovered evidence which substantiates the claims. This is the great advantage that this case has over many other types of secretive conspiracies.

DCS' Motion, basically, throws everything against the wall to see what sticks. While the Motion's approach is broad, its substance is very shallow. The Plaintiffs' Complaint contains highly detailed factual allegations, which are incorporated as necessary into the elemental pleadings. The Plaintiffs' allegations, including the detailed representative transactions in this scheme, are substantially ignored by the Motion to Dismiss.

DCS' Motion erroneously contains four pages of novel facts (DCS Motion, pages 2-5), and new factual representations throughout, in support of a self-serving effort to cast the Plaintiff in a harsh light that has no bearing upon a motion to dismiss. Plaintiffs insert ad hominem comments meant to demean Plaintiffs' counsel, accusing him of filing a complaint only worthy of a "pro se" plaintiff. This is part of the pattern of personal attacks on parties and their counsel and to use the legal system as a means of breaking the will of opposing parties rather than fully and fairly addressing legal issues. Plaintiffs respectfully request this Court to strike these factual allegations, sua sponte.

DCS' Motion, and the portions which seek to inject new questions of fact and issues of evidence are improper. The Court cannot rely on extrinsic evidence outside the pleadings when considering a Rule 12(b)(6) motion. *Morrison v. Amway Corp*. 323 F.3d 920, 924 (11th Cir. 2003). The Plaintiffs believe that this request to strike promotes judicial efficiency, and that formal motion procedure is not required as the Court has the authority to take such action sua sponte. (To the extent the Court decides to consider DCS' new factual representations, and convert this into a summary judgment motion, Plaintiffs request notice of such conversion so that it can respond.)

## II.   **Standard on Motion to Dismiss**

The threshold for surviving a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a low one. *Connors v. Orlando Regional Healthcare System, Inc.*, 2009 WL 2524568 at *1 (M.D. Fla. 2009). A court will accept the factual allegations of the plaintiffs' complaint as true, construe the allegations in the light most favorable to the plaintiff, and view the allegations to determine whether the plaintiff has satisfied his obligation of pleading a basis of relief that is not speculative. Id., citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id.   However, the standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in its theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the alleged claim.   "[A] complaint must contain sufficient factual matter . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). Here, the Complaint presents a detailed recitation of Plaintiffs' assertions that more than satisfies the pleading requirements. A review of the entire Complaint demonstrates that the Complaint in no way relies upon mere legal conclusions but contains a detailed factual account of Defendants' illegal practices which establish their liability for the violations.

Federal Rule of Civil Procedure 8(a) requires a complaint to provide "a short and plain statement," that shows that the pleader is entitled to relief." Rule 12(e) authorizes a motion for a more definite statement" when the allegations are so "vague and ambiguous" that the defendant is prevented from "reasonably preparing a response." Motions for a  more definite statement and to dismiss are evaluated by similar standards.  The former is disfavored, largely because it offers little that discovery could not provide, while creating delay. 5A, *Wright and Miller, Federal*

*Practice and Procedure* (3d ed.), § 1377, at 600. A a motion for a more particular statement is only appropriate where the complaint is so unintelligible that it prevents the movant from "determining the issues he must meet." Id.

The United States Supreme Court cautioned that, when moving for "a more definite statement," a defendant must show that the plaintiff failed to detail its "allegations in a manner that provides sufficient notice." *Swierkiewicz v. Sorema*, N.A., 534 U.S. 506 (2002). The Plaintiff is not required to plead a prima facie case. Id. This is very close to the standard for consideration of a motion to dismiss.

Federal Rule of Civil Procedure 9(b) requires that plaintiffs plead fraud with particularity. Thus, a plaintiff often traverses the Charybdis and Scylla of a short and plain statement with the heightened particularity standards of a fraud claim, which is the essence of most RICO claims. This delicate balance often becomes trickier in light of the Plausibility standards of *Twombly* and *Iqbal*. Often claimants lack access to the closely guarded secrets of their opponent sufficient to overcome these hurdles.

That is not the case here. As previously described, the Plaintiff provides a voluminous amount of detail, the recitation of which offers the virtually ineluctable conclusion that the Defendants acted in concert to illegally control the POA to extort money and property from lot owners and to embezzle funds and opportunities from the POA.

The interactions described above cannot be dismissed as "Unadorned, the defendant-unlawfully-harmed me accusations." What the Plaintiffs substantiate is a complex network of individuals and businesses which may appear to be legitimate, but, when looked at in totality, form a network for the commission of fraud for profit.

