**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**OCALA DIVISION**

CS BUSINESS SYSTEMS, INC., a foreign       NO. 5: 17-CV-86-OC-40-PRL

for-profit corporation, JAMES L. SHELTON,
and VIRGINIA SHELTON,

      Plaintiffs,

v.                                 **FIRST AMENDED**
                                       **COMPLAINT**

DWIGHT C. SCHAR, et al.

      Defendants.

_____/

## PLAINTIFFS' VERIFIED AMENDED COMPLAINT

Plaintiffs, James Shelton and Virginia Shelton, by and through the undersigned, submit their Verified Amended Complaint, stating as follows:

## INTRODUCTION

1.      This is a complex civil action for remedies authorized by the Federal RICO statutes 18 U.S.C. §1961 et seq.; for breach of fiduciary duty; by the Federal Fair Debt Collection Practices Act; and for actual, consequential, and punitive damages; and for all other relief which this honorable District Court deems just and proper under the circumstances that have given rise to this First Amended Complaint.

2.      This Amended Complaint concerns a widespread criminal enterprise engaged in a pattern of racketeering activity across state lines. It details a conspiracy among numerous individuals to engage in racketeering activity, including multiple predicate acts that have occurred within the past ten years and continue to be ongoing.

3.      The predicate acts alleged in the forthcoming paragraphs occurred through the control of a non-profit organization.  This concerted effort was to achieve the common goal of extorting real property from Plaintiffs, and similarly situated individuals, for the express benefit of the community's second Developer.  The second Developer took assignment of the subject community and maintained iron grip control over the Bella Collina POA.

4.      Since the filing of the Original Complaint ("OC") in this proceeding on March 2, 2017, the objectives of the Defendants engaged in the racketeering enterprise continue to be achieved while the conspiracy has grown in scope.  Defendants' retaliatory actions against Plaintiffs by intentionally inflicting severe and sustained hardship and intimidation upon Plaintiffs with the intent of impairing, obstructing, preventing and discouraging Plaintiffs from maintaining this proceeding, which threatens the goals of the conspiracy.

5.      Actions by certain Defendants also constitute breaches of fiduciary duties expressly provided for in Florida law.  These duties are owed to Plaintiffs as well as other members of the community that were subjected to these illegal actions.  Many of these actions have occurred through the usage of the POA board or were carried out by individuals who are considered fiduciaries expressly by Florida law.

6.      Defendants utilized racketeering activity to create two sales markets within the community that apply to the real property at issue, which include:

    a.  Restricted real property sales by private third party individuals; and

    b.  Unrestricted and incentive laden sales through the new community Developer,
        DCS Real Estate Investments, LLC, which sales include incentives that individual
        third parties are not allowed to provide.

7.     Plaintiffs have also been subjected to violations of the Fair Debt Collection Practices Act.

8.     The Defendants in this action fall into the following categories

a.     Defendants Dwight C. Schar, Paul E. Simonson, Richard Arrighi, Randall Greene, James Ryan, Michael Ryan, and David Burman are individuals who conspired to conduct the affair of an enterprise through a pattern of racketeering.  As more particularly described herein, these individuals, in concert with one another, concocted an intricate and complex scheme to utilize a non-profit organization as a mechanism with which to extort real property from hundreds of individuals. Notably, Richard Arrighi, is a felon who was convicted of embezzling millions of dollars from the Massachusetts State Treasury.

b.     Defendants Rocking Red H, LLC, DCS I, DCS II, DCS III, DCS IV, DCS IV-A, and DCS V are holding companies that were created for the purpose of receiving extorted property to clear any encumbrances clouding title and convey the property free and clear to DCS Real Estate Investments, LLC.

c.     Defendant Rick Scharich is an individual who acted in concert with Schar, Simonson, Arrighi, Greene, J. Ryan, M. Ryan and Burman as a conduit to receive extorted lots to clear any encumbrances clouding title and convey the property free and clear to DCS Real Estate Investments, LLC.

d.     Defendants Keith Clarke, Paul Lebreux, and Cullen D'Ambrosio are individuals who acted in concert with Schar, Simonson, Arrighi, Greene, J. Ryan, M. Ryan, and Burman to effectuate various components of the overall scheme, which

actions are in agreement with and in furtherance of the common and overall

objective of the racketeering enterprise: "DCS wants Lots."


## JURISDICTION

9.      This honorable District Court has subject matter jurisdiction over the federal

claims alleged in this Amended Complaint pursuant to 28 U.S.C. §1331 because these claims

arise under the laws of the United States.


## VENUE

10.     Venue is proper in this Judicial District under 28 U.S.C. §1391(b) because all

Defendants reside and/or do business in the State of Florida, and because all claims for relief

arise from acts, events, and omission that occurred in this District and a substantial part of the

property that is the subject of the action is situated in this District, e.g. all real estate which is the

subject of this case is located in Lake County Florida.


## PARTIES

### i.      *Plaintiffs*

11.     Plaintiff, James L. Shelton, is an individual who owns real property in the subject

community.

12.     Plaintiff, Virginia Shelton, is the spouse of James L. Shelton, and owns real

property in the subject community.

### ii.     *Defendants*

13.     Defendant, Dwight C. Schar, an individual, is a resident of Virginia, and at all

relevant times, funded and commanded the criminal enterprise.  Bella Collina is owned and

operated by DCS Investment Holdings, a private equity group based in West Palm Beach,

Florida and which is owned by Dwight C. Schar.

14.    Defendant, DCS Investment Holdings, GP, is a Florida limited liability company,

managed by DCS Investment Holdings GP, LLC, with a principal address at 505 South Flagler

Drive, Suite 900, West Palm Beach, Florida  33401.

15.    Defendant, DCS Real Estate Investments, LLC, is a Florida limited liability

company, managed by DCS Investment Holdings GP, LLC, with a principal address at 505

South Flagler Drive, Suite 900, West Palm Beach, Florida 33401.

16.    Defendant, The Bella Collina Property Owner's Association, Inc. is a Florida not

for profit corporation, with a principal place of business in Champions Gate, Florida.

17.    Defendant, The Club at Bella Collina, LLC, is a Florida limited liability company,

managed by DCS Investment Holdings GP, LLC, with a principal address at 505 South Flagler

Drive, Suite 900, West Palm Beach, Florida 33401.  The Club at Bella Collina owns and operates

the golf club and related facilities at Bella Collina.  The Club at Bella Collina also utilizes the

non-profit Bella Collina POA as a debt collector and a mechanism through which it is able to file

suit against community members to aid in the extortion of real property.

18.    Defendant, DCS Real Estate Investments, LLC I, II, Ill, IV, IV-A, and V

(hereinafter "DCS I-V"), are six Florida limited liability companies that hold real estate obtained

by the illegal actions described in this Complaint.  Each holds a principal address at 505 South

Flagler Drive, Suite 900, West Palm Beach, Florida 33401.

19.    Defendant, Bella Collina Towers, LLC, is a company owned and managed by

DCS, Schar and Simonson, and was formed to construct and operate a hotel in this residential

community, which construction has been facilitated by the filing of false legal documents,

violates the Original CC&Rs and diminishes the property values of Bella Collina.

20.    Paul E. Simonson (hereinafter "Simonson") is an individual who resides in Palm

Beach, Florida and is the registered agent and chief executive officer of each DCS entity. Paul

E. Simonson also appoints members of the developer-controlled POA board.

21.    Defendant, David Burman, is a Florida licensed community association manager

and, at all relevant times, was a board member, officer and controller of the Bella Collina POA.

He is also the owner and operator of Aegis Management Solutions, Inc.

22.    Aegis Community Management Solutions, Inc. is a Florida for-profit corporation,

owned and operated by Burman, with headquarters at 8390 Champions Gate Boulevard,

Champions Gate, Florida.

23.    Randall F. Greene is a partner of DCS, who resides in Montverde, Lake County,

Florida, and at all relevant times was appointed as board member of the POA by Simonson.

24.    Keith Clarke is an officer of Phoenix Homes, a DCS designated builder, who

resides at Montverde, Lake County, Florida, and at all relevant times was a DCS appointed board

member of the POA.

25.    Paul Lebreux (hereinafter "Lebreux") is an individual who resides in Montverde,

Lake County, Florida, and, at all relevant times, is a DCS appointed board member of the POA.

26.    James D. Ryan and Michael J. Ryan are licensed Florida attorneys with offices at

636 U.S. Highway One, Suite 110, North Palm Beach, Florida 33408, who, at all relevant times,

represented DCS, the POA, Rocking Red H, LLC and various Schar entities.

27.     The Ryan Law Group is a Florida law firm owned and operated by James Ryan and Michael Ryan, with offices at 636 U.S. Highway One, Suite 110, North Palm Beach, Florida 33408.

28.     Cullen D'Ambrosio is a licensed Florida Attorney who works for the Ryan Law Group and resides in Palm Beach County, Florida.

29.     Rocking Red H, LLC is a Florida Limited Liability Company with headquarters at 636 U.S. Highway One, Suite 110, North Palm Beach, Florida 33408, whose managing member is D'Ambrosio.

30.     Richard Arrighi is an individual who resides in Lake County, Florida.

## FACTS

### i. *The Incorporation of Bella Collina*

31.     Bella Collina is a residential community located in Montverde, Florida.

32.     It was developed in 2003 by The Ginn Company ("Ginn").

33.     Ginn's intent for the community, reflected in the original Articles of Incorporation and Covenants, Conditions and Restrictions (hereinafter "CC&R"), was to develop a 1,900-acre luxury golf and equestrian community that embodies "The Spirit of Tuscany" in the "Highlands of Florida."