The DCS Defendnats' Motion ignores all these factual allegations. Applying the law of this Circuit, their Motion should be denied.

## III.  **Res Judicata Does Not Bar the Claims**

The DCS defendants assert that pending state court actions bar the claims raised in this case. Initially, it should be noted that the Sherman and Clayton antitrust claims may only be brought in Federal Court.  None of the state court cases raise antitrust or class action claims.

The Class Action Fairness Act requires the U. S. District courts have original jurisdiction over all class actions in excess of five million dollars ($5,000,000).  Section 4 adds a new §(d) to 28 U.S.C. §1332, expanding original "diversity" jurisdiction in the federal courts to include certain types of class actions in which the aggregated claims of the class exceed $5,000,000. Section 4 (New 28 U.S.C. §1332(d)) includes the following:

> "Sec. 4. Federal District Court Jurisdiction for Interstate Class Actions.
> (a) Application of Federal Diversity Jurisdiction - Section 1332 is amended-- (1) by redesignating subsection (d) as subsection (e); and (2) by inserting after subsection (c) the following: (d)(1) In this subsection --
> (A) the term "class" means all of the class members in a class action;
> (B) the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;
> (C) the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action ; and
> (D) the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action .
> <u>(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--</u>
> (A) any member of a class of plaintiffs is a citizen of a State different from any defendant;
> (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or
> (C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state."

Section 5 adds §1453 to Ch. 89 of Title 28 (28 U.S.C. §1453) entitled "Removal of class actions." It expands removal jurisdiction for class actions in which the aggregated claims exceed $5,000,000. It also provides for federal appeal of district court decisions ordering and denying remand to state court

of class actions removed pursuant to this newly created section. Public policy and legislative intent favors adjudication of class actions in Federal court.

Most of the lawsuits cited by the DCS Defendants were alleged assessment collection cases, filed by the POA, to which the Defendants filed compulsory counterclaims. The 2016 Shin and Sutherin cases involved a build compulsion and water well use claim asserted by the POA, to which the defendants did not file any counterclaims. The Heckingberg-ITZ state case only involved the plaintiffs' successful demand for a turnover of the POA to members, without any claims for damages. All of the cases in which compulsory counterclaims were asserted occurred before the acquisition of monopoly control by the DCS defendants and before many of the claims for relief contained in the above-captioned case accrued. There has not been a final judgment rendered in any of the state court cases in which the Plaintiffs in this case are involved.

Perhaps most importantly, the assertion of res judicata is not grounds for dismissal under F.R.C.P Rule 12(b)(6). For all of these reasons, the doctrine of res judicata cannot justify dismissal of the Plaintiffs' claims.

### IV.     The Younger Abstention Doctrine Does Not Apply

This case does not satisfy the very narrow circumstances in which the Younger Doctrine applies. The Supreme Court's 2013 decision in Sprint Communication v. Jacobs, 571 U.S. 588, (2013) clarified that a Federal court has an "unflagging" obligation to hear cases within its jurisdiction and that *Younger* extends "no further" than the three categories of ongoing state proceedings identified in *New Orleans Public Service, Inc. v. Council of City of New Orleans (NOPSI)*: state criminal prosecutions (as in *Younger* itself), civil enforcement proceedings (such as a bar disciplinary proceeding), and civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions (such as a state appellate bond requirement used to compel compliance with a state judgment). The syllabus to Supreme Court"s opinion states as follows:

*"Held:* This case does not fall within any of the three classes of exceptional cases for which *Younger* abstention is appropriate. Pp. 6–12.

(a) The District Court had jurisdiction to decide whether federal law preempted the IUB's decision, see *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635, 642, and thus had a "virtuallyunflagging obligation" to hear and decide the case, *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 817. In *Younger*, this Court recognized an exception to that obligation for cases in which there is a parallel, pending state criminal proceeding. This Court has extended *Younger* abstention to particular state civilproceedings that are akin to criminal prosecutions, see *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592, or that implicate a State's interest in enforcing the orders and judgments of its courts, see *Pennzoil Co.* v. *Texaco Inc.*, 481 U. S. 1, but has reaffirmed that "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States," *New Orleans Public Service, Inc.* v. *Council of City of New Orleans*, 491 U. S. 350, 368 (*NOPSI*). *NOPSI* identified three such "exceptional circumstances." First, *Younger* precludesfederal intrusion into ongoing state criminal prosecutions. See 491 U. S., at 368. Second, certain "civil enforcement proceedings" warrant *Younger* abstention. *Ibid.* Finally, federal courts should refrain from interfering with pending "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Ibid.* This Court has not applied *Younger* outside these three "exceptional" categories, and rules, in accord with *NOPSI*, that they define *Younger*'s scope. Pp. 6–8.