34.     The original Articles of Incorporation, recorded on December 23, 2003, set forth the following pertinent provisions:

    a.  The community "is intended to be comprised of eight hundred and ten (810) homes and the association property." (See Article I, Section 5 of Original Articles)

    b.  Each lot owner is a member of the association.

    c.   A majority of the board shall include a majority of members other than the

declarant on the turnover date, which must occur "three months after the

conveyance of 90% of the total developed lots (as defined in Article X.C hereof)

by Declarant, as evidenced by the recording of instruments of conveyance of such

lots amongst the Public Records of the County," at which time the members shall

assume control of the Association. (See Article V, Section D, 2, i)

35.    In 2009, Ginn retained Defendant Aegis Community Management Solutions, Inc.

("Aegis") to manage the affairs of Bella Collina.

36.    Aegis is owned and operated by Defendant David Burman, who served as both

community association manager ("CAM") and board member of the POA.

37.    Aegis and Burman received $85,000 to $109,000 per year in reported

compensation for board membership and management fees, without competitive bidding or

disclosure to members, despite Florida law prohibiting an association's board members from

receiving compensation.

38.    Ginn, Burman and Aegis, from 2004 to until 2012, managed Bella Collina and

exerted exclusive control over the POA.

39.    On April 19, 2004, the POA filed Amended and Restated Articles of

Incorporation which, *in pertinent part*, decreased the authorized number of residential lots from

810 to 801.  *(See Article I)* [The Amended Articles are attached as Exhibit B of the Second

Amended Articles, filed at Book 2810, Page 722, in the official records of Lake County, Florida]

40.    After the first conveyance, but before the turnover of the POA to the property

owners, the articles can only be amended with a majority vote of the board at a duly called

meeting.

41.     Following the occurrence of turnover, the articles can only be amended by a majority of voting interests at a duly called meeting and the Developer must pay "per lot assessments" like every other lot owner.

42.     Consistent with §720.301(8), Florida Statutes, the recorded original declarations and the articles of incorporation shall be collectively referred to as the "Governing Documents."

43.     The Governing Documents also recognize the existence of a club known as The Club at Bella Collina, LLC (f/k/a The Bella Collina Club, LLC), which in conjunction with a separate sports club, an equestrian center with a bridle path encircling the community, and various ballfields were some of the luxurious amenities promised in the Original CC&Rs.

44.     Plaintiffs, and other similarly situated individuals, acting in reliance upon the these Governing Documents, purchased almost all of the available lots in the community in the first two days at promotional events called "launches," which were marketed throughout the United States and various parts of the world.

45.     At the "launches," lots sold for prices between slightly less than $300,000.00 and up to $2,000,000.00 each, grossing an estimated $500,000,000.00.

46.     Conveyances of these lots occurred rapidly, triggering various statutory actions:

   a.   The first conveyance of a lot occurred prior to the Amended and Restated Dec.

   b.   By July 31, 2004, at least 311 lots had been conveyed.

   c.   By June 31, 2005, 405, or one-half of the authorized lots had been conveyed, at which time the POA was obligated to call a meeting and elect one non-developer member as a director.

   d.   By August 29, 2005, 721 lots, over 90% of the authorized number of lots, had been conveyed according to the Lake County public records, which occurrence

triggered the requirement that the non-developer lot owners assume control of the

three-member POA board.

47.     At the time of purchase, each prospective owner was provided with a HUD

registered report, which indicated, on page 13, that construction of the country club, and other

amenities, was optional at the discretion of the developer and membership was not mandatory.

48.     In complete disregard of the sales agreements that had already been signed,

Florida law and the governing documents already provided to those buyers, the "Amended and

Restated Declaration of Covenants, Restrictions and Easements for Bella Collina" ("Amended

CC&Rs") were recorded on May 15, 2004.

49.     This recordation occurred after Plaintiffs, and other similarly situated individuals,

purchased their property, and after execution of hundreds of lot purchase agreements with other

unsuspecting purchasers. [The Amended and Restated CC&Rs are recorded at Book Number

2571, Page 1533 in the Official Records of Lake County, Florida]

50.     Ginn then filed the "Second Amended and Restated Declaration of Covenants,

Conditions, and Restrictions for Bella Collina and Supplemental Declaration" (hereinafter the

"Second Amended CC&Rs,") on April 18, 2005, by which time 396 lots had been conveyed.

51.     Following the Second Amended CC&R's, many of the promised substantial and

material amenities, including the sports club, ballfields, equine facilities, and bike and bridle

trails, were never completed and the community suffered.

52.     During the ensuing seven year time period, the Declarations and Governing

Documents remained substantially unchanged, during which time, neither Ginn nor the

appointed property owner's association board ever attempted to enforce the illegal and

unreasonable amendments for mandatory club membership, the build compulsion, or the special assessment for club dues.

ii.    *The Purchase of Bella Collina by DCS*

53.    In 2012, Defendant Richard Arrighi discovered that Bella Collina, now a distressed community, was for sale.

54.    Arrighi, knowing that his friend, Defendant Randall Greene, was (at the time) a participant in real estate projects with DCS through his own company, RG Developments and Investments, LLC, advised Greene of the potential for acquiring Bella Collina.

55.    In turn, Defendant Greene, who is now a partner with DCS *(See Attached Exhibit 1)* as well as the President of the DCS-controlled Bella Collina Property Owner's Association ("POA"), reached out to his contacts at DCS regarding this potential.

56.    From 2004 to present, the community remained in illegal control of the Developer, rather than the Property Owners, because the Property Owners Association had not been turned over as required by law.

57.    Following the due diligence period, during which Defendant Greene negotiated with the then-owners of Bella Collina, Ginn-Lubert Adler, a meeting was planned to finalize plans for the acquisition of the community and discuss the systematic recovery of nearly all parcels of real property owned by Plaintiffs and similarly situated individuals.

58.    On May 14, 2012, Defendants Greene, Arrighi, Simonson, J. Ryan, and other individuals met in a boathouse owned by Defendant Dwight Schar (located at the time at 1375 South Ocean Blvd, Palm Beach, Florida).  *(See Attached Exhibit 2).*

59.    At this meeting, the "Bella Collina Project" (as it is referred to by certain Defendants) was discussed, including how, after purchasing the community from the original

developer, the scheme in which DCS could recover the lots that were owned by individuals for the purpose of relaunching the community in full. *(See Exhibit 2)*

60.     Defendant Schar's multi-million dollar budget for this illegal venture was also discussed at this meeting. *(See Exhibit 2)*

61.     Subsequently, on June 26, 2012, DCS closed on the purchase of Bella Collina and became the new "Declarant" (Developer).

62.     DCS' purchase price, $10,000,000.00, was a bargain compared to the initial development cost and revenue generated during the two "launches."

63.     At the time of conveyance, approximately 50 lots were Developer-owned and the remaining 701 lots had already been conveyed to third parties.

### iii.     The Foundation of the Racket

64.     Immediately after closing on the Bella Collina purchase, Schar, DCS, Simonson, Greene, Arrighi, M. Ryan and J. Ryan began to lay the foundation for the racket they would run to recover nearly $500,000,000.00 of real property without encumbrance and at minimal to no cost.

65.     Prior to effectuating this racket, several major milestones needed to be met to ensure the success of their scheme to extort real property from the POA members.

66.     First and foremost, a puppet POA board, comprised of DCS-controlled board members was appointed to execute certain agreements and amendments to the governing documents that were requisite to the success of the scheme.

67.     On or about June 27, 2012, without approval from POA members, and in defiance the requisites set forth in governing statutes, Defendants Greene, Burman and Arrighi were appointed to the self-serving board.

68.    Notably, Defendant Arrighi is a convicted felon, who was ineligible to serve on the POA board pursuant to the governing statutes.

69.    This self-serving appointment was effectuated by a document that was executed by the three individuals, titled "ACTION OF THE BOARD OF DIRECTORS OF THE BELLA COLLINA PROPERTY OWNERS ASSOCIATION, INC., TAKEN BY UNANIMOUS WRITTEN CONSENT IN LIEU OF A SPECIAL MEETING." *(See Attached Exhibit 3)*

70.    This self-appointment document was executed without notice to, nor input from, the lot owner members of the POA, as required by law.

71.    The following day, another document was executed and titled the same, this time without the felon Arrighi, to install an individual named Luen Chan as a lot owner board member.

72.    Following this execution, on August 25, 2012, a document was filed with the Florida Secretary of State falsely representing that:

a.    The POA principle place of business was Burman and Aegis' address;

b.    Aegis was the registered Agent for the POA; and

c.    Greene, Burman and Luen Chan, an individual lot owner, were the officers and directors of the POA

73.    The recordation of this document confirmed the illegal "Action of the Board of Directors of the Bella Collina Property Owners Association, Inc. Taken by Unanimous Written Consent in Lieu of a Special Meeting."

74.    However, Mr. Chan's "tenure" was short lived and the DCS-controlled POA board refused to consider any of his input that was contrary to the execution of the scheme to recover parcels of real property.