(b) The initial IUB proceeding does not fall within any of *NOPSI*'s three exceptional categories and therefore does not trigger *Younger* abstention. The first and third categories plainly do not accommodate the IUB's proceeding, which was civil, not criminal in character, and which did not touch on a state court's ability to perform its judicial function. Nor is the IUB's order an act of civil enforcement of the kind to which *Younger* has been extended. The IUB proceeding is not"akin to a criminal prosecution." *Huffman*, 420 U. S., at 604. Nor was it initiated by "the State in its sovereign capacity," *Trainor* v. *Hernandez*, 431 U. S. 434, 444, to sanction Sprint for some wrongful act, see, *e.g., Middlesex County Ethics Comm.* v. *Garden State Bar Assn.*, 457 U. S. 423, 433–434. Rather, the action was initiated by Sprint, a private corporation. No state authority conducted an investigation into Sprint's activities or lodged a formal complaint againstSprint.

Once Sprint withdrew the complaint that commenced administrative proceedings, the IUB argues, those proceedings became, essentially, a civil enforcement action. However, the IUB's adjudicative 3 Cite as: 571 U. S. ____ (2013)"

None of the three criterion set forth by the Supreme Court are present in this case.

Accordingly, the Younger abstention doctrine does not justify dismissal of the Plaintiffs' Complaint.

## V. <u>There are Substantive Allegations Against Schar, DCSI-IV, BC Towers and Scharich</u>

As discussed in detail in the introduction, the Complaint identifies the parties and their wrongdoing with great specificity. The Complaint identifies Schar as the owner and operator of

all of the DCS entities. He developed the illegal scheme to coerce lot owners into the surrender of their lots with Simonson, Arrighi, Greene, and the Ryans. He commanded all other Defendants to perform the illegal actions which harmed the Plaintiffs. He provided the investment capital and the marching orders to the other Defendants, who were his agents and officers. He profited from the illegal activities. He owned the Schar entities, e.g. DCS I-IV, which received the lots coerced from POA members and the write-off of assessments from the POA, which he controlled through a corporation of which he was the principle shareholder.

Scharich worked with the conspirators to control the POA, to suppress lot prices, to deprive the POA of assessments through the purchase of tax certificates on properties owned by Rocking Red H, and to manipulate lot values. BC Towers, ultimately owned and controlled by Schar and Simonson, conspired to file false amendments and zoning documents to permit the building of a hotel in this residential community to assist the Golf Club in its commercial activities, especially in weddings and catered events.

The roles and illegal activities of these entities are set forth with great specificity.

## VI. <u>The Claims For RICO And Florida's RICO Act Are Sufficiently Pled</u>

This is the quintessential RICO case. Conspirators formally organize to illegally control a legitimate non-profit organization for the criminal purpose of committing repeated acts of coercion and embezzlement. Their victims are members of the non-profit to whom the organization and its members owe statutory fiduciary duties. The complaint elaborately satisfies all elements of a RICO case. Paragraphs one (1) through twenty-five (25) identify the parties. Paragraphs thirty-five (35) through fifty nine (59) and eighty-one (81) through ninety(90) describe illegal control of the enterprise, the POA. Paragraphs fifty-nine (59) through eighty one (81) and ninety (90) through one hundred ninety-six (196) describe the illegal activities. Paragraphs two hundred twelve (212) through four hundred eight (408) detail twelve representative examples of the illegal conduct with specificity as to time, place, action and actors. Plaintiffs modeled this format after other successful RICO complaints filed with this Court. Taken as a whole, the Complaint advances not merely a plausible RICO case, but an ineluctable one.

The Federal RICO claims and Florida RICO claims are guided by the same case law, since Florida RICO is patterned on the federal act. *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir. 1994); Florida Software Sys., Inc. v. Columbia/HCA Healthcare Corp., 46 F.Supp.2d 1276, 1284 (M.D. Fla. 1999). As such, these claims may be considered together.