75.    Mr. Chan, in a resignation e-mail that was immediately accepted by the remaining board members, confirmed that Greene and Burman took action without his consent or involvement. *(See Attached Exhibit 4)*.

76.    However, Defendant Simonson, who is not a POA Board Member and does not have the authority of a board member, had already executed an "Action of Declarant of the Bella Collina Property Owners Association, Inc," dated August 25, 2012. *(See Attached Exhibit 5)*

77.    This document accepted Mr. Chan's resignation and resolved that Defendant Lebreux would serve as director in his place.

78.    Following this action, a slew of documents were filed with the Florida Department of State Corporations Bureau, the Lake County Departments of Zoning and Code Enforcement, and the Lake County Clerk of Courts by the POA Board to secure the foundation for the racket.

79.    These documents were fraudulent and invalid because the statutory requirements for implementation of the board action were not satisfied.

80.    The representation at the end of each document that the individual signing the documents were authorized representatives of the POA, and that they were authorized to act on behalf of the POA and its members, is a violation of law.

81.    These fraudulent documents that were filed with the Florida Department of State include, but are not limited to:

    a.    The aforementioned filings regarding the Arrighi board and the Chan board.

b.  Yearly filings with the Florida Division of Corporations, effectuated by

Defendant Burman, indicating that unelected agents or employees of DCS are the

directors and officers of the POA.

82.     Egregiously, on January 28, 2016, Burman filed a fraudulent document (assigned

document number N03000011005 and CC3513563321) with the Florida Division of

Corporations that indicated that an individual lot owner, Joseph P. Cross, was President of the

POA, Clark was the Secretary, Lebreux was the Vice President, Burman was a Director and

Aegis was the Registered Agent, which document bore the electronic signature of Cross. *(Exhibit

X)*

83.     However, testifying under oath at a hearing on a related matter, Mr. Cross stated

that the signature was not his, that he never signed the document, and that he was not POA

President, effectively signifying that his signature had been forged.  (*See Attached Exhibit 6*)

84.     Additionally, and most importantly, numerous self-serving and fraudulent

amendments were created and filed for the purpose of amending the community's CC&R's,

which was vital to effectuation of the racket.

85.     The first of these amendments, titled "Third Amendment to Second Amended and

Restated Declaration of Covenants, Conditions and Restrictions for Bella Collina" (hereinafter

the "Third Amended CC&Rs") [*Book Number 4208, Page 409 in the Public Records of Lake

County, Florida*], was executed on August 28, 2012 and recorded as a matter of public record on

September 4, 2012.

86.     The Third Amended CC&R's, in furtherance of the racket, ahd the effect of

benefitting the Developer at the expense of the community as follows:

a. "Pursuant to Article XII, Section 9(A) of the CC&Rs, ***Declarant may unilaterally amend the terms of the CC&Rs***."

b. The elimination of asphalt bike paths, horse trails, and …Equestrian Property.

c. The addition of 79 lots to circumvent statutory turnover requirements.

d. Requirement of notification to the Bella Collina Club and to the Bella Collina POA of proposed lot sales and a signed "joint certificate of approval" from the two entities.

e. The reduction of expired build compulsion provisions from 24 months to 18 months.

f. Increased the expiration of Declarant's re-purchase of property rights from 10 years to 24 years.

g. Authorization for the construction and operation of a hotel within the residential community.

h. Transfer of the POA's rights to enforce the lien and foreclosure provisions of previous iterations of the CC&R's to the Bella Collina Club Property Owner at the ***sole discretion of the POA***.

i. The addition of new language to Article l, Section 16 of the Second Amended Declarations (the previous iteration of the governing documents) providing that "Any facilities may be added or removed from the Club Property from time to time in the sole discretion of the Club Property Owner."

87.    The Third Amended CC&R's were signed by Defendant Simonson as "manager" of DCS Capital Investments, LLC, DCS Investment Holdings, GP, LLC, The Club at Bella Collinaand Bella Collina, LLC.

88.     The document also misrepresented that Defendant Simonson was joined by the POA in this effort.

89.     In an attempt to legitimize all of the previous fraudulent amendments made by DCS to the governing documents, a "Super Majority" amendment was adopted by Defendants Simonson and Greene on January 26, 2016.

90.     This unilateral amendment, which reflects DCS' extortion and recovery of a majority of the real property in Bella Collina, states that future land addition was always contemplated by "Declarant" and that no turnover of the community is or has ever been required as a matter of law, in an attempt to assume control of the POA.

### iv.     *Destruction of Real Property Value*

91.     After laying the foundation for the racketeering enterprise to come, the value of each lot in the community needed to be destroyed so that DCS would become the only entity with a vested interest in their acquisition.

92.     In order to achieve this, these lots, which were originally purchased for approximately $300,000.00 to well over $1,000,000.00, were systematically devalued by:

a.  The attachment of significant encumbrances to each lot by implementing special assessments authorized by the fraudulent Third Amended CC&R's.

b.  The attachment of significant encumbrances to each lot by implementing a mandatory club membership and related club dues and fees, which were authorized by the fraudulent Third Amended CC&R's.

c.  The attachment of significant encumbrances to each lot by inflating CDD fees, which CDD is controlled by DCS through authorization granted by the fraudulent Third Amended CC&R's.

d.   A barrage of conveyance recordings in the Lake County Official Records, which
conveyances were intended to create fraudulent real estate comparables.

e.   The elimination of promised luxurious amenities, including the sports club,
equestrian center, and ballfields.

f.   The re-zoning of the land originally committed to the amenities in section (d) of
this subsection for the creation of more lots to circumvent statutory turnover
requirements.

g.   The re-zoning of the land originally committed to the amenities in section (d) of
this subsection for the construction of a hotel in the community, which instantly
distinguished Bella Collina from other premiere luxury communities.

h.   Interference with the sale of real property between third parties through the usage
of "joint certificate approvals" that were subject to DCS and the DCS-controlled
board's sole discretion.

### v.   RICO

93.   Defendants Schar, Simonson, Greene, Arrighi, M. Ryan, J. Ryan, and Burman,
were either employed by or associated with the non-profit Bella Collina POA, conspired to
violate 18 U.S.C. § 1962(c) by conducting the affairs of this non-profit organization through a
pattern of racketeering activity.

94.   Defendants Schar, Simonson, Greene, Arrighi, M. Ryan, J. Ryan, and Burman
agreed to achieve the common goal of the recovery of numerous parcels of real property free and
clear, including that of Plaintiffs and similarly situated individuals, on behalf of DCS Real Estate
Investments, LLC, a company owned by Schar, managed by Simonson, partnered with Greene

and Arrighi, represented by M. Ryan and J. Ryan, and whose interests were enforced by Burman
through his company, Aegis.

95.    Defendants Schar, Simonson, Greene, Arrighi, M. Ryan, J. Ryan and Burman
accomplished this goal through a pattern of racketeering activity through numerous predicated
acts intended to further the scheme as detailed herein, including:

    a.    § 1512: Tampering with a Witness

    b.    § 1341: Mail Fraud

    c.    § 1343: Wire Fraud

    d.    § 1951: Extortion

96.    Defendants Scharich and D'Ambrosio engaged these Defendants in this
conspiracy by acting as or on behalf of "holding companies" to receive extorted property.

97.    Defendants Scharich, Rocking Red H, LLC, DCS Real Estate Investments, LLC,
DCS Investment Holdings GP, LLC, DCS Real Estate Investments I, LLC, DCS Real Estate
Investments, II, LLC, DCS Real Estate Investments III, LLC, DCS Real Estate Investments IV,
LLC, DCS Real Estate Investments IV-A, LLC, DCS Real Estate Investments V, LLC, The Club
at Bella Collina LLC and the Bella Collina Towers, LLC engaged these Defendants in this
conspiracy by tampering with a witness.

98.    Defendants Clarke and Lebreux engaged these Defendants in this conspiracy by
aiding Schar, Simonson, and Greene by executing fraudulent amendments to the community
CC&R's to build the foundation upon which the enterprise is able to operate.

99.    Each aforementioned Defendant objectively manifested, through action, their
willingness to agree to participate in the enterprise's affairs and was an integral part of the
overall scheme to obtain parcels of real property for DCS.

*Prefatory Meeting*

100.    As set forth above, on May 14, 2012, Defendants Greene, Simonson, Arrighi, J. Ryan, and other individuals met in a boathouse owned by Defendant Dwight Schar (located at the time at 1375 South Ocean Blvd, Palm Beach, Florida) (hereinafter "boathouse meeting"). *(See Exhibit 2).*

101.    At the boathouse meeting, the "Bella Collina Project" was discussed, including how, after purchasing the community from the original developer, DCS would recover the real property that was owned by third party individuals, including Plaintiffs, for the purpose of relaunching the community in full.

102.    Defendant Schar's multi-million dollar budget for this illegal venture was also discussed at this meeting.

*Stage 1*

103.    The first stage to effectuating the racket was to execute an "Agreement to Fund Collection Activities" was entered into by the Club and the POA, with Defendant Randall Greene as signatory for the POA and Defendant Paul Simonson as signatory for the Club, DCS Capital Investments, LLC, and DCS Investment Holdings, GP, LLC.  *(See Attached Exhibit 7).*

104.    This *vital* first stage could not occur without DCS first acquiring the Bella Collina Club as its own, installing its employees to the POA Board, and then amending the community governing documents to (1) allow for unilateral amendment of the governing documents' terms, (2) to allow the Bella Collina Club to encumber the real property within the community, and (3) authorize itself to execute agreements with a non-profit organization that it also controls to initiate litigation based upon the encumbrances that were created as a result of the unilateral amendments to the CC&R's.