The DCS Defendants' Motion challenges Plaintiffs' pleading of the four elements which make up a RICO violation: (l) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Langford v. Rite Aid*, 231 F.3d 1308, 1311 (11th Cir. 2000); *Williams v Mohawk Indu.*, 465 F.3d 1277, 1282 (11th Cir. 2006), and satisfy the particularity requirement of Rule 9(b) of the F.R.C.P.

## A. Conduct of an Enterprise

Plaintiffs satisfy the first RICO element by pleading facts establishing the "conduct of the enterprise," that the enterprise had a common goal, and that the defendants participated in the operation or management of the enterprise itself. *Williams*, supra, 465 F.3d at 1283-84.

The "conduct of the enterprise" is evidenced by an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. *United States v. Turkette*, 452 U.S. 576, 583 (1981). To plead conduct of an enterprise in the Eleventh Circuit, the only continuity requirement is that there are two or more predicate crimes committed by the enterprise. *Williams*, supra, 465 F.3d at 1284, citing *United States v. Goldin Industries, Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000). The "definitive factor [in the 11th Circuit] in determination of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes." Id

The Complaint details how the DCS Defendants formally agreed to control the POA and use it to commit hundreds of enumerated predicate acts. It describes how associated employees, agents and contractors conspired since at least June of 2012 to use the POA to assert false claims for assessments, file false documents, and dispossess lot owners to whom they owed fiduciary duties of their property.

As to the common purpose, all that is required in this Circuit for RICO pleading is the common purpose of making money. *United States v. Church*, 955 F.2d 688, 698 (11th Cir. 1992). The Complaint specifically alleges that the participants did profit directly or indirectly from the conspiracy through the acquisition of lots, the collection money from lot owners to settle fraudulent lawsuits, the use of POA funds, the forgiveness of assessments on lots obtained by the DCS Defendants, the payment of compensation, and many other ways. Participation in the operation or management of the enterprise itself is fully delineated. The detailed and factually specific Complaint properly alleges the existence of an enterprise.

## B. Pattern of Racketeering Activity

In the Eleventh Circuit, a "pattern of racketeering" is defined as "at least two acts of racketeering activity" occurring within a specified time. *Water Int 'l Network v. East,* 892 F.Supp. 1477, 1481 (M.D. Fla. 1995*); H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 238-43 (1989). A pattern for RICO requires a relationship plus continuity. *H.J. Inc.*, supra, 492 U.S. at 239-43. The defendants are engaged in businesses, and the practices which are alleged in the Complaint are their regular way of doing business. See *H.J. Inc.*, supra, 492 U.S. at 241-42.


The Complaint alleges the predicate acts of racketeering activity. These include fraud against a financial institution (18 U.S.C §1344); mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); and interstate transportation of money taken by fraud (18 U.S.C. §2314)., and many other state and Federal crimes. The elements of mail and wire fraud are identical and occur when the defendant (1) intentionally or knowingly participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme. *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991). "While a showing of fraudulent intent is necessary to establish mail or wire fraud, a RICO plaintiff 'need not produce direct proof or evidence of scienter." *United States v. Suba*, 132 F.3d 662, 673 (1 Ith Cir. 1998).

In this case, intent may be inferred from pleadings, which show that the Conspirators knowingly assumed illegal control of the POA and filed false documents in furtherance of the scheme to obtain lots and money. The fraudulent documents, including POA assessment invoices, build compulsion letters, legal notices and demand letters, were transmitted using the US mails and wires. Taking the pleadings as true, the DCS Defendants thus knowingly prepared false billings, sent false statements and notices, and filed false documents to defraud the Plaintiffs. The full scheme engaged in many other misrepresentations, including creating shell companies, creating false legal documents, and filing fraudulent lawsuits. Plaintiffs sufficiently pled the predicate acts of mail and wire fraud.

Plaintiffs also sufficiently pled fraud against a financial institution. The elements of "bank fraud" are knowingly executing, or attempting to execute, a scheme to defraud a financial institution or to "obtain any of the moneys . under the custody or control of a financial institution by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. Since the acts of mail and wire fraud described above affected financial institutions, e.g. SunTrust Bank, this act is also sufficiently pled.

Additionally, DCS Defendants' acts of preparing and submitting materially overstated assessment bills and attaching them to lawsuits were in order to lots owned by lot owners, many of which were financial institutions. As such, both prongs of bank fraud are sufficiently pled. There is no paucity of detail.