105.    This Agreement to Fund Collection activities allowed for the for-profit Bella Collina Club to fund and conduct litigation against POA members through the use of the non-profit POA.

106.    This provided the framework for the plan to extort lots by enforcing special assessments and mandatory club membership, fees and dues that had encumbered the devalued lots, without lot owner approval.

107.    Now armed with the ability for a for-profit entity to sue third parties under the auspices of a non-profit organization for fraudulent encumbrances, the next stage of effectuating the racket could occur.

### Stage 2

108.    In order to effectuate the racket, a law firm needed to be retained for the express purpose of suing members of the POA on behalf of a non-profit organization (which owes an express fiduciary duty to its' members) controlled by a for-profit organization.

109.    On June 25, 2012, Paul Simonson, acting on behalf of DCS, retained The Ryan Law Group, including James Ryan and Michael Ryan, to "prosecute the Client's claims regarding Association dues and Club Membership dues owed by various lot owners….[in] Bella Collina." *(See Attached Exhibit 8)*

110.    No other fee agreement is known to exist explicitly between The Ryan Law Group, or any of its members, and the Bella Collina POA, signifying DCS' complete control over both the POA Board and the Bella Collina Club.

111.    Having retained the Ryan Law Group, who agreed to prosecute individual owners of intentionally encumbered and devalued real property through racketeering acts committed by certain Defendants, the next step to effectuate the racket could occur.

*Stage 3*

112.     DCS, now in control of a non-profit organization, its fiduciaries, and a for-profit country club, was in position to achieve the mass acquisition of real property from the individual owners.

113.     The goal was to receive lots cheap cheaply and without encumbrance for a relaunch of the community.

114.     The acquisition of this massive amount of property required the creation of numerous "holding" companies to "hold" the real property DCS anticipated recovery of in order to clear the encumbrances that DCS itself attached to each lot through its efforts to devalue the property.

115.     These holding companies, which were all incorporated following DCS' acquisition of Bella Collina include:

a.  Rocking Red H, LLC

b.  DCS I

c.  DCS II

d.  DCS III

e.  DCS IV

f.  DCS IV-A

g.  DCS V

*(Incorporation Documents of the Holding Companies are attached as Exhibit 9)*

116.     These holding companies, which served as an intermediary in essence, would allow for one of several options to clear any encumbrances prior to a clean conveyance to DCS, including:

a.  Allowing the property sit long enough to achieve tax deed status in order to clear priority liens.

b.  Allowing for the negotiation and discharge of priority liens.

c.  Allowing for the POA Board, in conjunction with Defendants Burman and Aegis, to write off the encumbrances if they were strictly derivative from the POA and/or the Bella Collina Club.

117.    Notably, Rocking Red H, LLC was created as a joint venture between Defendant Simonson and Defendant Cullen D'Ambrosio, a member of the The Ryan Law Group. *(See Attached Exhibit 10).*

118.    In addition to the holding companies created expressly for the receipt of this real property, Defendant Rick Scharich also took title to many of lots within the community. *(Exhibit X).*

119.    Once the holding companies were ready, a "matrix" had to be created to determine which parcels of real property would be conveyed directly to DCS and which would be conveyed to the holding companies.

*Stage 4*

120.    As the POA was intentionally deprived of the property that it ostensibly sued its members for by DCS, a determination had to be made as to whether the real property could be conveyed directly to DCS or if it needed to sit in a holding company while encumbrances were cleared.

121.    For this determination, a matrix was created by Defendant Simonson to determine - the following:

a.  Where the lot would be conveyed to,

    b.   How much money the Ryan Law Group would be paid for acquiring the lot for

        DCS,

    c.   How much money the Bella Collina Club would receive from the transaction (if

        anything),

    d.   How much money the POA would receive from the transaction (if anything),

    e.   How much money DCS would be reimbursed for the litigation that it vicariously

        funded through its control of the Bella Collina Club, and

    f.   Calculations of the property tax and recording fees for the real property.

      *(The Simonson Matrix is attached hereto as Exhibit 11)*

122.    After the determination was finalized by the "matrix," the parcels of real property

acquired from the individual owners would be conveyed in kind.

123.    The actions required to obtain these parcels of real property from each individual

were extraordinary, requiring significant participation and coordination from multiple

Defendants, and amounted to one of the largest real estate frauds in Florida history.

***Stage 5***

124.    With the previous four steps completed, the real property could now be extorted

from the individual owners.

125.    A descending hierarchical strategy was devised and implemented by Defendants

DCS, Paul Simonson, Randall Greene, James Ryan, Michael Ryan, The Club at Bella Collina,

David Burman and Aegis to determine how to recover real property from each unique individual,

including Plaintiffs.

126.    Through this hierarchical strategy, the litigation tactics would be determined

based upon the following criteria:

a.  If the individual's real property was encumbered with both the annual assessments and Bella Collina Club dues, fees, and initiation costs, those would be the basis for litigation.

b.  If the individual's real property was encumbered with either the annual assessments or the Bella Collina Club dues, fees, and initiation costs, then that would be the basis for the litigation.

c.  If the individual's real property was not encumbered with either the special assessment or the Bella Collina Club dues, fees and initiation costs, but did not build a home on the parcel (despite the community being desolate), then the basis for litigation would be to enforce the build compulsion pursuant to the unilateral amendment to the CC&R made by DCS, even though the build compulsion expired in 2014

d.  If the individual's real property was not encumbered by any of the above, and already had a home built upon it, a series of harassing SLAPP lawsuits would be filed, based upon:

  i.  Meritless CDD "violations," including usage of "phantom" wells and irrigation systems.

  ii.  Meritless "violations" of the CC&R's in conjunction with aforementioned CDD "violations."

  iii.  Harassing text messages and e-mails.

127.    After drafting a boilerplate Complaint for each of the above categories, James Ryan and Michael Ryan filed approximately 400 lawsuits for the sole purpose of recovering real property for DCS. *(See Attached Exhibit 12)*

**Stage 6**

128.    After facing unilateral self-serving amendments to the CC&R's, a wholly suppressed sales market, the diminished value of the real property and litigation founded on

fraudulent encumbrances incurred through the self-serving amendments that was prosecuted

jointly by a for-profit country club and non-profit organization, the individual is left with little

recourse.

129.     Knowing that an individual faced these stacked odds, which odds were

intentionally created through fraudulent means, "settlement" offers were negotiated in which an

individual would:

     a.   Forfeit their real property either to DCS or a holding company;

     b.   Make a lump sum payment to DCS and the Ryan Law Group for the privilege
        to do so; and

     c.   Sign a confidential settlement agreement that contained an exorbitant
        liquidated damages clause that would trigger for merely mentioning its
        existence.

130.     Each settlement agreement contained the authorization and signatures from

Defendant Simonson on behalf of DCS and the Bella Collina Club, DCS Partner Randall Greene

on behalf of the DCS-controlled POA, and either Michael Ryan or James Ryan.

131.     Each settlement agreement directed the conveyance of the real property to either

DCS directly or to a holding company, usually Rocking Red H, LLC, never to the POA.

132.     Each settlement agreement contained an exorbitant liquidated damages clause,

which was *vital* to prevent any individual from discussing the litigation and rallying these

individuals together to fight back.

133.     If a case could not reach the point of settlement, it was dismissed by Ryan on

behalf of the POA so as not to leave any precedent.

*The Memorandum*

134.    The foregoing averments are memorialized in a signed memorandum drafted by

Defendant Michael Ryan.  *(See Attached Exhibit 13)* on August 25, 2014.

135.    In that Memorandum, Defendant M. Ryan, while outlining the plot to extort these

parcels of real property from each individual owner, admitted the goal of the entire conspiracy:

> a.   "The POA and The Club have an agreement based on the fact that The Club is
>     funding the costs and attorney fees incurred in the collection process with the
>     understanding that on settlement the costs and attorney fees are paid and/or
>     reimbursed first."
>
> b.   When we do recover a Lot, the POA's designee buys the Lot for a price based
>     on Paul's matrix."
>
> c.   "…in some cases the outstanding balance for real estate taxes is so high that
>     the Lot may be put in limbo in which case the title goes into a holding
>     company; otherwise the title goes straight to DCS."
>
> d.   "…if there is a lender to deal with…the title may go to the holding company if
>     this puts us in a better bargaining position to acquire clear title."
>
> e.   "In almost every instance a settlement will dictate that the balances
>     outstanding to The Club or the POA after applying the recovery should be
>     written off."
>
> f.   **"In summary, The Club funds this effort and DCS wants Lots."**

### vi.     *Illegal Collection of Debts*

136.     While simultaneously extorting parcels of real property from third party

individuals, DCS directed a massive collection effort of the fraudulent encumbrances that were

attached each parcel of real property.

137.     Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina

Club, Aegis Community Management Solutions, and the Bella Collina POA are all agents of and

acting on the behalf of DCS.

138.     Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina

Club, and Aegis Community Management Solutions are all agents of and acting on behalf of the

Bella Collina POA.

139.     Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina

Club, Aegis Community Management Solutions, DCS Real Estate Investments, LLC and the

Bella Collina POA have ratified the acts of the others.