Finally, there is interstate transportation of money taken by fraud, which has numerous acts which it makes criminal. One relied in pleading is the transporting, transmitting, or transferring in interstate commerce any money with the value of $5,000 or more, knowing the same to have been taken by fraud. 18 U.S.C. §2314. The overall scheme to defraud the POA or its lot owner members is well documented. A particular defendant need not personally commit the predicate acts, provided there is adequate evidence to connect the defendants to the scheme. *Spivey v. Board ofChurch Extension,* 1995 WL 350269, at *6 (M.D. Fla. 1995), citing Casperone v. Landmark Oil & Gas

Corp., 819 F.2d 112 (5th Cir. 1987). The Complaint sufficiently alleges a pattern of racketeering activity.

### C. Conspiracy

The Motion asserts that Plaintiffs have not pled a conspiracy. A claim of civil conspiracy has different elements from the statutory RICO conspiracy claim. *Am. United Life Insurance Co. v. Martinez*, 480 F.3d 1043, 1067 (l I [th] Cir. 2007. In the Eleventh Circuit, to properly allege a RICO conspiracy claim, Plaintiffs need only allege that the defendants conspired to violate some substantive provision of RICO, that some member of the conspiracy committed an overt act of racketeering, and that the act of racketeering injured the plaintiff. *Beck v. Prupis*, 162 F.3d 1090, 1098 (11th Cir. 1998). The existence of an agreement may be proved by "showing (l) the existence of an agreement on an overall objective, or (2) that the defendant agreed personally to commit two or more predicate acts." U.S. v. Castro, 89 F.3d 1443, 1451 (11th Cir. 1996). An agreement may be inferred from circumstantial evidence of the scheme. *Church*, supra, 955 F.2d at 695 (l I [th] Cir. 1992). The Complaint describes an association which worked together to commit hundreds of acts of mail fraud, wire fraud and bank fraud, many of which are detailed in the twelve "representative transactions." This scheme involved an agreement to reach the overall objective of controlling the POA and obtaining lots and money. It is a functional necessity that the participants agreed to participate, which Plaintiffs have alleged. In this case, there are actual written agreements which substantiate the agreements between many of the parties.

Because Plaintiffs properly have alleged, with sufficient particularity, all elements, of the RICO claims, the Motion to Dismiss the RICO claims should be denied.

### VII. Fraud Based Claims Have Been Pled With Particularity

The Motion argues that claims based upon fraud have not been pled with particularity, All fraud-based causes of action against Plaintiffs arise from the illegal control of the POA and the acquisition of money and lots through the exercise of that control. Multiple acts of fraud occurred in connection with this scheme, including suppression of the value of the Plaintiffs'

lots. These facts have been pled with sufficient particularity under Rule 9(b)ofthe Federal Rules of Civil Procedure.

Rule 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity," but the allegations concerning a defendant's state of mind "may be averred generally." Fed.R.Civ.P. 9(b). This heightened pleading standard alerts "defendants to the precise misconduct with which they are charged and protect[s against] spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (l Ith Cir.2001). Plaintiffs'detailed factual allegations, including representative transactions, more than meet this requirement.

The Defendants have facts sufficient to inform them of the precise misconduct with which each is charged. As argued above, Plaintiffs have pled with particularity the elements of both federal and state RICO claims. The Complaint details both the enterprise's multiple acts of fraud (for which each Defendant is liable as a conspirator), and the individual acts of fraud regarding each Defendant's role in the control of the POA and the acquisition of lots and money from the lot owner members. Thus, the Plaintiffs fraud based claims meet the required standard.

The Eleventh Circuit stated in Ziemba that: "Rule 9(b) is satisfied if the complaint sets forth (l) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." 256 F.3d at 1202; see also *U.S. ex rel. Clausen v. Laboratory Corp.*, 290 F.3d 1301, 1310 (l Ith Cir. 2002. The DCS defendants do not explain what facts are missing such that they are unable to identify the precise misconduct of which they are accused.

VI.    Negligence Per Se Claim Sufficiently Pleads Violations of Underlying Statutes

The Plaintiffs plead violations of numerous state and federal statutes involving fraud, which Singh claims fail for want of pleading with particularity. That argument is above and will not be set out again.