140.     Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina

Club, Aegis Community Management Solutions, and the Bella Collina POA are not licensed

debt collectors or licensed debt collection agencies.

141.     Plaintiffs, and other similarly situated individuals, own real property in the Bella

Collina community.

142.     As averred in the foregoing paragraphs, certain Defendants conspired to extort

real property situated within Bella Collina, which conspiracy included fraudulent unilateral

passage of numerous self-serving amendments to the community's governing documents in order

to create significant encumbrances on and devalue the subject real property.

143.     Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina Club, Aegis Community Management Solutions, and the Bella Collina POA, used as a pretext the collection of significant alleged debt that encumbered these parcels of real property owned by Plaintiffs and other similarly situated individuals through malicious, abusive and harassing collection tactics.

144.     Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina Club, Aegis Community Management Solutions, and the Bella Collina POA, each owed Plaintiffs and other similarly situated individuals a fiduciary duty in collecting this debt, where said debt purportedly originates from dues and fees owed by Plaintiffs and the putative class to the POA and The Club.

145.     Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina Club, Aegis Community Management Solutions, and the Bella Collina POA, each owed a fiduciary duty to Plaintiffs and other similarly situated individuals, whom have all suffered damages as a result of the actions by each that are detailed in this Amended Complaint, including the flagrant violations of the FDCPA and the FCCPA in addition to the racket.

146.     Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina Club, Aegis Community Management Solutions, and the Bella Collina POA, have violated provisions of the FDCPA, as explained more particularly herein.

147.     These violations occurred when each of these Defendants knowingly, willfully and wantonly sought to collect charges unreasonably, unnecessary and illegal charges from Plaintiffs and similarly situated individuals, which all formed the foundation of their debt collection activities.

148.    When certain Defendants began and continued these debt collecting activities,

Plaintiffs and similarly situated people:

      a.    Were not given the opportunity to challenge the debt;

      b.    Received invoices reflecting unexplained debt balances; and

      c.    Were threatened with litigation, the loss of real property, and exorbitant fees

          and costs by the Ryan Law Group and DCS;

149.    Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina

Club, Aegis Community Management Solutions, and the Bella Collina POA, each breached their

fiduciary duty owed to Plaintiffs and similarly situated individuals by failing to protect each from

the unreasonably, unnecessary and illegal charges and the wrongful conduct that has been set

forth in the four corners of this Amended Complaint while ratifying the actions of certain

Defendants.

150.    As a designed part of the racket and fraudulent debt collection activities that

certain Defendants have engaged in, Plaintiffs and similarly situated individuals have made

payments above and beyond the sum due to their POA or have been sued to recover for DCS,

The Club and the POA, payments above and beyond the sum due to their POA.

*vii.    Embezzlement of Association Monies*

          <u>**Golf Membership Deposits**</u>

151.    Upon closing the purchase of the Bella Collina Community, DCS also purchased

The Bella Collina Club, LLC, which is the country club in the community. *(See attached Exhibit*

*14)*

152.    At the time of conveyance, a third party law firm, Cameron Gonzalez &

Marroney, P.A. (formerly Cameron, Davis & Gonzalez, P.A.), acted as escrow agent for deposits

that were paid by individuals who wanted to hold a placement for a golf membership for the time

that the golf course was completed, as there were only 350 golf memberships available.

153.    Cameron, Gonzalez & Marroney, P.A. held approximately $2,448,158.09 in an

interest bearing account at the time of conveyance to DCS.

154.    Defendant Simonson was the signatory for DCS and the *assignee* of the escrow

funds.

155.    The total balance, which was reflected in the "Assignment and Assumption

Agreement for Escrow Agreement for Membership Deposits," dated June 27, 2012, showed:

a.   $2,401,387.50 as Membership Deposits.

b.   $40,491.95 as interest.

156.    Following execution of the closing documents and transfer of these escrow funds

to DCS and Simonson as *assignee*, individuals who paid these deposits were not informed of

subsequent escrow arrangements.

157.    Upon request by deposit holders, including Plaintiffs, to review financial

documents that are pertinent to and reflective of the existence of an escrow account showing

these golf membership deposits and generated interest, The Bella Collina Club and its agents

have vehemently denied access and cooperation.

**POA Assessments**

158.    As set forth in the foregoing paragraphs, when a settlement is reached in litigation

involving encumbered real property in Bella Collina, a formula is entered into the "Simonson

matrix" that was devised by Defendant Simonson.

159.     The recovery of the real property, which is effectuated by litigation that The Bella

Collina Club drives through its use of the non-profit POA, often times includes delinquent POA

assessments as encumbrances.

160.     When the DCS-controlled POA settles litigation, it does not receive the benefit of

the recovery sought through the litigation, but rather:

      a.  A settlement agreement is reached and authorized by DCS, not the POA, and

           includes conveyance of the real property and a monetary penalty.

      b.  Upon settlement, the lot is entered into the "Simonson matrix."

      c.  If a lot is unencumbered, it is conveyed directly to DCS and not the POA,

           pursuant to the "Simonson matrix."

      d.  If a lot is encumbered, the "Simonson matrix" then determines which DCS-owned

           holding company the lot is conveyed to and the division of the monetary amount

           of the settlement.

      e.  After division of the monetary settlement to DCS, The Ryan Law Group, The

           Club, and governmental fees/taxes, there is often no remainder for the POA which

           leads to DCS tendering a check to them for $500.00 (an amount far less than what

           was sued for).

161.     Simply put, DCS retains almost the entirety of the benefit of the litigation initiated

by DCS-owned Club through its control of the POA.

162.     DCS, Greene and Simonson are trusted with holding assets on behalf of the POA

for a specific purpose and, through the fraudulent practices set forth in the aforementioned

paragraphs, converts the property without knowledge or authorization from the property-owner

members of the POA.

**Write Off of POA Assessments**

163.    Often times, while a lot sits in a DCS holding company, Defendant Greene directs

Defendant Burman and other agents of Defendant Aegis to write-off the encumbrances to

effectuate a faster conveyance to DCS or one of its agents.

164.    Rocking Red H, LLC has aided in the routine on-going write off of POA

assessments, which will total approximately $423,262.00. *(See Exhibit Attached 15)*

165.    This is a small sampling of the hundreds of thousands of dollars, if not millions of

dollars, of delinquent assessments that have been written off at the instruction of Simonson,

Greene and Burman.

166.    On September 3, 2014, Defendant Greene directed Defendant Burman to write off

approximately $48,000.00 of POA encumbrances on property that was being conveyed to

Defendant Arrighi and ensure that the records reflect this. *(See Exhibit Attached 16).*

167.    Defendant Burman, on the instruction of Simonson and Greene, then ordered his

subordinate, Karla Key, to write off the entire amount, allowing DCS-agent Arrighi to obtain the

home free and clear.

168.    Defendants Greene and Burman ordered numerous write-offs of encumbrances on

property obtained by DCS-agents and affiliates, including:

    a.    Lot 355 obtained by Defendant Keith Clarke. *(See Exhibit Attached 17)*

    b.    15019 Pendio Drive, a property owned by Greene in which delinquencies and late

        fees were "suspended" and reversed. *(See Exhibit Attached 18)*

169.    The exact amount of the write offs is readily discoverable by reference to

documents in the possession of Aegis and the POA.

170.     When bad debt on a particular lot is paid to the POA to reduce or eliminate any

delinquencies, it goes into the coffers of the POA, but the Developer (through Defendant

Simonson) reduces the Developer obligation to the POA dollar for dollar by using Deficit

Funding which is not authorized in bad debt collection.

### viii.     Actions since the filing of the Original Complaint

171.     Since the filing of the OC, certain Defendants have gone to extraordinary lengths

to conceal the racketeering activity and ensure the long term viability of DCS' efforts.

## Subornation of Perjured Testimony from a Convicted Felon

172.     Subsequent to the filing of this proceeding, the Defendants acquired a copy of the

confidential work-product that would ultimately be Plaintiffs' OC through an individual named

Vincent Soulsby.

173.     Mr. Soulsby is a felon whose vast criminal history include charges and/or

convictions for:

      a.   False Pretenses;

      b.   Delivery and Manufacturing of a Controlled Substance;

      c.   Felony Failure to Pay Child Support;

      d.   Felony Child Neglect;

      e.   Aggravated Battery; and

      f.   Felony probation violations.

174.     Mr. Soulsby's extreme level of dysfunction in society extends to his finances,

including numerous money judgments, evictions and wage garnishments of record, leaving him

ripe for exploitation.

175.    Using this copy of the OC, a unilateral "deposition" of Mr. Soulsby was

conducted by Attorney Michael Crosbie, with Defendant Greene present, on February 22, 2017

at the Bella Collina Clubhouse.

176.    Notably, Mr. Crosbie does not represent Defendant Greene as he does the other

"DCS Defendants," despite Greene's express partnership with DCS.

177.    DCS has tried to distance itself from Greene as a "DCS Defendant" to avoid

impropriety and do not include him in their proprietary label of "DCS Defendants" in pleadings

on this docket.

178.    The "deposition," which was taken prior to the initiation of this proceeding and

without any knowledge or prior notice to the undersigned:

    a.    Utilized the correct case caption of "CS Business Systems, Inc. *et. al.* v.