## VIII.    Plaintiffs Have Sufficiently Pled Causation

Plaintiffs identify the harm caused by the Plaintiffs with great specificity throughout the Complaint, especially in the Irreparable Harm Section, the Representative Transactions Section and the exhibit setting forth monetary damages related to each lot.  Mindful of the standard set forth in *Bell Atlantic Corp. v. Twombly*, Plaintiffs have  not filed some bare averment that it wants relief and is entitled to it. Supra, 550 U.S. at 556 fn.3. To the contrary, they have explained in great detail exactly how each Plaintiffs' participation in the coercion and embezzlement damaged the Plaintiffs.  Moreover, a reasoned inference can be made that the conduct of the defendants would cause diminution of lot values, loss of revenue to the POA and intangible loss of control of one's community.

## IX.    Fair Debt Collections Practices Act Claim Is Well Pled

The Complaint identifies the Golf Club as a party.  It states that Plaintiffs are consumers as defined by Florida Statutes §15 u.s.c. §1692 A(3).  It identifies Defendants DCS, the Ryans, The Ryan Law Group, Aegis, the Golf Club and the POA as debt collectors as defined by 15 U.S.C. §1692a(b). It states that Defendants DCS, the Ryans, The Ryan Law Group, Aegis, the Golf Club and the POA and their officers and directors violated the Fair Debt Collection Practices Act by knowingly sending false billing statements related to illegal special assessments, billing lot owners for sports club initiation fees and dues knowing that such bills were illegal and unenforceable, and engaging in abusive, deceptive and unfair practices to collect an alleged debt in violation of 15 U.S.C. § 1692 a, et seq. Finally, it represents  that these violations of law caused Plaintiffs to suffer the inability to sell its property at fair market value, the unnecessary payment of a special assessment for a non-existent sports club, a deposit for possible membership, and diminution in the value of its lots in an amount as high as $as indicated in Schedule B, which is attached hereto and incorporated herein by reference.  These

representations put the identified parties on notice of this claim, which, in the context of the whole Complaint, was not only plausible but compelling. Accordingly, this claim should not be dismissed.

### X. Antitrust Claims Are Well Pled

Plaintiffs begin their Sherman and Clayton Antitrust claims by identifying the applicable statutes, 15 U.S.C. §§ 1 and 2 and 15 U.S.C. §12, et seq., and that the claims are against all parties. They incorporate paragraphs 1 through 408, which set forth detailed relevant facts. They state that "Bella Collina is a discrete market for the sale and development of 801 lots." DCS and the DCS related entities possess monopoly power in the market for the sale of lots in Bella Collina, owning or controlling 80% of all lots and homes, and "The value of any lot was dependent on the operation of the POA and the actions of the developer." They assert that "The defendants conspired to illegally control the POA and enforce restrictive covenants which they knew to be invalid, illegal and unreasonable for the illegal purpose of destroying the value and economic viability of the lots and coercing lot owners to surrender them to DCS and the DCS entities." They follow with "The illegal mandatory golf club membership, illegal special assessment, illegal control of the POA, requirement that lot owners must pay for club memberships and assessments on lots, write-off of assessments on lots owned by the Conspirators, the merger of control of the boards of the POA, the Golf Club, DCS, the DCS entities and the CDD, and exorbitant and unreasonable country club fees and dues constituted anti –competitive practices in the form of price discrimination, exclusive dealings, price control, anti-competitive merger, inter-locking directorates and tying," and "This conspiracy to perform the acts described in the preceding paragraph, to monopolize this market and to restrain the development and resale of the lot owners' property violates the Sherman Antitrust Act, 15 U.S.C. and the Clayton Act §15 U.S.C. §12, et seq." Finally they assert damges by alleging "These violations caused the Plaintiffs, and all similarly situated current and former, lot owners to suffer damages in the nature of diminished lot values and excessive carrying costs related to ownership and lack of marketability of their lots  The Florida Antitrust Act of 1980 claim, §542.15, Florida Statutes dovetails with the Federal Antitrust claims.

The claim by the DCS Defendants that the Plaintiffs have not established a market is patently false. The market is obviously the 801 lots, property and country club located within the gated walls of Bella Collina. The monopoly is indisputable, since the conspiracy of the DCS Defendants resulted in the acquisition of an eighty percent (80%) share of all lots, unfettered control of the POA property and purported authority to force lot owners to pay initiation fees and membership dues to the Golf Club in order to own or sell property. The complaint represents that the DCS Defendants used this monopoly to dramatically suppress prices and coerce forced sales and club memberships at arbitrary and unreasonable costs.