        Dwight C. Schar, *et al*" prior to the case being initiated;

    b.    Made numerous references to the unfiled complaint; and

    c.    Was comprised almost entirely of leading questions asked by Mr. Crosbie to

        solicit self-serving testimony to support false claims of "witness tampering"

        by Plaintiff James Shelton, Expert Witness William Sentner (a highly

        qualified federal expert), Plaintiffs' attorney and former Plaintiffs Bart and

        Kathryn Sutherin.

179.    As aforementioned, this self-serving testimony in the Vincent Soulsby

"deposition" was solicited through the usage of numerous leading questions posed by Mr.

Crosbie, including the following:

    a.    Q. Well, the sense you got out of it [McCullough's phone call], you were being
        offered some sort of compensation, either money or discount on a house to testify
        in favor of the Sutherins and other Plaintiffs?
        A. Yes.

Q. And so when Tim e-mailed you the complaint, the draft complaint that's marked as Exhibit A, was this what he intended or is this what you understood he intended to give you so you'd have bullet points to know what to say? (Doc. 149-5, P. 7)

b. Q. Did they say anything about – they said essentially that these guys, Dwight, Randall and Paul stole the POA; did they give any more detail about how --? (Doc. 149-5, P. 7)

Q. Do you want to take a break for a second?
A. No response.
Q. So back on the record.  You've taken a second to think about something you had forgotten and you remembered something:  what was that? (Doc. 149-5, P. 8)

180.    The obvious intent of these questions was to solicit self-serving responses supporting false contentions.

181.    Notably, a break was taken in the middle of a question, and when the deposition resumed, Mr. Soulsby was told, not asked, that he had taken a second to think about something that he had forgotten and had now remembered, indicating a coached response, likely by Defendant Greene who was present for this "deposition."

182.    This document has since been filed twice on this Federal Docket (Doc. 128 and 149) by Defendants Schar, Simonson, Arrighi, Rocking Red H, LLC, Scharich, DCS I, DCS II, DCS III, DCS IV, DCS IV-A, and DCS V in aid of their defense of the claims set forth in this proceeding, including the claims of racketeering, and has been referred to in numerous pleadings despite its patently false nature and lack of evidentiary support.

183.    The purpose of this "deposition" was to protect Defendants Greene and Arrighi when the pair learned that Plaintiffs were investigating claims that they engaged in a scheme to devalue a residential home located in Bella Collina so that Arrighi could purchase it at a rock bottom price.

184.    Ironically, Defendant Arrighi is also a felon, having been convicted of embezzling millions from the Massachusetts State Treasury, and the deposition was utilized to protect one felon with the perjured testimony of another.

185.    On March 7, 2017, approximately 12 days after the Crosbie-Soulsby Statement and four days after the Plaintiffs filed the above-captioned complaint, Defendant J. Ryan cites the Soulsby perjury in a status conference in a related matter, accusing Plaintiffs and their attorney of misconduct before the Court.

186.    On March 20, 2017, Defendant Ryan reprised Mr. Crosbie's charade, replaying the role of investigating attorney, in a thinly veiled plan to attack Plaintiffs.

187.    He re-enacted the same leading lines of questions, coaching a confused, vague and uncertain Soulsby through another deposition.

188.    This deposition was unilaterally scheduled on two days' notice after being told that the undersigned would not be present, violating every conceivable state and local rule of procedure and of professional courtesy for the scheduling of a deposition.

189.    Mr. Ryan incessantly led the witness, suggesting answers with the intent of obtaining substantially false responses.

190.    Defendant Ryan then used the Soulsby statement to file a fraudulent criminal complaint against Plaintiff James Shelton, Former Plaintiffs Bart Sutherin and Kathryn Sutherin, expert witness William Sentnor, and the Plaintiffs' attorney.

191.    This criminal complaint was meritless and treated as such by the investigating officer.

**Creation of a Threatening and Defamatory Website**

192.    Following initiation of this proceeding, and in furtherance of the conspiracy, a website was created for the express purposes of threatening Plaintiffs for their involvement in this proceeding and severing their relationship with their attorney.

193.    Defendant Randall Greene utilized the website host "Pissed Consumer" to create this web page, "https://mccullough-and-mitchell.pissedconsumer.com," with malicious intent harm Plaintiffs and to protect the enterprise through intimidation tactics.

194.    Posts on the website are thinly disguised as "anonymous reviews" of the case and of Plaintiffs' attorney.

195.    They all address the current lawsuit and many reference facts and issues only known by certain Defendants and their lawyers.

196.    The first post, which was revealed to have been made by Defendant Greene on March 20, 2017, stated in pertinent part *(See Exhibit Attached 19)*:

> Now it appears that E. TIMOTHY MCCULLOUGH has filed another bogus case against another very, very large and well respected developer, DCS Real Estate Holdings, Dwight C. Schar, Paul Simonson, Randall F. Greene and others alleging the same garbage.
>
> They have no idea that they have just poked at a sleeping bear. **They are going to shread this guy and his dumb clients to bits**. [emphasis added].

197.    Following Defendant Greene's threat, an anonymous user utilizing the pseudonym "Lawyers are blood suckers," whose IP Address is revealed to be 174.208.22.48, and whose post was notably submitted across state lines from the State of Utah (as revealed by the IP Address), wrote "**Don't worry the mob will thin them out**." [emphasis added] *(See Attached Exhibit 20)*

198.    Dozens of other posts on the website exist, including more posts self-identifying as Defendant Greene, all of which are disparaging and intimidating.

**Anonymous and Intimidating Mailings**

199.    Following the initiation of this proceeding, each current named Plaintiff, as well as other similarly situated individuals, received envelopes addressed to their homes.

200.    These envelopes included:

    a.    A postmark that bore locations in either Georgia, Texas, or Arizona.

    b.    "Personal and Confidential" written in large font across the front of the envelope.

201.    This is part of an organized effort to intimidate Plaintiffs for their involvement in this case.

202.    Contained in these mailings are copies of various docket entries, including notices of withdrawal by some of the former named Plaintiffs, along with descriptions stating that "this is not good" and other comments meant to intimidate Plaintiffs into withdrawal, all in furtherance of the conspiracy.

203.    Each document contained a handwritten message and was signed "Stan." *True and correct copies of each letter sent to Plaintiffs and similarly situated individuals are attached hereto and incorporated herein as Exhibit 21.*

204.    Notably, the Sheltons filed an address change with the POA, after which these intimidating mailings appeared at their new address.

205.    In addition to sending these anonymous mailings via USPS, similarly situated

individuals who resided in Bella Collina received letters placed directly in their mailbox with no

postmark.

## CLASS ACTION ALLEGATIONS

206.    Plaintiffs bring forth this case as a class action pursuant to the provisions set forth

in Rule 23 of the Federal Rules of Civil Procedure and Middle District Local Rule 4.04.

207.    Plaintiffs seek class certification on behalf of two classes of similarly situated

individuals:

**Class I.**
Bella Collina lot owners during the period of June 27, 2012 to the present.

Approximately 350-400 individuals and entities are eligible for this proposed class.
Proposed class members are easily ascertainable through county records.

**Excluded** from this Class are developers Ginn-LA Pine Island, Ltd. LLLP and DCS Real
Estate Investments, LLC; all employees, subsidiaries and parent companies of Ginn-LA
Pine Island, Ltd. LLLP and DCS Real Estate Investments, LLC; all employees,
subsidiaries and parent companies of named preferred builders for homes within the Bella
Collina Community; and any other developer lot owners.

**Class II.**
All current Bella Collina lot owners.

Approximately 95 individuals and entities are eligible for this proposed class. Proposed
class members are easily ascertainable through county records.

**Excluded** from this Class are developers Ginn-LA Pine Island, Ltd. LLLP and DCS Real
Estate Investments, LLC; all employees, subsidiaries and parent companies of Ginn-LA
Pine Island, Ltd. LLLP and DCS Real Estate Investments, LLC; all employees,
subsidiaries and parent companies of named preferred builders for homes within the Bella
Collina Community; and any other developer lot owners.

208.    Each named Plaintiff possesses the same interests and has suffered the same

economic injury shared by all the putative class members, which claims for damages and other

relief arise from the same operative facts and legal theories discussed at length in this Amended

Complaint.

### *Numerosity*

209.    Plaintiffs are seeking to certify classes of approximately 350 members and

approximately 95 members.

210.    Joinder with approximately 350 members or with 95 members is certainly

impracticable and is certainly in line with precedent for class certification.

211.    The identity and addresses of the putative class members are reasonably

ascertainable and can be readily identified from the business records maintained by the Bella

Collina Property Owner's Association and Aegis Community Management Solutions, Inc.

212.    Individual lawsuits by putative class members are not practical due to economic

cost of the litigation.

### *Commonality*

213.    All prospective class members own or at one time owned property within the

community, have incurred the same damages alleged by Plaintiffs, and all causes of action and

requested relief apply to the prospective class members as a whole.

214.    Plaintiffs and putative class members have all been injured in their property as a

direct result of the Defendants' scheme to defraud and the artifices used to carry it out.

215.    Plaintiffs and putative class members have all been injured as a direct result of the

Defendants' illegal collection of invalid debt.

*Typicality*

216.     In their Amended Complaint, Plaintiffs have set forth an action with the same essential characteristics of the class at large.

217.     All prospective class members own or at one time owned property within the community, have incurred the same damages alleged by Plaintiffs, and all causes of action and requested relief apply to the prospective class members as a whole.