The Plaintiffs have not merely stated a powerful claim for economic harm by a monopoly, but have set forth sufficient facts of such a highly credible nature, that the claim is virtually proven at the pleading stage. At a minimum, the DCS Defendants are placed on notice of the claim, the internal logic of which is inherently plausible. What remains is for the Defendants to conduct discovery in an attempt to explain how the monopoly is reasonable in the light of obvious destruction of property values, the tying of a country club memberships to land ownership and the use of the POA as a weapon against its members. The interstate commerce requirement is met by the marketing and sale of lots and club memberships to residents of other states and countries, some of whom are the named parties in this case. The Clayton Act objections should await discovery of the extent to which lot sales, home construction, memberships, bank transactions, communications flow across state lines and affect interstate commerce.

## XI.     Count Eight For Fraud Has Been Stated With Particularity And Is Not Barred By The Statute Of Limitations

For the reasons previously stated, all fraud claims have been stated with great particularity. Statute of limitations defenses normally depend on a weighing of numerous factual circumstances and are not the proper subject matter of a 12(b)(6) motion to dismiss. This is especially true, since the allegations of fraud are continuing in nature and occurred constantly since 2012.

**XII.** **Counts Nine, Eleven, Twelve, Thirteen, Fourteen and Sixteen Place The DCS Defendants On Of Claims Against Them**

All of the Florida statutory claims and common law causes of action fully place the applicable DCS Defendants on notice of the claims against them for the reasons previously discussed in great detail. Any statute is fully delineated and sufficient factual information is contained in the incorporated paragraphs of the Complaint and in the Count itself to satisfy pleading requirements.

**XIII.** **The Request For Receivership May Not Be Dismissed As *Res Judicata***

Rule 12(b)(6) does not include *res judicata* as a basis for dismissal. Further, the June 24, 2016 Order of Judge Singletary denied the statutory requests for receivership without prejudice. The current request for receivership includes circumstances that occurred after this Order and are still occurring. This Court has inherent and statutory authority to appoint a receiver.

**XIV.** **Class Certification**

Plaintiffs clearly have standing to seek class certification. As referenced in the Complaint, the Florida Homeowners Association Act provides any member of any association to raise issues concerning violations of law or covenants by the POA. All named Plaintiffs have been harmed as previously discussed.

Plaintiffs have also recited and substantiated the requirements of F.R.C.P. Rule 23. The Plaintiffs have requested certification of two classes. Neither is impermissible under Eleventh Circuit law, nor is a 12(b)(6) motion appropriate to determine this issue. The local rules require designation of class allegations, with which Plaintiffs have complied. Further determination of class issues will be subject to a motion for class certification and concomitant evidentiary hearings.

**XV.** **Attorney Fees**

The DCS Defendants are not entitled to attorney fees under any statute at this stage of the proceedings.

### XVI.  <u>Conclusion</u>

For the reasons set forth herein, the Plaintiffs request dismissal of the DCS Defendants Motion to

Dismiss.

Dated this day 14th day of April, 2017.

<div style="margin-left:40%">

Respectfully submitted,

<u>/s/ E. Timothy McCullough</u>

E. TIMOTHY McCULLOUGH, Esq.
Trial Counsel for Plaintiffs
Florida Bar Number: 0033624
7463 Conroy Windermere Rd., Suite A
Orlando, FL 32835
Telephone: (407)601-6941
Fax: (407) 601-5982
timlaw81@aol.com

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing was filed with the Clerk of Court and was served via email all counsel

of record by the CM/ECF system on the 14th day of April, 2017.

<div style="margin-left:40%">

Respectfully submitted,

<u>/s/ E. TIMOTHY McCULLOUGH</u>
E. TIMOTHY McCULLOUGH, Esq.
Trial Counsel for Plaintiffs
Florida Bar Number: 0033624
7463 Conroy Windermere
Rd.Suite A
Orlando, FL 32835
Telephone:     (407)601-6941
Fax:       (407)601-5982
timlaw81@aol.com