218.     The legal theories that Plaintiffs have based their case upon are applicable not only to themselves, but to all class members as a whole.

*Adequacy of Representation*

219.     Plaintiffs do not have any substantial conflict with proposed class members and are willing and prepared to represent the interests of the putative class members, complying with all duties and obligations both inherent and express.

220.     Plaintiffs have engaged the services of the undersigned counsel, who is experienced in federal complex litigation and has been involved in a previous class action.

221.     Plaintiffs are also able and willing to obtain the services of a second law firm as co-counsel should this Court impose such requirements.

**Rule 23(b)(1)(b)**

222.     Numerous Defendants owed Plaintiffs and putative class members a fiduciary duty.  If this Court determines that the actions of Defendants rise to racketeering, a breach of fiduciary duty is inherent and obvious.

223.     Such determination would directly affect any individual who has ever owned property within Bella Collina, both past and present, and whether they are Plaintiffs or not.

224.    Rule 23(b)(1)(B) certification would prevent the risk that adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications.

225.    A favorable ruling by the Court benefits each of these individual owners, both past and present.

**Rule 23(b)(3)**

226.    The questions of law and fact common to members of the classes predominate over any questions affecting only individual members.

227.    Under these circumstances, a class action is superior to individual claims and may be the only practical method for the fair and efficient adjudication of the controversies alleged in this complaint, in as much as:

    a.  Individual claims by the Class Members are impractical as the costs of litigation may far exceed what any one class member has at stake.

    b.  There has been no known individual litigation over the federal RICO violations raised herein, and individual class members should have no interest in prosecuting and controlling separate federal RICO actions.

    c.  There has been no known individual litigation over the Fair Debt Collection Practices Act violations raised herein, and individual class members should have no interest in prosecuting and controlling separate FDCPA actions.

## COUNT I
### Violation of 18 U.S.C. § 1962(c)
### Plaintiffs v. Dwight C. Schar, Paul E. Simonson, Randall Greene,
### Richard Arrighi, Michael Ryan, James Ryan and David Burman

228.     Plaintiffs hereby incorporate by reference the following numbered paragraphs as

though set forth at length: 93-134 and 150-204.

229.     The Bella Collina Property Owner's Association, Inc., a non-profit organization,

is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in

activities that affect interstate commerce.

230.     Defendants Schar, Simonson, Greene, Arrighi, M. Ryan, J. Ryan and Burman

have knowingly conducted and participated, directly or indirectly, in the conduct of the Bella

Collina POA's affairs through a pattern of racketeering activity consisting of repeated violations

of the predicate acts of witness tampering, mail fraud, wire fraud, and extortion.

231.     Defendants Schar, Simonson, Greene, Arrighi, M. Ryan, J. Ryan and Burman

used the enterprise as the mechanism in which it sought to extort and recover, and in many

instances did recover, hundreds of parcels of real property owned by Plaintiffs and similarly

situated individuals.

232.     The Bella Collina POA's business is racketeering activity, in as much as the

enterprise exists for the purpose of utilizing abusive litigation tactics founded in fraud to extort

real property from Plaintiffs and other similarly situated individuals who are expressly owed a

fiduciary duty from the organization and its members.

233.     The predicate acts of extortion are the regular way in which Schar, Simonson,

Greene, Arrighi, J. Ryan, M. Ryan and Burman operated the Bella Collina POA in as much as

the organization was not engaged in legitimate business ordinarily conducted by similar non-

profit property owners associations, and acts of extortion were necessary for the successful use of acquiring the subject real property.

234.    The predicate acts of mail fraud are the regular way in which Schar, Simonson, Greene, Arrighi, J. Ryan, M. Ryan and Burman perpetuated the scheme across state lines when mailing correspondence to out of state individuals similarly situated to Plaintiffs to begin the process of acquiring their real property.

235.    The predicate acts of mail fraud are also the regular way in which Schar, Simonson, Green Arrighi, J. Ryan, M. Ryan and Burman mailed, or directed to be mailed, anonymous and intimidating letters directly to Plaintiffs in furtherance of the overall conspiracy and scheme.

236.    The predicate acts of wire fraud are the regular way in which Schar, Simonson, Greene, Arrighi, J. Ryan, M. Ryan and Burman transferred ill-gotten monetary gains as a result of their acquisition of the subject real property.

237.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of extortion, which includes silencing each victim through the use of aforementioned settlement agreements, implies a threat of continued criminal activity, as does the fact that the Defendants continue to receive real property through present day.

238.    Defendants are engaged in inherently unlawful acts, in as much as they have engaged and continue to engage in utilizing a non-profit organization as a debt collector for a for-profit organization to deprive Plaintiffs and other similarly situated individuals of their property, as well as wholly depriving the Property Owner's Association of the real property and delinquent assessments which it sues for.

239.     Plaintiffs were damaged in the approximate amount of $357,149.00; similarly situated individuals are estimated to have a damage range of approximately $300,000.00 to over $1,000,000.00.

240.     By reason of its injury, Plaintiffs and putative class members are entitled to treble damages, costs and reasonably attorney's fees pursuant to 18 U.S.C. 1964(c), as well any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs request entry of an Order awarding $1,071,447.00, inclusive of treble damages, attorney's fees and costs, and other relief that this honorable Court deems proper.

### COUNT II
### Violation of 18 U.S.C. § 1962(d)
**Plaintiffs v. Dwight C. Schar, Paul E. Simonson, Randall Greene, Richard Arrighi, Michael Ryan, James Ryan, David Burman, Aegis, Paul Lebreux, Keith Clarke, Cullen D'Ambrosio, Rocking Red H, LLC, DCS I, DCS II, DCS III, DCS IV, DCS IV-A, DCS V, Rick Scharich,**

241.     Plaintiffs hereby incorporate by reference the following numbered paragraphs as though set forth at length: 93-134 and 150-204.

242.     The Bella Collina Property Owner's Association, Inc., a non-profit organization, is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

243.     Defendants Schar, Simonson, Greene, Arrighi, M. Ryan, J. Ryan, Burman, Aegis, Lebreux, Clarke, D'Ambrosio, Rocking Red H, LLC, Scharich, and DCS I-V are employed by or associated with the Bella Collina POA enterprise.

244.     Defendants Schar, Simonson, Greene, Arrighi, M. Ryan, J. Ryan, Burman, Aegis, Lebreux, Clarke, D'Ambrosio, Rocking Red H, LLC, Scharich, and DCS I-V knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the

conduct of the Bella Collina POA's affairs through a pattern of racketeering activity consisting of repeated violations of the predicate acts previously set forth, and agreed to and acted in furtherance of the common and overall objective: "DCS wants Lots." *(Exhibit 13)*

245.    In furtherance of the conspiracy, Defendants D'Ambrosio and Simonson jointly created Rocking Red H, LLC for the express purpose of receiving extorted lots that were sued for through the Bella Collina POA, clearing the encumbrances from these lots through the means more particularly described above, and conveying title to DCS Real Estate Investments, LLC free and clear, which actions are in agreement with and in furtherance of the common and overall objective: "DCS wants Lots." (*Exhibit 13*)

246.    In furtherance of the conspiracy, Defendant Scharich has expressly agreed through his actions to receive extorted lots that were sued for through the Bella Collina POA, assist in clearing encumbrances from these lots through the means more particularly described above, and conveying title to DCS Real Estate Investments, LLC free and clear, which actions are in agreement with and in furtherance of the common and overall objective: "DCS wants Lots." (*Exhibit 13*)

247.    In furtherance of the conspiracy, Defendants Lebreux and Clarke allowed the Simonson to dictate amendments and other Bella Collina POA actions, and signed off on illegal amendments and other enterprise affairs, which actions are in agreement with and in furtherance of the common and overall objective: "DCS wants Lots." (*Exhibit 13*)

248.    In furtherance of the conspiracy, Defendants DCS I, DCS II, DCS III, DCS IV, DCS IV-A, and DCS V received or were created to receive extorted lots that were sued for through the Bella Collina POA, assist in clearing encumbrances from these lots through the means more particularly described above, and conveying title to DCS Real Estate Investments,

LLC free and clear, which actions are in agreement with and in furtherance of the common and overall objective: "DCS wants Lots." (*Exhibit 13*)

249.    In furtherance of the conspiracy, Defendant Aegis, a fiduciary, knowingly and willfully enforced illegal provisions of governing documents that were unilaterally passed by Defendants Simonson, Greene, The Bella Collina Club and DCS Real Estate Investments, LLC, and wrote off significant amounts of assessments and other debt owed to the Bella Collina POA, which actions are in agreement with and in furtherance of the common and overall objective: "DCS wants Lots." (*Exhibit 13*)

250.    Plaintiffs were damaged in the approximate amount of $357,149.00; similarly situated individuals are estimated to have a damage range of approximately $300,000.00 to over $1,000,000.00.

251.    By reason of its injury, Plaintiffs and putative class members are entitled to treble damages, costs and reasonably attorney's fees pursuant to 18 U.S.C. 1964(c), as well any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs request entry of an Order awarding $1,071,447.00, inclusive of treble damages, attorney's fees and costs, and other relief that this honorable Court deems proper.