</div>

# EXHIBIT A: COMPLAINT TABLE OF CONTENTS

PAGE PARAGRAPH 2  N/A

   PRELIMINARY STATEMENT 3  1

      PARTIES

7    25    JURISDICTION AND VENUE

7    28    GENERAL ALLEGATIONS

8    35    ILLEGAL DEVELOPER CONTROL OF THE POA

11   59    THE    CONSPIRATORS

12   64    THE CONSPIRACY

16   81    ILLEGAL CONTROL OF THE POA

17   90    THE FRAUDULENT RECORDED AND POA DOCUMENTS

18   123   IRREPARABLE HARM CAUSED BY THE CONSPIRACY

19   158   CONSPIRATOR INTERFERENCE WITH THE TURNOVER

34   196   CLASS ACTION ALLEGATIONS

                REPRESENTATIVE CONSPIRACY ACTIONS

36   212   JAMES L. SHELTON AND VIRGINIA L. SHELTON

40   242   CS BUSINESS SYSTEMS

42   264   KATHRYN AND BART SUTHERIN

46   287   BRAD HECKENBERG AND LANA C. HECKENBERG

47   294   ITZ GROUP,

48   303   P.S.I. CAPITAL, INC.

50   316   THE SUN TRUST LOTS

51   326   KENNETH OWEN LAM AND LUEN C. CHAN

53   349   STEPHEN AND ELIZABETH FRIEZE

56   370   ARRIGHI AND 15008 PENDIO

57   384   JORDAN AND MYRA RUPERT

59   399   NICK FALDO PROPERTY


60   409   FIRST CLAIM FOR RELIEF
                18 U.S.C.
                AGAINST ALL DEFENDANTS
64   434   SECOND CLAIM FOR RELIEF
                Florida Rico Act
                AGAINST ALL DEFENDANTS
65   436   THIRD CLAIM FOR RELIEF
                15 U.S.C. 062, Et seq. FAIR DEBT COLLECTION PRACTICES ACT
                AGAINST RYAN, RYAN LAW GROUP, AEGIS, THE GOLF CLUB AND THE POA

66    442    FOURTH CLAIM FOR RELIEF
15 U.S.C. u and 15 U.S.C. M2, et seq.
AGAINST ALL DEFENDANTS 66

PAGE PARAGRAPH

67    450    FIFTH CLAIM FOR RELIEF
$542.15, FLORIDA STATUTES, et seq.
AGAINST ALL DEFENDANTS

67    453    SIXTH CLAIM FOR RELIEF
CONSUMER COLLECTION PRACTICES ACT, FLA. STAT. 6$559.55-559.785
AGAINST RYAN, RYAN LAW GROUP, AEGIS, AND THE POA

68    458    SEVENTH CLAIM FOR RELIEF
BREACH OF FIDUCIARY DUTY
AGAINST RYAN, RYAN LAW GROUP, AEGIS, BURMAN, GREEN, CLARKE, LEBREAUX AND THE POA

75    465    EIGHTH CLAIM FOR RELIEF
COUNT XI-MATERIAL MISREPRESENTATION
AGAINST POA, THE RYANS, THE RYAN LAW GROUP, BURMAN, DCS, THE GOLF CLUB

76    471    NINTH CLAIM FOR RELIEF
COUNT XII-CONSPIRACY
AGAINST ALL DEFENDANTS

77    477    TENTH CLAIM FOR RELIEF
BREACH OF CONTRACT-COVENANT-DUTY OF GOOD FAITH AND FAIR DEALING
AGAINST POA, RYAN, RYAN LAW GROUP, BURMAN AND AEGIS

78    483    ELEVENTH CLAIM FOR RELIEF
COUNT XV-INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
AGAINST AEGIS, DCS

80 489 TWELTH CLAIM FOR RELIEF ABUSE
OF PROCESS AGAINST RYAN, AEGIS, DCS, POA

81    495    THIRTEENTH CLAIM FOR RELIEF
FDUPTA
AGAINST DCS

82    501    FOURTEENTH CLAIM FOR RELIEF
CONSUMER COLLECTION PRACTICES ACT, FLA. STAT. «559.55-559.785
AGAINST DCS

83    506    FIFTEENTH CLAIM FOR RELIEF
Act. Fla. Stat. u68.4334
AGAINST AEGIS AND BURMAN

84    511    SIXTEENT CLAIM FOR RELIEF
CONSTRUCTIVE TRUST
AGAINST ALL DEFENDANTS

84    516    SEVENTEENTH CLAIM - TRO AND TEMPORARY INJUNCTION 87

        525    EIGHTEENTH CLAIM FOR RELIEF - APPOINTMENT OF A RECEIVER

88    534    PRAYER FOR RELIEF 90    N/A    DEMAND FOR TRIAL BY JURY