## COUNT III
### Violation of 18 U.S.C. § 1512(b)(1)
**Plaintiffs v. Randall Greene, Dwight C. Schar, Paul E. Simonson, Richard Arrighi, Michael Ryan, James Ryan, Cullen D'Ambrosio, Rocking Red H, LLC, DCS I, DCS II, DCS III, DCS IV, DCS IV-A, DCS V, Rick Scharich, and Bella Collina Towers, LLC**

252.    Plaintiffs hereby incorporate by reference the following numbered paragraphs as though set forth at length: 171-190.

253.    On or about February 17, 2017, Defendant Greene acquired a confidential work product copy of Plaintiffs' Original Complaint.

254.    Following this acquisition, Defendant Greene corruptly and intentionally persuaded convicted felon Vincent Soulsby to provide false testimony as a means to enhance the forthcoming defense of the claims asserted in this action.

255.    On February 22, 2017, Soulsby did indeed provide false testimony at a unilateral deposition that was attended only by Soulsby, Greene and Attorney Michael Crosbie.

256.    Acting in concert with Defendant Greene, this transcript of this deposition has since been utilized by Defendants Schar, Simonson, Arrighi, Rocking Red H, LLC, Scharich, DCS I, DCS II, DCS III, DCS IV, DCS IV-A, and DCS V in aid of their defense of the claims set forth in this proceeding, including the claims of racketeering. (Doc. 128-2 & 145-5)

257.    The utilization of this false testimony was done so in furtherance of the conspiracy and in agreement with and in furtherance of the common and overall objective: "DCS wants Lots." (*Exhibit 13)*

258.    Witness tampering is a "racketeering activity" as defined in 18 U.S.C. 1961(1), which is expressly forbidden by 18 U.S.C. 1962(c) and (d).

259.    Plaintiffs were damaged in the approximate amount of $357,149.00; similarly situated individuals are estimated to have a damage range of approximately $300,000.00 to over $1,000,000.00.

260.    By reason of its injury, Plaintiffs are entitled to treble damages, costs and reasonably attorney's fees pursuant to 18 U.S.C. 1964(c), as well any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs request entry of an Order awarding $1,071,447.00, inclusive of treble damages, attorney's fees and costs, and other relief that this honorable Court deems proper.

**COUNT IV**
**Violation of 18 U.S.C. § 1692**
**Plaintiffs v. J. Ryan, M. Ryan, The Ryan Law Group, The Bella Collina Club, Aegis Community Management Solutions and Bella Collina Property Owner's Association, Inc.**

261.    Plaintiffs hereby incorporate by reference the following numbered paragraphs as though set forth at length: 135-149.

262.    Defendants, James Ryan, Michael Ryan, The Ryan Law Group, The Bella Collina Club, Aegis Community Management Solutions, and the Bella Collina POA (collectively "Debt Collection Defendants") acted as debt collectors as defined by 15 U.S. Code § 1692a(6).

263.    Plaintiffs and other similar situated individuals are considered "consumers" as defined by 15 U.S. Code § 1692a(3).

264.    The Debt Collection Defendants and each of them attempted to collect a debt from Plaintiffs and other similarly situated individuals and failed to satisfy requirements for collecting the debts as set forth in 15 U.S. Code § 1692.

265.    As a matter of routine and practice, the Debt Collector Defendants attempted to collect debts from Plaintiffs and similarly situated individuals without complying with 15 U.S. Code § 1692.

266.    M. Ryan, J. Ryan and the Ryan Law Group made demands upon Plaintiffs and similarly situated individuals, which demands:

a.    Failed to identify that M. Ryan, J. Ryan and the Ryan Law Group as debt collectors.

     b.   Failed to state that any information obtained would be used for this express

          purpose of debt collection.

     c.   Failed to advise the consumer of opportunities to dispute the debt.

     d.   Failed to confirm the validity of the debt prior to the filing of a lawsuit which

          attached billing statements containing false information.

267.    The Bella Collina Club demanded payment of debts based upon:

     a.   Illegal special assessments for country club dues.

     b.   Illegal 18% interest applied to the delinquency.

268.    Aegis, acting as an agent on behalf of the Bella Collina POA, is responsible for

sending out billing statements which contained false information in the form of:

     a.   Illegal assessments.

     b.   Illegal special assessments for country club dues.

     c.   Illegal "lotscape" fees.

     d.   Illegal technology fees.

     e.   Illegal fines.

     f.   Excessive interest of 18%.

269.    The Bella Collina Club is responsible for authorizing Aegis to collect the debts

more particularly described in the foregoing paragraph.

270.    The above described acts and omissions of the Debt Collector Defendants were

undertaken by them indiscriminately and persistently, as part of their regular and routine debt

collection efforts, and in complete disregard of the rights of Plaintiffs and similarly situated

individuals.

271.    Plaintiffs and similarly situated individuals are entitled to damages as set forth in

15 U.S. Code § 1692k et seq., as well as attorney's fees and the Debt Collector Defendnats are

civilly liable for the same.

272.    The Debt Collector Defendants' conduct continues as of the date of filing this

Amended Complaint.

**WHEREFORE**, Plaintiffs request entry of an Order awarding the maximum statutory

damage amount per offense, with the number of offenses to be determined at the time of trial,

attorney's fees and costs, as well as any further relief that this honorable Court deems proper.

**<u>COUNT IV</u>**
**Breach of Fiduciary Duty**
**Plaintiffs v. J. Ryan, M. Ryan, The Ryan Law Group, Aegis Community**
**Management Solutions, David Burman, Randall Greene, Keith Clarke, Paul**
**Lebreux and Bella Collina Property Owner's Association, Inc.**

273.    Plaintiffs hereby incorporate by reference the following numbered paragraphs as

though set forth at length: 48-52 and 66-204.

274.    Defendants J. Ryan, M. Ryan, The Ryan Law Group are ostensibly the

attorneys for the Bella Collina Property Owner's Association (despite no known fee agreement

between the parties.

275.    Defendants Burman and Aegis Community Management Solutions are the

community's licensed "community association manager" and Management Company,

respectively.

276.    Defendants Greene, Clarke, and Lebreux comprise the DCS-controlled board

of the Bella Collina Property Owner's Association.

277.    Each of the foregoing Defendants, at all relevant times, were acting as agents

of the POA within the scope of their agency.

278.     Board members of property owners associations, their lawyers, licensed
community association managers and community management companies have express
statutory fiduciary duties and are expected to review, know and abide by properly adopted
governing documents and the Florida Homeowners Association Act, as set forth in as set forth
in Florida Statute 720.303(1), the Non-Profit Corporations Act, the ethics and disciplinary
codes of the Florida Bar Association, and the rules and regulations of the Florida DBPR
governing community association managers.

279.     Such duties are inclusive of the obligation to act in the members' best interest, tell
members the truth about all material matters, disclose any pertinent material facts, and to obey
all lawful obligations.

280.     The POA and its officers, directors and lawyers breached the duties described
above by:

    a.  Not determining if amendments were properly adopted or valid according to the
        governing documents or law;

    b.  Attempting to collect illegal special assessments;

    c.  Failing to turn over the community to lot owners 90 days after August 29, 2005,
        the triggering date for turnover;

    d.  Failing to turn over the community lot owners when ordered to do so pursuant to
        the June 24, 2016 Order in Lake County Court;

    e.  Utilizing a non-profit fiduciary organization to sue lot owners for alleged special
        assessments owed to a private, for-profit country club;

    f.   Demanding that prospective lot owners pay for sports club initiation fees and

        dues;

    g.   Deterring resale of non-developer owned lots;

    h.   Restricting lot owner's choice of builder;

    i.   Improperly and unlawfully collecting fraudulent debts; and

    j.   Intentionally destroying the value of non-developer owned real property within

        the community in furtherance of the RICO conspiracy and scheme.

281.    The POA's breaches of duty caused the Plaintiffs to suffer significant economic

harm as detailed in the foregoing paragraph.

**WHEREFORE**, Plaintiffs request entry of an Order awarding compensatory damages

and punitive damages in an amount to be determined at the time of trial, attorney's fees and

costs, as well as any further relief that this honorable Court deems proper.

## <u>DEMAND FOR JURY TRIAL</u>

282.    Plaintiffs demand a jury trial of this action.


Dated: February 28, 2018               Respectfully submitted,

                                /s/ E. Timothy McCullough
                                E. TIMOTHY McCULLOUGH, Esq.
                                Trial Counsel for Plaintiffs
                                Florida Bar Number: 0033624
                                7463 Conroy Windermere Rd., Suite A
                                Orlando, FL 32835
                                Telephone: (407) 601-6941
                                Fax: (407) 601-5982
                                timlaw81@aol.com

## CERTIFICATE OF SERVICE

I certify that on February 28, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, of which will send a notice of electronic filing to all counsel of record.

*/s/ E. Timothy McCullough, Esq.*
**Attorney for Plaintiffs**

## VERIFICATION

**STATE OF FLORIDA
COUNTY OF ORANGE**

On the 28th day of February, 2018, I, James L. Shelton, Plaintiff in the above-captioned matter, have reviewed the foregoing and swear, under the penalty of perjury, that it is true and correct to the best of my knowledge.



James L. Shelton

On February 28, 2018, James L. Shelton, who is personally known to me, appeared before me and signed the above verification as is free and voluntary act and deed.

EARL TIMOTHY MCCULLOUGH
Notary Public - State of Florida
Commission # GG 017601
My Comm. Expires Aug 1, 2020
Bonded through National Notary Assn.

Notary Public

Stamp / Seal